1  JANET L. CHUBB, ESQ.
   Nevada State Bar No. 176
2  LOUIS M. BUBALA III, ESQ.
   Nevada State Bar No. 8974
3  JONES VARGAS
   100 W. Liberty St, 12th Floor
4  P.O. Box 281
   Reno, NV 89504-0281
   Telephone:  775-786-5000
5  Fax:  775-786-1177
   Email:  jlc@jonesvargas.com
6      and   tbw@jonesvargas.com
       and   lbubala@jonesvargas.com
7
   Attorneys for Certain Direct Lenders
8

WILLIAM A. BREWER III, ESQ.
Texas State Bar No. 02967035
*Pro Hac Vice to be filed*
MICHAEL J. COLLINS, ESQ.
Texas State Bar No. 00785495
*Pro Hac Vice to be filed*
KENNETH N. HICKOX, JR., ESQ.
Texas State Bar No. 24045194
*Pro Hac Vice to be filed*
ROBERT M. MILLIMET, ESQ.
Texas State Bar No. 24025538
*Pro Hac Vice to be filed*
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas  75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015
Email:  wab@bickelbrewer.com
        mjc@bickelbrewer.com
        kzh@bickelbrewer.com
        rrm@bickelbrewer.com

*Left margin vertical text:* JONES VARGAS · 100 West Liberty Street, Twelfth Floor · P.O. Box 281 · Reno, NV 89504-0281 · Tel: (775) 786-5000   Fax: (775) 786-1177

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re: | Chapter 11 |
|---|---|
| | (Jointly Administered under) |
| ASSET RESOLUTION LLC, | Case No. BK-S-09-32824-BAM |
| BUNDY 2.5 MILLION SPE, LLC, | BK-S-09-32831-BAM |
| BUNDY FIVE MILLION SPE, LLC | BK-S-09-32839-BAM |
| CFP ANCHOR B SPE, LLC | BK-S-09-32843-BAM |
| CFP CORNMAN TOLTEC SPE, LLC | BK-S-09-32844-BAM |
| CFP GESS SPE LLC | BK-S-09-32846-BAM |
| CFP GRAMERCY SPE, LLC | BK-S-09-32849-BAM |
| FIESTA STONERIDGE, LLC | BK-S-09-32851-BAM |
| FOX HILLS SPE, LLC | BK-S-09-32853-BAM |
| FHAH MONACO SPE, LLC | BK-S-09-32868-BAM |
| HUNTSVILLE SPE LLC | BK-S-09-32873-BAM |
| LAKE HELEN PARTNERS SPE LLC | BK-S-09-32875-BAM |
| OCEAN ATLANTIC SPE LLC | BK-S-09-32878-BAM |
| SHAMROCK SPE LLC | BK-S-09-32880-BAM |
| 10-90 SPE, LLC | BK-S-09-32882-BAM |
| Debtors. | |
| ■ Affects All Debtors<br>☐ Affects Only _____ | **MOTION FOR ORDER CONVERTING CASES TO CHAPTER 7, OR, ALTERNATIVELY, FOR THE APPOINTMENT OF A TRUSTEE**<br><br>Hearing Date:  OST Pending<br>Hearing Time:  OST Pending<br>Estimated Hearing Time:  ½ Hour |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

TABLE OF CONTENTS

Page(s)

I. Preliminary Statement ................................................................................................ 1

II. Background ................................................................................................................ 1

    A.    Debtors Commence These Chapter 11 Cases..................................... 1

    B.    The Direct Lenders Commence The 892 Case..................................... 3

    C.    The Court In The 892 Case Enters A Preliminary Injunction. ........................... 3

    D.    The Court In The 892 Case Resolves The Respective Parties' Entitlement To Disputed Waterfall Funds.................................................................................... 4

    E.    Termination Of Asset Resolution As Purported Loan Servicer Is Warranted. .... 6

        1.    Asset Resolution merely pursues its own pecuniary interests as loan servicer. ..................................................................................... 6

            a.  The Gess Property......………………………………............6

            b.  The Anchor B Property......…………………………….........8

            c.  The disputed waterfall funds being held in trust pursuant to the Preliminary Injunction……………………….9

            d.  Asset Resolution's bankruptcy schedules ..…………………11

            e.  Asset Resolution's debtor in possession financing motion……………….............................................12

            f.  Asset Resolution's inability to fund its operations.................12

            g.  Asset Resolution's liquidation, not servicing, intention……12

        2.    The direct lenders seek to reclaim control of the loan servicing rights under the LSAs to protect and preserve their remaining real property investments. ................................................................................ 15

    F.    Upon The Modification Of The Automatic Stay, The Court In The 892 Case Apparently Intends To Terminate Asset Resolution's Loan Servicing Rights Under The LSAs And To Disburse The Trust Funds........................................ 16

III  Argument and Authorities ......................................................................................... 17

    A.    Relevant Legal Standard.............................................................................. 17

        1.    Conversion of a Chapter 11 case to a Chapter 7 proceeding................. 17

1

## TABLE OF CONTENTS

Page(s)

2

         2.       Appointment of a Chapter 11 Trustee. ................................................... 19

3

    B.    Cause Exists For Conversion Of These Chapter 11 Cases Into
4           Chapter 7 Proceedings ........................................................................... 20

5

         1.       Debtors lack a reasonable likelihood of rehabilitation. .......................... 20

6

         2.       Debtors have failed to file their first requisite monthly operating report.21

7

         3.       Debtors are unable to be a fiduciary as debtors in possession................ 22

8

                a. Asset Resolution engages in recent loan
9                   servicing misconduct....................................................22

10

                b. Asset Resolution makes "fraudulent" bankruptcy
11                  claim for ownership of all the funds being held in
                  trust for the direct lenders…………………………………….23

12

                c. Asset Resolution misuses the trust funds for its
13                 own purposes…………………………………………….24

14                d. Asset Resolution pays and seeks to continue to pay
                 its admitted insider SOS millions of dollars in claimed
15                 servicing fees.........................................................25

16                e. Debtors' principal seeks to financially ruin some of
                 the direct lenders………………………………………….25

17

18    C.    In The Alternative, The Appointment Of A Chapter 11
        Trustee Is Warranted…........................................................................ 26

19

IV.  Request for Relief............................................................................................. 26

20

21

22

23

24

25

26

27

28

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*All Denominational New Church v. Pelofsky (In re All Denominational New Church)*,
   268 B.R. 536 (B.A.P. 8th Cir. 2001) ...................................................................... 20, 21, 23

*Commodity Futures Trading Comm'n v. Weintraub*,
   471 U.S. 343 (1985) ............................................................................................... 21, 27

*In re Fed. Roofing Co.*,
   205 B.R. 638 (Bankr. N.D. Ala. 1996) ............................................................ 20, 21, 23, 27

*In re Hampton Hotels Investors, L.P.*,
   270 B.R. 346 (Bankr. S.D.N.Y. 2001) ................................................................... 21, 27

*In re Humphreys Pest Control Franchises, Inc.*,
   40 B.R. 174 (Bankr. E.D. Pa. 1984) ....................................................................... 22, 28

*In re Intercat, Inc.*,
   247 B.R. 911 (Bankr. S.D. Ga. 2000) .................................................................... 22, 28

*In re Lyons Transp. Lines, Inc.*,
   123 B.R. 526 (Bankr. W.D. Pa. 1991) .................................................................... 21, 23

*In re Sharon Steel Corp.*,
   871 F.2d 1217 (3d Cir. 1989) ................................................................................ 22, 28

*In re V Cos.*,
   274 B.R. 721 (Bankr. N.D. Ohio 2002) ......................................................... 20, 21, 23, 27

*Loop Corp. v. United States Trustee*,
   379 F.3d 511 (8th Cir. 2004) .................................................................................. 20, 23

*Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*,
   838 F.2d 1133 (10th Cir. 1988) ............................................................................. 22, 28

*Pioneer Liquidating Corp. v. United States Trustee (In re Consol. Pioneer Mortgage
   Entities)*,
   248 B.R. 368 (B.A.P. 9th Cir. 2000) ............................................................................ 20

### STATUTES

11 U.S.C. § 547 ............................................................................................................... 27

11 U.S.C. § 1104(a) ................................................................................................... 21, 28

11 U.S.C. § 1112(b) ......................................................................................... 19, 20, 22, 23

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

Certain Direct Lenders ("Movants") hereby move to convert these jointly administered Chapter 11 cases into proceedings under Chapter 7 of the Bankruptcy Code or, alternatively, for the appointment of a Chapter 11 Trustee, as follows:

### I.

### **PRELIMINARY STATEMENT**

Debtor Asset Resolution LLC ("Asset Resolution") is merely a corporate shell that has no employees and exists only to hold servicing rights for certain loans as well as fractional beneficial interests in those loans, and the other 14 Debtors are merely special purpose entities ("SPEs") with no employees holding in trust for the "direct lenders" the title to certain real estate collateral or the proceeds from the sale of other such collateral. Thus, Debtors have <u>no</u> reasonable expectation of rehabilitation. Indeed, not only is their stated intention merely to liquidate the direct lenders' remaining real property collateral under the auspices of the Bankruptcy Code, but upon the modification of the automatic stay, Asset Resolution's loan servicing rights are anticipated to be terminated in the pending action styled *3685 San Fernando Lenders, LLC, et al. v. Compass USA SPE, LLC, et al.*, Case No. 2:07-cv-00892-RCJ-GWF ("892 Case"). Moreover, Asset Resolution is now a fiduciary of the direct lenders, but it has a documented history of self-dealing and taking other inappropriate actions that plainly demonstrate its inability to be a debtor in possession. Accordingly, Movants respectfully request that the Court promptly convert these Chapter 11 cases to Chapter 7 proceedings or, in the alternative, appoint a Chapter 11 Trustee to protect and preserve Debtors' estates from further diminution and loss.

### II.

### **BACKGROUND**

**A.    Debtors Commence These Chapter 11 Cases.**

On October 14, 2009, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.[1] As

---

[1] *See* Declaration of Rodger W. Stubbs in Support of Certain Direct Lenders' Motion for Order Converting Cases to Chapter 7 Proceedings or, Alternatively, for the Appointment of a Chapter 11 Trustee, and Motion for Order Shortening Time Regarding Same, dated December 9, 2009

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    a result, Debtors' first monthly operating report was required to be filed no later than November 20,

2    2009.[2]  Debtors are accruing quarterly fees pursuant to 28 U.S.C. § 1930, the first payment for which

3    is due on January 10, 2010.[3]  On November 24, 2009, venue of Debtors' Chapter 11 cases was

4    ordered to be transferred to this Court.[4]

5         No ruling has yet been made on:  (i) Debtors' applications to retain and employ general

6    bankruptcy counsel, special corporate, real estate, and litigation counsel, special litigation counsel,

7    accountants, and a real estate broker; or (ii) Debtors' motion for authorization to obtain debtor in

8    possession financing.[5]  An official committee of unsecured creditors was appointed by the United

9    States Trustee for Region 2, but no ruling has yet been made on its application to retain and employ

10   counsel or financial advisors.[6]

11        As further discussed herein, Debtors' Chapter 11 cases automatically stayed the litigation of

12   certain direct lenders' claims against Asset Resolution in the 892 Case, but did not stay those direct

13   lenders' claims against six non-debtors, including Compass Partners LLC and Compass USA SPE

14   LLC (together, "Compass") and Silar Advisors, LP and Silar Special Opportunities Fund, LP

15   (jointly, "Silar").[7]  Among other claims in the 892 Case, the direct lenders assert their right to

16   terminate their loan servicer under certain Loan Servicing Agreements ("LSAs") and Nevada law.[8]

17   Compass purchased those loan servicing rights in the Chapter 11 case of USA Commercial

18   Mortgage Company ("USACM").[9]  Silar financed that purchase and subsequently formed Asset

19   Resolution to foreclose on Compass's assets, including the loan servicing rights under the LSAs.[10]

20   As a result, Asset Resolution has been purporting to act as the loan servicer under the LSAs.[11]  In

21

22

_____

23   ("Stubbs Decl."), ¶ 3, which is contemporaneously filed herewith.
     [2] *See id.*, ¶ 4 & Ex. 1, ¶ 6.
     [3] *See id.*

24   [4] *See id.*, ¶ 3.
     [5] *See id.*, ¶ 5.

25   [6] *See id.*, ¶ 7.
     [7] *See id.*, ¶¶ 2, 60-66 & Exs. 12, 33-34 thereto.  The other two defendants are the former principals

26   of Compass.  *See id.*, ¶ 2.
     [8] *See id.*, ¶¶ 10, 66 & Ex. 3 thereto.

27   [9] *See id.*, ¶ 9.
     [10] *See id.*, ¶¶ 9, 14 & Ex. 7 thereto.

28   [11] *See id.*, ¶¶ 15, 48, 60 & Exs. 8, 12, 28 thereto.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1   addition, the direct lenders claim that they are entitled to most of the more than $10 million in

2   disputed "waterfall" funds being held in trust by Asset Resolution for their benefit as a result of a

3   written summary judgment order issued in the 892 Case in September 2009.[12]

4   **B.    The Direct Lenders Commence The 892 Case.**

5        The direct lenders are fractional beneficial interest holders in various real properties as a

6   result of commercial loans originated and originally serviced by USACM.[13]   In April 2006, USACM

7   filed for Chapter 11 relief under the Bankruptcy Code in this Court, and in February 2007, sold its

8   loan servicing rights under the LSAs and its fractional beneficial interests in those loans to

9   Compass.[14]

10       In May 2007, several direct lenders sued Compass and Silar in the 892 Case, claiming that

11  they were liable for breach of contract and in tort as a result of Compass's loan servicing misconduct

12  pursuant to the LSAs, and seeking declaratory relief in connection with the loan servicing rights

13  under the LSAs.[15]   Compass engaged in significant loan servicing misconduct.[16]

14  **C.    The Court In The 892 Case Enters A Preliminary Injunction.**

15       On November 6, 2007, the Court in the 892 Case entered a Preliminary Injunction pursuant

16  to Compass's motion that severely limited the rights of the direct lenders to control their real

17  property investments in favor of Compass as their loan servicer.[17]   Specifically, the Preliminary

18  Injunction protected Compass from being terminated as the direct lenders' loan servicer, and

19  prevented the direct lenders from taking any actions in connection with:  (i) the servicing of their

20  loans; (ii) the collection of any payments due and owing from the borrowers on those loans; and (iii)

21  any foreclosure proceedings in connection with those loans.[18]   The Preliminary Injunction also

22  required Compass to hold in trust disputed waterfall funds that it obtained on outstanding USACM

23

24

---

25  [12] *See id.*, ¶¶ 20-21, 66 & Ex. 11-12 thereto.
    [13] *See id.*, ¶ 8.
26  [14] *See id.*, ¶ 9.
    [15] *See id.*, ¶ 10 & Ex. 3 thereto.
27  [16] *See id.*, ¶ 11 & Ex. 4 thereto.
    [17] *See id.*, ¶ 12 & Ex. 5 thereto.
28  [18] *See id.*

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

loans pending the resolution of to whom such funds were to be paid.[19]  Those funds could not be disbursed without "further order of this Court obtained upon a motion brought by a party in interest after appropriate notice."[20]

In October 2008, Silar informed the Court in the 892 Case that, through Asset Resolution, it was foreclosing on Compass's assets, including the loan servicing rights and fractional beneficial loan interests that Compass acquired from USACM.[21]  Silar subsequently moved on behalf of Asset Resolution in the 892 Case to substitute Asset Resolution for Compass as to the LSAs and under the Preliminary Injunction.[22]  In April 2009, the Court in the 892 Case acknowledged, but did not approve, the substitution of Asset Resolution for Compass.[23]

## D.    The Court In The 892 Case Resolves The Respective Parties' Entitlement To Disputed Waterfall Funds.

On July 6, 2009, the Court in the 892 Case made oral partial summary judgment rulings that limited the compensation to which the loan servicer is entitled under the LSAs.[24]  Those rulings were included in a written order issued on September 18, 2009.[25]  Specifically, the Court in the 892 Case ruled that:

> Section 5 of the LSAs provides for an authorization of a method of compensation for the loan servicer.  Defendants do not collect default interest or late charges from the borrower in the event that the amount ultimately collected is less than the principal amount of the loan under "b" and "c" of [section 5 of the LSAs'] language.  Defendants do have a right to retain the annual servicing fee under the "a" portion of [section 5 of the LSAs'] language.  A loan servicer is not entitled to recover default interest and late fees directly from the direct lender.[26]

---

[19] *See id.*

[20] *See id.*, ¶ 12 & Ex. 5 thereto, ¶ 6.  In February 2009, Silar and Asset Resolution sought the approval of the Court in the 892 Case to disburse the trust funds, which were then being held in one account, into loan specific accounts for greater transparency to the direct lenders.  In doing so, they represented that they "understand and acknowledge that funds will not be distributed from these accounts without further order of the Court."  *See id.*, ¶ 13 & Ex. 6 thereto at 5.

[21] *See id.*, ¶ 14.

[22] *See id.*, ¶ 14 & Ex. 7 thereto.

[23] *See id.*, ¶ 15 & Ex. 8 thereto.

[24] *See id.*, ¶ 16 & Ex. 9 thereto.

[25] *See id.*, ¶ 17 & Ex. 10 thereto.

[26] *See id.*, ¶ 17 & Ex. 10 thereto at 12.

4

1  The Court in the 892 Case also concluded that the loan servicer under the LSAs is a fiduciary of the

2  direct lenders in connection with the handling of funds collected by it on behalf of the direct

3  lenders.[27]

4         The Court's oral rulings at the summary judgment hearing held on July 6, 2009, clarify the

5  servicing fees to which the loan servicer is entitled under the LSAs.  Specifically, the Court in the

6  892 Case stated:

> THE COURT:  So I think I'm ready to find and I will so find that the meaning of this is that with respect to the example I have used and with respect to this particular LSA . . . [y]ou collected $1,000,000 without designation.  You did collect $1,000,000, and I think under A you have a right to keep the one percent of the maximum principal amount of the loan. . . . I think you have the right to do that.  I think under A it just simply says retain, and you got $1,000,000, and you have the right to retain out of it.  And we don't care whether its designated interest or default interest or principal or anything else.  You've got the right to twelve-twelves [sic] of your annual servicing fee. . . .
>
> MR. COLLINS:  . . . Is the Court saying that they get one . . . percent of the twenty-six-five or one percent of eight and a half?
>
> THE COURT:  Of the actual collection.  I had another step in that finding, and that is that the property was part of the collection.  The value I placed on it was not the value at the time of the foreclosure sale of a maximum possible (indiscernible).  The value was the eight-and-a-half million dollars.  Since the whole transaction now is collapsible, the whole thing has been completed, including the sale of the property or at least a proposed sale, that the one percent is of the eight-and-a-half million dollars.  That was my ruling (indiscernible).
>
> MR. COLLINS:  Right.  And is that your ruling today, too, your Honor, just as far as the servicing fees?
>
> THE COURT:  If we have a total, complete sale, and eight-and-a-half million dollars was realized off the REO, yeah. . . . That's the ruling . . . .[28]

---

[27] *See id.*, ¶ 18 & Ex. 10 thereto at 6 ("The Motion is GRANTED in part to the extent that Asset Resolution is a fiduciary to the extent of its handling of funds received on account of loans from borrowers."); *see also id.*, ¶ 18 & Ex. 9 thereto at 38:2-12 ("THE COURT:  When they actually collect a dollar . . . they are a fiduciary of that dollar. . . . It's in an escrow.  They must segregate it.  They can't put it in their general fund. . . . They must account for it.  If they're going to withhold from it their servicing fee, they must disclose and account.").

[28] *See id.*, ¶ 19 & Ex. 9 thereto at 58:13-59:15, 105:2-106:18.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

In other words, the loan servicer under the LSAs is to receive one accrued annual servicing fee, which is to be calculated based on the application of the annual servicing fee percentage specified in the LSAs to the total amount ultimately collected for each loan.[29]

As a result of the summary judgment rulings in the 892 Case, on September 28, 2009, the direct lenders in the 892 Case moved for the transfer and disbursement of the funds being held in trust for the direct lenders by Asset Resolution.[30]  At the hearing on that motion, the Court in the 892 Case indicated that it could not resolve that motion in light of the automatic stay.[31]  Moreover, on October 7, 2009, Silar and Asset Resolution filed a breach of contract and unjust enrichment adversary proceeding in the still pending USACM bankruptcy case.[32]  That adversary proceeding seeks reimbursement of amounts that were purportedly collectible by the loan servicer under the LSAs that the summary judgment order entered by the Court in the 892 Case has now concluded were not, in fact, recoverable by the loan servicer under the LSAs.[33]

**E.**    **Termination Of Asset Resolution As Purported Loan Servicer Is Warranted.**

       **1.**    **Asset Resolution merely pursues its own pecuniary interests as loan servicer.**

              **a.**    **The Gess Property.**

On July 9, 2009, the Court in the 892 Case made rulings in connection with the disposition of the "Gess Property" that were consistent with its oral partial summary judgment rulings.[34]  Specifically, pursuant to the Preliminary Injunction, Silar and Asset Resolution sought approval from that Court to sell the Gess Property for $8.5 million and to retain all proceeds from that sale (after paying off a tax lien in the amount of approximately $2 million) as compensation for servicing fees purportedly due under the LSAs.[35]  Because the direct lenders would have received no return on their investment under Silar and Asset Resolution's sale proposal, the direct lenders alternatively sought and obtained that Court's approval to form a joint venture with another investor to retain the

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

---

[29] *See id.*
[30] *See id.*, ¶ 20 & Ex. 11 thereto.
[31] *See id.*, ¶ 21 & Ex. 12 thereto at 33:5-38:22.
[32] *See id.*, ¶ 22 & Ex. 13 thereto.
[33] *See id.*
[34] *See id.*, ¶ 23.
[35] *See id.*

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

Gess Property, with those direct lenders, including Asset Resolution, that were not interested in participating in the joint venture receiving a pro rata distribution of their beneficial interest in the Gess Property based on a sale price of $8.5 million.[36]  On August 28, 2009, the Court in the 892 Case entered its order determining that Silar and Asset Resolution were entitled to recover only approximately $1.5 million in servicing fees and advances from the sale of the Gess Property to that joint venture.[37]

As a result, Silar and Asset Resolution diligently sought to stop the sale of the Gess Property to the joint venture, filing a notice of lis pendens as well as a notice of appeal to, and an emergency motion to stay the sale of the Gess Property to the joint venture with, the Ninth Circuit Court of Appeals.[38]  In fact, all the efforts taken by Silar and Asset Resolution to stop the sale of the Gess Property to the joint venture necessitated another order of the Court in the 892 Case to preclude further interference by them with the sale.[39]  Those actions were plainly contrary to the decision of the majority of the direct lenders in the Gess Property – from whom the loan servicer supposedly is to take direction – to approve the joint venture, even though Asset Resolution had previously represented to the Court in the 892 Case that it would support that decision.[40]

Further, during the consideration of the joint venture for the Gess Property, Robert Leeds ("Leeds"), President and CEO of Silar and Asset Resolution, specifically told Terry Helms ("Helms"), who is the largest individual direct lender investor in the USACM loan portfolio (and is not represented by the undersigned counsel), that "he [Leeds] would use any means possible to ruin Donna Cangelosi and the other 'loan captains' for the direct lenders even though these are the same people that he purports to represent as their loan servicer," and that "it is his [Leeds'] goal to personally damage Donna Cangelosi and her family and as many loan captains as possible that

---

[36] *See id.*

[37] *See id.*, ¶ 23 & Ex. 14 thereto.

[38] *See id.*, ¶ 24 & Exs. 15-17 thereto.

[39] *See id.*, ¶ 25 & Ex. 18 thereto.

[40] *See id.*, ¶ 26 & Ex. 19 thereto at 34:7-14 (Katherine Windler:  "What I'm trying to get at is if the Quinlan sale happens -- and we support it.  ARC does not intend to stand in the way of the direct lenders if they want this deal.  As you heard from me last time, we would have supported the Granite deal, we would have supported an equity contribution, we would have done what it took to get them what they wanted.  And we're not planning to stand in the way of this.").

oppose Silar and that he had set aside a large sum of money to do just that."[41]  Thus, based on his "numerous telephone conversations and face-to-face meetings" with Leeds as well as Leeds' offer to pay a premium for Helms' substantial beneficial interest in the Gess Property, Helms opines that:  (i) Leeds sought to stop the sale of the Gess Property to the joint venture; (ii) Leeds "has no concern for the well-being of the direct lenders or the loans in which the direct lenders have invested their money" but, instead, "is solely looking out for Silar's interests in the USACM loan portfolio, including the fees he believes Silar is owed under the loan servicing agreements, to the detriment of the direct lenders;" and (iii) Leeds' "vengeance against a few is costing all direct lenders their right for a servicer to act as our fiduciary in all our best interest. . . . [I]f Compass and Silar were working in our best interest and not theirs, most if not all of these loans would have been worked out or resolved at a higher value for all to share."[42]

### b.    The Anchor B Property.

On September 30, 2009, in light of its experience with the Gess Property, Asset Resolution disposed of the "Anchor B Property" without seeking the prior approval of the Court in the 892 Case pursuant to the requirements of the Preliminary Injunction.[43]  Asset Resolution also wrongly purported to obtain the requisite approval of 51% of the direct lenders to sell the Anchor B Property.[44]  In fact, four of the direct lenders that purportedly approved the sale of the Anchor B Property – who comprise 8.311% of the 51% of direct lenders who allegedly approved the sale of the Anchor B Property – actually voted <u>against</u> that sale.[45]  Those direct lenders were also pressured into voting in favor of the sale, were lied to, and were not told how the proceeds from the sale would be disbursed.[46]  Asset Resolution was able to retain control of and sell the Anchor B Property because it continues to be the purported loan servicer under the LSAs.[47]

---

[41] *See* Declaration of Terry Helms ("Helms Decl."), dated September 9, 2009, ¶¶ 3, 5, which is contemporaneously filed herewith.
[42] *See id.*, ¶¶ 5, 7-10.
[43] *See* Stubbs Decl., ¶ 27.
[44] *See* id.; Declaration of ___.
[45] ANCHOR B DECLARATIONS
[46] ANCHOR B DECLARTNS
[47] *See* Stubbs Decl., ¶ 27.

Jones Vargas
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    Pursuant to the direct lenders' motion, the Court in the 892 Case issued a temporary

2    restraining order ("TRO") on October 1, 2009, and a preliminary injunction on October 16, 2009,

3    enjoining Asset Resolution and the Anchor B Property Debtor from disbursing the proceeds from

4    that sale.[48]   The Court in the 892 Case did not enjoin the sale of the Anchor B Property because

5    counsel for Asset Resolution represented at the TRO hearing that the sale had already been

6    completed.[49]  In fact, however, the deed of sale was not recorded until the day <u>after</u> that hearing.[50]

7    Moreover, even though Asset Resolution represented at the TRO hearing that it was in

8    possession of approximately $460,000 in net proceeds from the sale of the Anchor B Property and

9    that it would not disburse those proceeds,[51] and even though it represented at the preliminary

10   injunction hearing that it was in compliance with the TRO,[52] those representations were false.  In

11   actuality, on October 1, 2009 (the date of the TRO hearing), Asset Resolution paid $374,102.43 of

12   those net sale proceeds to its counsel, Greenberg Traurig, LLP; and as of October 14, 2009 (the

13   petition date and two days prior to the preliminary injunction hearing), only $10,247.74 of those

14   funds remained in the possession of the Anchor B Property Debtor.[53]  Even assuming *arguendo* that

15   Asset Resolution was allowed to disburse any of those net sale proceeds – which was not permitted

16   without further order of the Court in the 892 Case pursuant to the Preliminary Injunction,[54] not to

17   mention that Court's TRO and preliminary injunction concerning the Anchor B Property[55] – Asset

18   Resolution was entitled to disburse only approximately $9,194, not $374,102.43, of those net sale

19   proceeds as compensation for its servicing fee in connection with the Anchor B Property pursuant to

20   the summary judgment order issued by the Court in the 892 Case.[56]

21        c.    <u>The disputed waterfall funds being held in trust pursuant to the</u>
              <u>Preliminary Injunction.</u>

22

23

24   [48] *See id.*, ¶ 28 & Exs. 20-21 thereto.
     [49] *See id.*, ¶ 29 & Ex. 20 thereto at 11:9-12:1, 15:2-4, 17:23-25.
25   [50] *See id.*, ¶ 29 & Ex. 22 thereto.
     [51] *See id.*, ¶ 30 & Ex. 20 thereto at 16:55-16, 26:10-24.
26   [52] *See id.*, ¶ 31 & Ex. 21 thereto at 6:19-7:17.
     [53] *See id.*, ¶ 32 & Ex. 23 thereto at Schedules 3(B), 10.
27   [54] *See id.*, ¶ 12 & Ex. 5 thereto, ¶ 6; *see also id.*, ¶ 13 & Ex. 6 thereto at 5.
     [55] *See id.*, ¶ 28 & Exs. 20-21 thereto.
28   [56] *See id.*, ¶ 33 & Ex. 24 thereto.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    Debtors' Rule 1007 Affidavit avers that none of the direct lenders are among Asset

2    Resolution's top 20 (or even top 50) unsecured creditors because "ARC, as successor-in-interest to

3    Compass' rights in this account [holding in excess of $10 million in trust for the direct lenders],

4    claims that it is entitled to <u>all</u> such funds in respect of servicing fees and the right to collect servicing

5    fees acquired from the USACM bankruptcy."[57]    However, Asset Resolution's claim is directly

6    contrary to its prior representations in the 892 Case:

> MS. WINDLER: Your Honor, this is Katherine Windler. I understand
> the Court's ruling. I'd simply like to again point out that there is a
> dispute as to who is entitled to those funds. And it seems to me that this
> Court cannot make such an allocation at this time, because if it is
> determined that those funds are solely and exclusively the property of
> Asset Resolution, as a debtor in possession, and that the direct lender's
> claims to those funds are not appropriately asserted –
>
> THE COURT: You could only make that claim, Ms. Windler, if you
> allege -- if you are making an allegation of fraud on your own behalf. In
> other words, you could – you have already stood in this court, and many
> times, and the other parties have, too, and you have acknowledged that
> you're holding the bulk of those funds in trust. So, if you attempt to
> allege now, contrary to your representations to this Court, that they're
> not held in trust, they're owned wholly by Asset Resolution, you would
> be committing fraud, ma'am.[58]

15    Moreover, Asset Resolution has misused the trust funds for its own purposes.  Although

16    Debtors' Rule 1007 Affidavit reflects that the amount of those funds exceeds $10 million, those

17    funds in actuality should amount to more than $12 million, demonstrating that Debtors have misused

18    those funds.  Specifically, the total balance of those trust funds was approximately $12,032,133 as of

19    April 1, 2009, and approximately $12,158,101 as of June 30, 2009, but was only approximately

20    $10,759,861 as of October 14, 2009 (the petition date).[59]  Indeed, Asset Resolution's Statement of

21    Financial Affairs, dated October 14, 2009, reflects that a total of approximately $950,460 in trust

22    funds was disbursed on September 3, 2009, including approximately $325,000 as purported

23    servicing fees pursuant to the Preliminary Injunction.[60]  Those disbursements on September 3 were

24    made less than one week after:  (i) the Court in the 892 Case had entered its order, on August 28,

---

[57] *See id.*, ¶ 34 & Ex. 25 thereto, ¶ 54 (emphasis added).
[58] *See id.*, ¶ 35 & Ex. 12 thereto at 26:11-27:3.
[59] *See id.*, ¶ 36, Ex. 26 thereto at Ex. 7 thereto, & Ex. 27 thereto at Schedule B-2.
[60] *See id.*, ¶ 37 & Ex. 23 thereto at Schedule 3(B).

10

2009, approving the sale of the Gess Property to the direct lenders' joint venture and affording Asset Resolution servicing compensation in the total amount of only approximately $1.5 million; and (ii) Jay Gracin ("Gracin"), an officer of Asset Resolution, stated under penalty of perjury in connection with Silar's and Asset Resolution's appeal of that order that Asset Resolution would be insolvent within 30 days if the Ninth Circuit Court of Appeals did not immediately stay that order.[61]

### d.    Asset Resolution's bankruptcy schedules.

Asset Resolution's bankruptcy schedules reflect that it has no revenue generating assets other than the compensation to which it claims it is entitled under the LSAs, which has been litigated in the 892 Case since May 2007.[62]  It also appears that those assets are overstated in light of the Court's partial summary judgment rulings.[63]  Those schedules further reflect that Asset Resolution paid approximately $4.132 million in alleged servicing fees to admitted insider Servicing Oversight Solutions, LLC ("SOS"), between July 24, 2009, and October 14, 2009 (the petition date), but that between January and May 2009, Asset Resolution made monthly purported servicing payments to SOS in amounts ranging from only $75,000 to $86,000, which totaled approximately $406,906.[64]

In addition, Asset Resolution's dramatically different payment of servicing fees to SOS began on July 24, 2009, which was only a couple of weeks after the Court in the 892 Case made its oral summary judgment and Gess Property rulings on July 6 and July 9, 2009, respectively, that circumscribed the compensation to which the loan servicer under the LSAs was entitled.[65] Moreover, Asset Resolution made $2,049,208.41 of those dramatically different payments to SOS after Gracin stated under penalty of perjury that Asset Resolution would be insolvent within 30 days if the Ninth Circuit Court of Appeals did not immediately stay the order approving the sale of the Gess Property.[66]  Finally, of those dramatically different payments to SOS, $1,561,970.10 was paid to SOS as additional servicing fees for the months of February, March, and April 2009 – after SOS

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

---

[61] *See id.*, ¶¶ 23, 37 & Exs. 14, 28 thereto.
[62] *See id.*, ¶ 38.
[63] *See id.*
[64] *See id.*, ¶ 39 & Ex. 23 thereto at Schedule 3(C).
[65] *See id.*, ¶ 40; *see also id.*, ¶¶ 16, 23 & Ex. 9 thereto.
[66] *See id.*, ¶ 41 & Ex. 28 thereto.

1    had contemporaneously been paid only $75,000, 86,000, and $80,000, respectively, as its purported

2    servicing fee for those three months.[67]

3         e.     **Asset Resolution's debtor in possession financing motion.**

4        In its request for debtor in possession financing, Asset Resolution's assertion that such

5    financing is required to satisfy the costs of taxes, repairs, and maintenance in connection with certain

6    real estate collateral is belied by the budget submitted in connection with that motion for the

7    following 90 days (through the end of January 2010).[68]    That budget indicates that Asset Resolution

8    seeks financing for, among other things:

9    •    property insurance in the total amount of approximately
10       $101,000;

11   •    property taxes in the total amount of $0; and

12   •    property maintenance in the total amount of $3,000.[69]

13       In comparison, the budget indicates that Asset Resolution seeks financing until the end of

14   January 2010 for the following:

15   •    servicing fees in the total amount of approximately $1.5 million;

16   •    other operational expenditures, other than servicing fees and
     property insurance, taxes, and maintenance, in the total amount of

17       approximately $500,000; and

18   •    bankruptcy related items in the total amount of approximately $1.6
     million, including $135,000 to pay its chief restructuring officer,
     Sara Pfrommer.[70]

19

20   Notably, the budget reflects the payment of $1.5 million in servicing fees over the next 90 days not

     to Asset Resolution, but to admitted insider SOS, which is a wholly-owned subsidiary of Silar.[71]

21        f.     **Asset Resolution's inability to fund its operations.**

22       In connection with the appeal from the order approving the disposition of the Gess Property

23   to the direct lenders' joint venture, Gracin stated in his declaration dated August 28, 2009, that:  (i)

24

---

25   [67] *See id.*, ¶ 42 & Ex. 23 thereto at Schedule 3(C).
     [68] *See id.*, ¶ 43 & Ex. 29 thereto; *see also id.*, ¶ 44 & Ex. 29 thereto, ¶ 33 ("The Debtors believe that the

26       Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course
         in connection with the operation of their businesses for the period set forth in the Budget.").

27   [69] *See id.*, ¶ 45 & Ex. 29 thereto at Ex. B thereto.
     [70] *See id.*, ¶ 46 & Ex. 29 thereto at Ex. B thereto.

28   [71] *See id.*, ¶ 47; *see also id.*, Ex. 29 thereto at Ex. B thereto & Ex. 25, ¶ 47.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    its only business is servicing the loans originated by USACM; (ii) it operates based on credit

2    associated with its erroneous interpretation of the compensation purportedly owed to it by the direct

3    lenders pursuant to the LSAs; and (iii) "unless the Order [approving the transfer of title of the Gess

4    Property to the joint venture] is stayed, <u>Asset Resolution faces imminent shutdown, as its investors</u>

5    <u>will no [sic] finance its operations.</u>  Absent an additional influx of investor capital, <u>Asset Resolution</u>

6    <u>does not have funds sufficient to operate more than 30 day[s].</u>"[72]  That risk of insolvency was borne

7    out on October 14, 2009, when it commenced these Chapter 11 cases.[73]  Indeed, in their motion for

8    debtor in possession financing, Debtors recognized that such financing is necessary "to fund the

9    continued operation of the Debtors' business" and "to prevent a significant disruption to the

10   Debtors' estates."[74]  In that motion, which was filed on November 4, 2009, Debtors summarized

11   their need for interim financing to perpetuate their operations, as follows:

12           Pending the Final Hearing, the Debtors require immediate access to
             cash in order to satisfy the day-to-day financing needs of the Debtors'
13           business operations.  It is essential that the Debtors continue paying
             for ordinary, post-petition operating expenses, as well as certain pre-
14           petition expenses approved by this Court on the Petition Date.

15           Absent immediate access to the DIP Financing for their continuing
             business operations, the Debtors will be unable to pay operating
16           expenses and, therefore, be unable to continue to conduct their
             business operations pending the Final Hearing.  Consequently, if
17           interim relief is not granted, the Debtors' attempt to maintain value as
             a going concern will be immediately and irreparably jeopardized to
18           the detriment of their estates, their creditors and other parties in
             interest.[75]
19
20   Debtors also asserted in their debtor in possession financing motion that they cannot obtain

21   unsecured financing, and could only obtain secured financing from an admitted insider and then only

22   under section 364 of the Bankruptcy Code.[76]

23

24

25   ───────────────
     [72] *See id.*, ¶ 48 & Ex. 28 thereto, ¶¶ 1-3, 7-8, 12 (emphasis added).
     [73] *See id.*, ¶ 48.
26   [74] *See id.*, ¶ 49 & Ex. 29 thereto, ¶¶ 37, 45.  The motion also asserts that such financing will provide
         Debtors with "adequate liquidity" to pay its administrative expenses through the end of January
27       2010.  *See id.*, Ex. 29 thereto, ¶ 33.
     [75] *See id.*, ¶ 50 & Ex. 29 thereto, ¶¶ 53-54.
28   [76] *See id.*, ¶ 51 & Ex. 29 thereto, ¶¶ 24, 41-43, 45.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1   Moreover, because the Court in the 892 Case has determined that Asset Resolution is entitled

2   to recover only <u>one</u> accrued servicing fee based on the total amount ultimately collected for each

3   loan, Debtors will only incur more losses and have negative cash flow based on their administrative

4   expenses.[77]  Specifically, of the 33 outstanding USACM loans, Asset Resolution has estimated the

5   value of the real estate collateral for 26 of those loans in connection with the commencement of

6   these Chapter 11 cases.[78]  Based on those estimated values, as well as the weighted average of the

7   serving fee percentage contained in the LSAs for the direct lenders in each of those loans (an

8   exercise that was performed by Compass pursuant to the Preliminary Injunction), Asset Resolution's

9   estimated total future servicing fee income resulting from its servicing of those 26 outstanding loans

10  is only approximately $1,180,377.[79]  That sum is well below the approximately $3.6 million in

11  expenditures that Debtors have included in the budget submitted with their debtor in possession

12  financing motion – including $1.5 million for payment of additional servicing fees to SOS – for just

13  the period ending January 2010![80]  Asset Resolution has <u>no</u> other source of loan servicing income

14  other than its one accrued annual servicing fee for each of the outstanding 33 loans, and the other

15  Debtors are merely SPEs holding real estate collateral or sales proceeds in trust for the direct lenders

16  with <u>no</u> prospect of any future income.[81]

17            **g.    Asset Resolution's liquidation, not servicing, intention.**

18            In its debtor in possession financing motion, Asset Resolution asserted that "Debtors intend

19  to operate their businesses and manage their properties as debtors in possession pursuant to sections

20  1107(a) and 1108 of the Bankruptcy Code."[82]  However, Asset Resolution plainly represented at the

21  transfer of venue motion hearing held on November 12, 2009, that it merely intends to liquidate the

22  remaining USACM loan portfolio and real estate collateral:

23            THE COURT:  But no, come back to the ordinary course, the ordinary
              servicing.  I mean, there is a basic challenge here to just the servicing.

24

25  _____

26  [77] *See id.*, ¶ 52.
    [78] *See id.*, ¶ 53 & Ex. 30 thereto.
    [79] *See id.*, ¶ 54 & Exs. 24, 30 thereto.
27  [80] *See id.*, ¶ 54 & Ex. 29 thereto at Ex. B thereto.
    [81] *See id.*, ¶ 55 & Ex. 25 thereto, ¶ 8.
28  [82] *See id.*, ¶ 57 & Ex. 29 thereto, ¶ 3.

14

MR. KLESTADT:  And I think, Your Honor, the answer to that is there is no ordinary servicing here any more because of the fact that all of these loans are in default.  So if we were to attempt to settle any of the loans or to sell any of the properties, we would have to do so pursuant to motion to Your Honor on notice, Your Honor, to all parties, all 2,500 direct lenders and all creditors of Asset Resolution and the specific SPEs.  So that way, Your Honor, any proposed transaction would be subject to notice in hearing and approval by Your Honor.  But I would submit to Your Honor that we can't do anything in the quote, unquote, "normal course of business" because of the nature of this portfolio and what's transpired to date.

THE COURT:  So then what would your long term plan be then here –

MR. KLESTADT:  The long –

THE COURT:  -- to liquidate all of these assets – or liquidate may be the wrong word but –

MR. KLESTADT:  I think liquidate is the correct word, Your Honor. . . .[83]

**2.**   **The direct lenders seek to reclaim control of the loan servicing rights under the LSAs to protect and preserve their remaining real property investments.**

The termination of Asset Resolution as their purported loan servicer under the LSAs is of critical importance to the direct lenders.[84]   Since May 2007, they have litigated the 892 Case to reclaim control of what remains of their real property investments, whereas Silar and Asset Resolution have continuously sought to impede those litigation efforts for their own pecuniary gain.[85]   Debtors' bankruptcy filings are yet another attempt by Silar and Asset Resolution to delay those direct lenders' efforts to recoup what remains of their investments.[86]   The direct lenders will suffer prejudice and potentially have no recourse if they cannot service their remaining real property investment loans and the collateral for those loans is lost to tax foreclosure sales as a result of the neglect, misconduct, or inability of Asset Resolution.[87]

---

[83] *See id.*, ¶ 58 & Ex. 32 thereto at 50:1-22.
[84] *See id.*, ¶ 59.
[85] *See id.*
[86] *See id.*
[87] *See id.*

15

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

F.    **Upon The Modification Of The Automatic Stay, The Court In The 892 Case Apparently Intends To Terminate Asset Resolution's Loan Servicing Rights Under The LSAs And To Disburse The Trust Funds.**

The Court in the 892 Case has indicated that it intends to enter an order enabling the direct lenders to reclaim the servicing rights to their outstanding real estate investment loans upon the modification of the automatic stay:

> THE COURT: . . . I am also willing, on the merits, to rule at this point in time that, based upon the failure of Asset Resolution to get approval from this Court of transfer of the servicing rights to Asset Resolution - - which I never did; I simply acknowledged that Silar had attempted to do that -- and, number two, based upon Asset Resolution's Chapter 11 bankruptcy, that, therefore, they are an inappropriate servicer and there is a right to terminate them. And, so, I am willing to enter an order, and you do not need to try this issue at the trial, but I think I am ready to enter an order, finally, final judgment, saying that the direct lenders do have the right to take back the servicing right. . . .

> THE COURT:   . . . [D]irect lenders have presented an issue of termination of the servicing rights of Silar and of Compass. To the extent they want to terminate servicing rights of Asset Resolution, there is probably a stay in place. But they can proceed against the servicing rights against Compass, which has already been defaulted, and Silar. And damages asserted by the direct lenders; I believe they have damage claims, too. So, those are the issues that remain for trial, and I believe all of it is bench trial . . . .

> THE COURT:   What I said was, based upon their current filing, their inability to render service as a servicer, and based upon the Court's failure to ever approve the transfer of servicing rights to Asset Resolution, I am ready to terminate their servicing rights as of now. . .

> MR. MILLIMET:   . . . [A]s to the Court's inclination to terminate Asset Resolution on a going forward basis, is it the Court's position that that -- the entry of that actual order is stayed by the bankruptcy court filing?

> THE COURT:   Stayed by the bankruptcy court filing. I think it is stayed. Yeah.[88]

Thus, the Court has stated that Movants must seek modification of the automatic stay for the 892 Case to proceed against Asset Resolution on the termination issue (which they have done):

---

[88] *See id.*, ¶ 60 & Ex. 12 thereto at 38:23-39:9, 40:2-15, 44:11-45:1.

16

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1
2
3
4
5
6
7

> THE COURT:  Now, how does that affect our case?  Asset Resolution is not yet under a lift of stay, so that . . . any party can proceed against them.  You do need to -- that's why I'm bringing it to your attention.  You do need to move in our local bankruptcy court forthwith to make sure that that is accomplished . . . .  I also said in ruling – in granting default, vis-à-vis Compass, that that doesn't necessarily impact Silar's rights.  So, we either need judgment on summary judgment as a matter of law, or we need trial vis-à-vis Silar and, through Silar, Asset Resolution's rights, it seems to me. . . .  I'll ask you to proceed on any motions to lift stay vis-à-vis Asset Resolution so that we can get a complete resolution . . . .[89]

8
9
10
11
12

The termination issue has been fully briefed and argued and is ripe for adjudication upon the modification of the automatic stay.[90]  The Court has also stated its intention to hold the bench trial on the effective date of the termination of the loan servicing rights under the LSAs as to Compass and Silar no later than early 2010.[91]  Finally, the Court has indicated that the automatic stay precludes it from disbursing the funds held in trust by Asset Resolution.[92]

13
14
15

## III.

## ARGUMENT AND AUTHORITIES

16

**A.    Relevant Legal Standard**

17

**1.    Conversion of a Chapter 11 case to a Chapter 7 proceeding.**

18
19
20
21
22
23

Conversion of a Chapter 11 case into a Chapter 7 proceeding is <u>mandatory</u> upon a showing of "cause."[93]  Although not exhaustive, the Bankruptcy Code identifies various circumstances that constitute cause, including:  (i) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;" and (ii) "unexcused failure to satisfy timely any

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

24
25
26
27
28

---

[89] *See id.*, ¶ 61 & Ex. 33 thereto at 7:2-9, 8:16-21, 9:20-22.
[90] *See id.*, ¶ 62 & Ex. 34 thereto.
[91] *See id.*, ¶¶ 63-64 & Ex. 33 thereto at 4:2-6, 14:5-13.
[92] *See id.*, ¶ 65 & Ex. 12 thereto at 33:5-38:22.
[93] *See* 11 U.S.C. § 1112(b)(1) ("[O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.").

17

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1  filing or reporting requirement established by this title or by any rule applicable to a case under this

2  chapter."[94]  "[T]he satisfaction of one subsection of § 1112(b) is sufficient to show cause."[95]

3  A "substantial or continuing loss to or diminution of the estate" is shown by establishing that the

4  debtor has incurred losses or maintained a negative cash flow.[96]  Rehabilitation of a debtor "means

5  to put back in good condition; re-establish on a firm, sound basis."[97]  "The purpose of § 1112(b)(1)

6  is to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at

7  the creditors' expense when there is no hope of rehabilitation."[98]  It is, therefore, axiomatic that a

8  debtor that only intends to liquidate its estate has no reasonable likelihood of rehabilitation and that

9  conversion of a Chapter 11 case into a Chapter 7 proceeding is proper.[99]

10

11  [94] *See id.* §§ 1112(b)(4)(A),(F); *Pioneer Liquidating Corp. v. United States Trustee (In re Consol. Pioneer Mortgage Entities)*, 248 B.R. 368, 375 (B.A.P. 9th Cir. 2000) ("The enumerated causes [in § 1112(b)(4)] are not exhaustive, and 'the court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.'") (quoting H.R. No. 95-595, 95th Cong., 1st Sess. 405-06 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6362); *All Denominational New Church v. Pelofsky (In re All Denominational New Church)*, 268 B.R. 536, 538 (B.A.P. 8th Cir. 2001) ("Subsection (b) of section 1112 enumerates ten examples of events or conduct that constitute cause.  However, this list is not exhaustive, and the court is free to consider other factors as they arise and to use its equitable powers to reach an appropriate result in individual cases.").

16  [95] *See Loop Corp. v. United States Trustee*, 379 F.3d 511, 515 n.2 (8th Cir. 2004); *see also In re Fed. Roofing Co.*, 205 B.R. 638, 641 (Bankr. N.D. Ala. 1996) (same).

17  [96] *See, e.g., Loop Corp.*, 379 F.3d at 515-16 ("In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow - including that resulting only from administrative expenses - effectively comes straight from the pockets of the creditors.       This       is       enough       to       satisfy       the       first       element       of § 1112(b)(1)http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=1000546&DocName=11USCAS1112&FindType=L.  Thus, the bankruptcy court did not err in finding continuing loss to or diminution of the estate.") (internal citation omitted); *In re V Cos.*, 274 B.R. 721, 725 (Bankr. N.D. Ohio 2002).

21  [97] *See In re V Cos.*, 274 B.R. at 725 (internal quotations and citation omitted).

22  [98] *See Loop Corp.*, 379 F.3d at 516 (internal quotations and citation omitted).

22  [99] *See id.* ("Likewise, the bankruptcy court did not err in concluding that a liquidating debtor who had no intention of restoring its business had no reasonable likelihood of rehabilitation.  Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business.  Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.") (internal citations omitted); *In re All Denominational New Church*, 268 B.R. at 538 ("The bankruptcy court did not err in dismissing Debtor's case based on its conclusion that Debtor had no ability to reorganize. . . . Debtor concedes that the sole purpose if its bankruptcy case was to stay Jackson County's tax sale of certain of its properties.  When the court lifted the stay and authorized Jackson County to proceed with its tax sale of these properties, it effectively foreclosed any feasible opportunity to reorganize. . . . Consequently, the appeal notwithstanding, the properties have been sold and are no longer assets available for a reorganization."); *In re Lyons Transp. Lines, Inc.*, 123 B.R. 526, 534-35 (Bankr. W.D. Pa. 1991) ("We conclude that there is no authority in the Bankruptcy Code

18

Monthly operating reports are a reporting requirement in a Chapter 11 case that, if unsatisfied, constitutes cause for conversion into a Chapter 7 proceeding.[100]  In addition, cause exists for the conversion of a Chapter 11 case into a Chapter 7 proceeding when a debtor has engaged in self-dealing or is otherwise unable to be a fiduciary as a debtor in possession.[101]  Indeed, a lack of confidence that the debtor in possession can serve as a fiduciary is sufficient to support cause for conversion of a Chapter 11 case into a Chapter 7 proceeding.[102]

### 2.    Appointment of a Chapter 11 Trustee.

Pursuant to 11 U.S.C. § 1104(a), the appointment of a Chapter 11 Trustee is mandatory if: (i) "cause" exists, "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause;" (ii) such appointment is "in the interests of creditors;" or (iii) grounds exist to convert or dismiss the case under section 1112 but the appointment of a trustee is, instead, "in the best interests of creditors and the estate."  It is well settled that "cause" exists for the appointment of

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

---

allowing a debtor to file a petition for relief under Chapter 11 for the purpose of self-liquidation.") (converting Chapter 11 cases to Chapter proceedings).

[100] *See In re All Denominational New Church*, 268 B.R. at 538 ("[T]he bankruptcy court acted appropriately in dismissing the case for failure to file monthly operating reports. A failure to file monthly operating reports, whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceeding."); *In re V Cos.*, 274 B.R. at 726, 739 ("Courts have looked beyond the § 1112(b) list to find cause to convert or dismiss based on . . . a debtor's failure to file required operating reports. . . . The duty to create and maintain records that accurately reflect a debtor's financial activities while under the protection of the Bankruptcy Court is one of a debtor's basic obligations.").

[101] *See, e.g., In re V Cos.*, 274 B.R. at 726 ("Courts have looked beyond the § 1112(b) list to find cause to convert or dismiss based on . . . a debtor-in-possession's dereliction of its fiduciary duty to creditors.  When a corporation files for protection under Chapter 11, the officers and managing employees have a fiduciary duty to creditors and shareholders.  This creates an 'obligation to treat all parties, not merely the shareholders, fairly.'"); *In re Fed. Roofing Co.*, 205 B.R. at 643 ("A Chapter 11 debtor as debtor in possession has certain fiduciary duties, a dereliction of which could subject the case to dismissal or conversion.").

[102] *See In re Hampton Hotels Investors, L.P.*, 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001) (citing self-dealing by the debtor's principal and the court's lack of confidence in the principal's ability and inclination to comply with the fiduciary duties of a debtor in possession as cause under section 1112(b)); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[I]f a debtor remains in possession - that is, if a trustee is not appointed - the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.  Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.") (internal quotations and citation omitted).

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    a trustee when management has engaged in malfeasance, including self-dealing, diversion of assets,

2    or dishonesty.[103]

3    **B.    Cause Exists For Conversion Of These Chapter 11 Cases Into Chapter 7 Proceedings.**

4    Three independent bases for cause exist for conversion of these Chapter 11 cases into

5    Chapter 7 proceedings: (i) the lack of a reasonable likelihood that Debtors can be rehabilitated; (ii)

6    the failure of Debtors to file required monthly operating reports; and (iii) the inability of Debtors to

7    be a fiduciary as debtors in possession. Moreover, since these Chapter 11 cases remain in their

8    infancy – that is, no "first day" motions have yet been granted let alone considered – conversion is

9    appropriate. Accordingly, section 1112(b)(1) mandates conversion of these Chapter 11 cases into

10   Chapter 7 proceedings under the circumstances.

11   **1.    Debtors lack a reasonable likelihood of rehabilitation.**

12   Asset Resolution has admitted that it is teetering on insolvency and that it is unable to fund

13   its operations or pay its administrative expenses without obtaining secured debtor in possession

14   financing.[104] In addition, Asset Resolution is locked into a cycle of generating losses and negative

15   cash flow as it has no reliable sources of new income, given that its only business is servicing and

16   liquidating the outstanding USACM loan portfolio.[105] Further, the 14 SPEs Debtors have no

17   prospect for generating any future income or paying their administrative expenses without obtaining

18   secured debtor in possession financing.[106] Under such circumstances, the administrative expenses to

19

---

20   [103] *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217, 1220-21, 1225-26 (3d Cir. 1989) (affirming finding of cause for appointment of Chapter 11 Trustee based on debtor's pre-petition transfer of its yacht and plane to an affiliate, and its payment of $3.7 million to another affiliate on the eve of bankruptcy, and because debtor's management did not fulfill its fiduciary duty of seeking to avoid those preferential transfers because it shared common management with the recipients of those transfers); *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1135-36 (10th Cir. 1988) (affirming finding of cause for appointment of Chapter 11 Trustee because debtor was not making a serious effort to collect debts owed by affiliated companies); *In re Intercat, Inc.*, 247 B.R. 911, 922-23 (Bankr. S.D. Ga. 2000) (cause existed for appointment of Chapter 11 Trustee when debtor was involved in self-dealing, and its management was guilty of dishonesty); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 175-77 (Bankr. E.D. Pa. 1984) (finding cause for appointment of Chapter 11 Trustee when hundreds of thousands of dollars were transferred from debtor subsidiary to parent for supposed "management fees," with no documentation).

27   [104] *See* Stubbs Decl., ¶¶ 48-51 & Exs. 28-29 thereto.

     [105] *See id.*, ¶¶ 48, 52-55 & Exs. 24-25, 28-30 thereto.

28   [106] *See id.*, ¶¶ 49-51, 55 & Exs. 25, 29 thereto.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1   be incurred in these Chapter 11 cases alone represent a "substantial [and] continuing loss to or

2   diminution of the estate."[107]

3          It also cannot be disputed that Debtors' "business plan" is merely to liquidate the outstanding

4   USACM loan portfolio.[108]  Indeed, Debtors have no employees, and the Court in the 892 Case is

5   apparently on the threshold (upon the modification of the automatic stay) of terminating Asset

6   Resolution's loan servicing rights under the LSAs as well as disbursing the funds it is holding in

7   trust for the direct lenders which it wrongly claims as property of the estate.[109]  Nor do the 14 SPEs

8   Debtors have any reasonable likelihood of rehabilitation as they merely exist to hold certain property

9   in trust pursuant to the Preliminary Injunction entered by the Court in the 892 Case.[110]  Moreover, it

10  is axiomatic that an intention merely to liquidate assets constitutes no reasonable likelihood of

11  rehabilitation and is otherwise sufficient to convert a Chapter 11 case into a Chapter 7 proceeding.[111]

12  Thus, cause exists to convert Debtors' Chapter 11 cases into Chapter 7 proceedings.[112]

13         **2.**    **Debtors have failed to file their first requisite monthly operating report.**

14         This case has been pending since October 14, 2009.[113]  As a result, Debtors' first monthly

15  operating report was required to be filed no later than November 20, 2009.[114]  However, Debtors

16  have failed to file that required report, and have not sought an extension to file that report or

17  otherwise indicated that they intend to file that report.  In addition, that report was due before the

18  Bankruptcy Court for the Southern District of New York entered its order transferring venue of these

19  Chapter 11 cases to this Court,[115] demonstrating that the lack of a ruling on Debtors' "first day"

20

21

22

23  [107] *See, e.g., Loop Corp.*, 379 F.3d at 515-16; *In re V Cos.*, 274 B.R. at 725.
    [108] *See* Stubbs Decl., ¶ 58 & Ex. 32 thereto.
24  [109] *See id.*, ¶¶ 56, 60-65 & Exs. 12, 33-34 thereto.
    [110] *See id.*, ¶¶ 12, 55-56 & Ex. 5 thereto.
25  [111] *See Loop Corp.*, 379 F.3d at 516; *In re All Denominational New Church*, 268 B.R. at 538; *In re
    Lyons Transp. Lines, Inc.*, 123 B.R. at 534-35.
26  [112] *See* 11 U.S.C. §§ 1112(b)(1),(b)(4)(A),(F); *Loop Corp.*, 379 F.3d at 515 n.2; *In re Fed. Roofing
    Co.*, 205 B.R. at 641.
27  [113] *See* Stubbs Decl., ¶ 3.
    [114] *See id.*, ¶ 4 & Ex. 1 thereto.
28  [115] *See id.*, ¶¶ 3-4 & Ex. 1 thereto.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    motions is not an excuse for Debtors' failure to file their first requisite monthly operating report.

2    Thus, cause exists for conversion of these Chapter 11 cases into Chapter 7 proceedings.[116]

3        **3.    Debtors are unable to be a fiduciary as debtors in possession.**

4        The evidence of Debtors' inability to be a fiduciary as debtors in possession is extensive.

5            **a.    Asset Resolution engages in recent loan servicing misconduct.**

6        Asset Resolution seeks to liquidate the direct lenders' remaining real estate collateral over

7    which it purports to have possession.[117]    Asset Resolution, however, engaged in loan servicing

8    misconduct in connection with the Gess and Anchor B Properties – which were the last two

9    instances in which it sought to dispose of such collateral.

10        As to the Gess Property, even though the Court in the 892 Case approved the disposition of

11    that real estate collateral to a joint venture based on the same valuation for which Asset Resolution

12    had sought to sell it to a third-party buyer,[118] and even though their counsel represented to the Court

13    in the 892 Case that they would abide (as they must) by the decision of the majority of the direct

14    lenders to sell that real estate collateral to the joint venture,[119] Silar and Asset Resolution

15    subsequently undertook several actions in an attempt to thwart that disposition.    Specifically, Silar

16    and Asset Resolution filed a notice of lis pendens and immediately appealed the order approving the

17    sale and sought an emergency stay of that sale from the Ninth Circuit.[120]    Indeed, Silar's and Asset

18    Resolution's actions required the direct lenders to obtain a second order from the Court in the 892

19    Case to effectuate its prior order approving the sale to the joint venture.[121]    Silar and Asset

20    Resolution undertook those actions in light of the determination by the Court in the 892 Case that

21    Asset Resolution was entitled to only approximately $1.5 million in servicing fees and advances

22    rather than the approximately $6.5 million to which it claimed to be entitled under the LSAs.[122]

23

24    ─────────────────
[116] *See* 11 U.S.C. §§ 1112(b)(1),(b)(4)(A),(F); *Loop Corp.*, 379 F.3d at 515 n.2; *In re Fed. Roofing Co.*, 205 B.R. at 641; *In re All Denominational New Church*, 268 B.R. at 538; *In re V Cos.*, 274

25    B.R. at 726, 739.
[117] *See* Stubbs Decl., ¶ 58 & Ex. 32 thereto.

26    [118] *See id.*, ¶ 23.
[119] *See id.*, ¶ 26 & Ex. 19 thereto.

27    [120] *See id.*, ¶ 24 & Exs. 15-17 thereto.
[121] *See id.*, ¶ 25 & Ex. 18 thereto.

28    [122] *See id.*, ¶¶ 23-24 & Ex. 17 thereto.

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

As to the Anchor B Property, Asset Resolution did not seek the prior approval of the Court in the 892 Case as it had done with the Gess Property and as was required by the Preliminary Injunction.[123]  Asset Resolution also misrepresented to the Court in the 892 Case at the TRO hearing that it had obtained the requisite approval of 51% of the direct lenders, and that the sale could not be enjoined because the deed of sale had already been recorded.[124]  In addition, the declarations of the four direct lenders who voted against the sale demonstrate that, in connection with Asset Resolution's efforts to obtain the requisite 51% approval for the sale, admitted insider SOS made misrepresentations concerning the proposed sale, placed immense pressure on those individuals to vote in favor of the sale without affording them with requisite information to assess the propriety or need for the sale or an opportunity to consult with counsel, and did not identify how the proceeds from the sale would be disbursed.[125]  Finally, Asset Resolution violated the Preliminary Injunction as well as the TRO and preliminary injunction issued in connection with the Anchor B Property by misrepresenting to the Court in the 892 Case that it would not disburse, and had not disbursed, the net proceeds from the sale of the Anchor B Property.[126]  In fact, Asset Resolution paid $374,102.43 of those net sale proceeds to its counsel on October 1, 2009, and the Anchor B Property Debtor held only $10,247.74 of those net sale proceeds as of October 14, 2009.[127]

Thus, Asset Resolution's recent loan servicing misconduct demonstrates that it cannot be trusted to be a fiduciary and that, therefore, cause exists for conversion of these Chapter 11 cases to Chapter 7 proceedings.

### b. Asset Resolution makes "fraudulent" bankruptcy claim for ownership of all the funds being held in trust for the direct lenders.

The Court in the 892 Case has indicated that Asset Resolution would be "committing fraud" if, in fact, it sought to retain most of the trust funds for itself as servicing compensation because that position would be contrary to its prior representations in the 892 Case.[128]  As demonstrated in

---

[123] *See id.*, ¶ 27.
[124] *See id.*, ¶¶ 27, 29 & Exs. 20, 22 thereto; ANCHOR B DECLS
[125] ANCHR B DECLS
[126] *See* Stubbs Decl., ¶¶ 30-32.
[127] *See id.*, ¶¶ 32-33 & Ex. 23-24 thereto.
[128] *See id.*, ¶ 35 & Ex. 12 thereto.

23

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1   Debtors' Rule 1007 Affidavit, however, Asset Resolution has, indeed, made such a "fraudulent"

2   claim, asserting in these Chapter 11 cases that it is entitled to <u>all</u> those funds.[129]  Moreover, not only

3   is Asset Resolution's claim contrary to its prior representations to the Court in the 892 Case, but that

4   claim is also contrary to that Court's summary judgment order and rulings in connection with the

5   Gess Property that significantly truncated the purported compensation to which the loan servicer is

6   entitled under the LSAs.[130]  Thus, given its antipathy to the rulings of the Court in the 892 Case in

7   connection with its loan servicing compensation under the LSAs, Asset Resolution cannot be trusted

8   to serve as a fiduciary in connection with the funds it holds in trust for the direct lenders.

9   **c.      Asset Resolution misuses the trust funds for its own purposes.**

10          Asset Resolution also cannot be trusted to be a fiduciary based on its prior misuse of the trust

11   funds for its own purposes.  Although Debtors' Rule 1007 Affidavit reflects that the amount of those

12   funds exceeds $10 million, those funds in actuality should amount to more than $12 million.[131]  The

13   only explanation for that difference is that Asset Resolution has misused those funds for its own

14   purposes and has not accounted for that misuse.[132]  Indeed, Asset Resolution's Statement of

15   Financial Affairs, dated October 14, 2009, reflects that a total of approximately $950,460 in such

16   funds was disbursed on September 3, 2009, including approximately $325,000 as purported

17   servicing fees pursuant to the Preliminary Injunction.[133]  Nor is that misuse an isolated incident, as

18   demonstrated by the recent additional misuse of the funds that Asset Resolution and the Anchor B

19   Property Debtor were required to hold in trust pursuant to the TRO and preliminary injunction

20   entered by the Court in the 892 Case on October 1 and 16, 2009, respectively.[134]

21

22

23

24

25

---

26   [129] *See id.*, ¶ 34 & Ex. 25 thereto.
     [130] *See id.*, ¶¶ 16-19, 22 & Exs. 9-10, 13 thereto.
     [131] *See id.*, ¶ 36 & Exs. 26-27 thereto.
27   [132] *See id.*
     [133] *See id.*, ¶ 37 & Ex. 23 thereto.
28   [134] *See id.*, ¶¶ 30-32 & Exs. 20-21, 23 thereto.

24

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

d.    **Asset Resolution pays and seeks to continue to pay its admitted insider SOS millions of dollars in claimed servicing fees.**

Asset Resolution's conduct with respect to admitted insider SOS demonstrates that it cannot be a fiduciary as a debtor in possession.  Between July 24, 2009, and October 14, 2009 (the petition date), Asset Resolution made alleged servicing fee payments to SOS in the amount of approximately $4.132 million, but between January and May 2009, made monthly purported servicing fee payments to SOS in amounts ranging from only $75,000 to $86,000, totaling only approximately $406,906.[135] Not only does that disparate payment activity reflect self-dealing, but all those payments are also avoidable transfers as preferential payments.[136]  Of course, because Asset Resolution and SOS are both wholly-owned subsidiaries of Silar, it cannot be expected that Asset Resolution will perform its fiduciary duty to seek to avoid those purported servicing fee payments as improper preferential payments.[137]  Indeed, the budget that Debtors submitted in conjunction with their request for debtor in possession financing reflects that they seek financing until the end of January 2010 to pay SOS – not Asset Resolution – additional servicing fees in the total amount of approximately $1.5 million.[138]  Moreover, the timing and amount of Asset Resolution's payments to SOS are suspect because they were made shortly <u>after</u>:  (i) adverse rulings related to its loan servicing compensation under the LSAs were rendered by the Court in the 892 Case;[139] and (ii) Gracin stated under penalty of perjury that Asset Resolution would be insolvent within 30 days.[140]

e.    **Debtors' principal seeks to financially ruin some of the direct lenders.**

Leeds, Debtors' principal, has stated his intention to "ruin" those direct lenders that have contested Silar's and Asset Resolution's efforts to be paid tens of millions of dollars in late charges, default interest, and servicing fees under the LSAs.[141]  Those sentiments by Debtors' principal

---

[135] *See id.*, ¶¶ 39-42 & Ex. 23 thereto.

[136] *See* 11 U.S.C. § 547.

[137] *See In re Hampton Hotels Investors, L.P.*, 270 B.R. at 358; *Commodity Futures Trading Comm'n*, 471 U.S. at 355.  Indeed, Debtors seek to retain special counsel that has also been employed by Silar in this and in other matters.  *See* Stubbs Decl., ¶ 6 & Ex. 2 thereto.

[138] *See id.*, ¶ 47 & Ex. 29 thereto.

[139] *See id.*, ¶¶ 39-40 & Ex. 9 thereto.

[140] *See id.*, ¶¶ 39, 41 & Ex. 28 thereto.

[141] *See* Helms Decl.

25

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1    negate <u>any</u> likelihood that Asset Resolution can be deemed a fiduciary for the direct lenders as a

2    debtor in possession.[142]

3         Accordingly, for all the foregoing reasons, conversion of the Chapter 11 cases into Chapter 7

4    proceedings is mandated by section 1112(b).

5    **C.    In The Alternative, The Appointment Of A Chapter 11 Trustee Is Warranted.**

6         Assuming *arguendo* that cause is lacking for the conversion of these Chapter 11 cases into

7    Chapter 7 proceedings (which is not the case), the appointment of a Chapter 11 Trustee is

8    nevertheless warranted because Asset Resolution should no longer be in control of the direct

9    lenders' outstanding real estate collateral or the funds being held in trust for the direct lenders.  The

10   foregoing evidence of Asset Resolution's malfeasance demonstrates that the removal of Asset

11   Resolution as the loan servicer under the LSAs is mandated by all three statutory bases for the

12   appointment of a Chapter 11 Trustee.  Specifically, Asset Resolution's loan servicing misconduct,

13   fraud, self-dealing, and inability to be a fiduciary:  (i) constitute cause for the appointment of a

14   Chapter 11 Trustee; (ii) demonstrate that the removal of Asset Resolution as the loan servicer under

15   the LSAs is in the interests of the direct lenders, who are the primary creditors of Debtors; and (iii)

16   are grounds for conversion under section 1112 and the removal of Asset Resolution as the loan

17   servicer under the LSAs is in the best interests of the direct lenders as well as Debtors' estates.[143]

18   Accordingly, in the event that the Court does not convert these Chapter 11 cases into Chapter 7

19   proceedings, it should at the very least appoint a Chapter 11 Trustee for Debtors' estates.

20   **IV.**

21   **REQUEST FOR RELIEF**

22        For all the foregoing reasons, Movants respectfully request that the Court grant this motion

23   and convert Debtors' Chapter 11 cases into Chapter 7 proceedings or, in the alternative, appoint a

24   Chapter 11 Trustee, and award them such other and further relief to which they are entitled.

25

26   [142] *See, e.g., In re V Cos.*, 274 B.R. at 726; *In re Fed. Roofing Co.*, 205 B.R. at 643; *In re Hampton Hotels Investors, L.P.*, 270 B.R. at 358; *Commodity Futures Trading Comm'n*, 471 U.S. at 355.

27   [143] *See* 11 U.S.C. § 1104(a); *In re Sharon Steel Corp.*, 871 F.2d at 1220-21, 1225-26; *In re Oklahoma Refining Co.*, 838 F.2d at 1135-36; *In re Intercat, Inc.*, 247 B.R. at 922-23; *In re*

28   *Humphreys Pest Control Franchises, Inc.*, 40 B.R. at 175-77.

DATED:  December 10, 2009

BICKEL & BREWER
JONES VARGAS


By:     /s/ Janet L. Chubb
        JANET L. CHUBB, ESQ.
        LOUIS M. BUBALA III, ESQ.

Attorneys for Certain Direct Lenders

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

# CERTIFICATE OF SERVICE

1.     On December 10, 2009, I filed and served the following document(s):

**MOTION FOR ORDER CONVERTING CASES TO CHAPTER 7, OR, ALTERNATIVELY, FOR THE APPOINTMENT OF A TRUSTEE**

**2.**     I served the above-named document(s) by the following means to the persons listed below:

■   a.     ECF System (attach the "Notice of Electronic Filing" or list all persons and addresses):

- LOUIS M. BUBALA    lbubala@jonesvargas.com, tbw@jonesvargas.com;bcopeland@jonesvargas.com
- ROB CHARLES    rcharles@lrlaw.com, cjordan@lrlaw.com
- JANET L. CHUBB    tbw@jonesvargas.com
- NATALIE M. COX    ncox@klnevada.com, bankruptcy@klnevada.com;kgregos@klnevada.com
- RANDOLPH L. HOWARD    rhoward@klnevada.com, ckishi@klnevada.com;bankruptcy@klnevada.com
- DEAN T. KIRBY    dkirby@kirbymac.com, gsparks@kirbymac.com,jrigg@kirbymac.com,jcastranova@kirbymac.com
- LISA A. RASMUSSEN    lisa@lrasmussenlaw.com, secretary@lrasmussenlaw.com
- U.S. TRUSTEE - LV - 11    USTPRegion17.lv.ecf@usdoj.gov

□   b.     United States mail, postage fully prepaid(list persons and addresses):

□   c.     Personal Service (list persons and addresses):

■   d.     By direct email (as opposed to through the ECF System) (list persons and email addresses):

**TRACY L. KLESTADT**
KLESTADT & WINTERS, LLP
Email: tklestadt@klestadt.com

**IAN R. WINTERS**
KLESTADT & WINTERS, LLP
Email: iwinters@klestadt.com

**JOSEPH CORNEAU**
KLESTADT & WINTERS, LLP
Email: jcorneau@klestadt.com

**PATRICK J. ORR**
KLESTADT & WINTERS, LLP
Email: porr@klestadt.com

**SEAN C. SOUTHARD**
KLESTADT & WINTERS, LLP
Email: ssouthard@klestadt.com

☐ e.    By fax transmission (list persons and fax numbers)

■ f.    By Messenger

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 10th day of December, 2009.

Tawney Waldo                              /s/Tawney Waldo
_____        _____
Name                                              Signature

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177