1  SULLIVAN, HILL, LEWIN, REZ & ENGEL          **Electronically Filed: February 13, 2013**
   A Professional Law Corporation
2    James P. Hill, CA SBN 90478 (Pro Hac Vice)
     Jonathan S. Dabbieri, CA SBN 91963 (Pro Hac Vice)
3    Elizabeth E. Stephens, NV SBN 5788
   228 South Fourth Street, First Floor
4  Las Vegas, NV 89101
   Telephone:  (702) 382-6440
5  Fax Number: (702) 384-9102

6  Attorneys for Chapter 7 Trustee,
   William A. Leonard, Jr.
7

8                    UNITED STATES BANKRUPTCY COURT

9                           DISTRICT OF NEVADA

10  In re                                    ) CASE NO. BK-S-09-32824-RCJ (Lead Case)
                                             )
11  ASSET RESOLUTION, LLC,                   ) Jointly Administered with Case Nos.:
                                             ) BK-S-09-32831-RCJ; BK-S-09-32839-RCJ;
12              Debtor.                       ) BK-S-09-32843-RCJ; BK-S-09-32844-RCJ;
                                             ) BK-S-09-32846-RCJ; BK-S-09-32849-RCJ;
13                                           ) BK-S-09-32851-RCJ; BK-S-09-32853-RCJ;
                                             ) BK-S-09-32868-RCJ; BK-S-09-32873-RCJ;
14                                           ) BK-S-09-32875-RCJ; BK-S-09-32878-RCJ;
                                             ) BK-S-09-32880-RCJ; BK-S-09-32882-RCJ
15                                           )
                                             ) Chapter 7
16  Affects:                                 )
      ☒ All Debtors                          ) **SULLIVAN HILL LEWIN REZ &**
17    ☐ Asset Resolution, LLC, 09-32824      ) **ENGEL'S EIGHTH INTERIM**
      ☐ Bundy 2.5 Million SPE, LLC, 09-32831 ) **APPLICATION FOR COMPENSATION**
18    ☐ Bundy Five Million SPE, LLC, 09-32839)
      ☐ CFP Anchor B SPE, LLC, 09-32843      ) [Hearing To Be Assigned]
19    ☐ CFP Cornman Toltec SPE, LLC, 09-32844)
      ☐ CFP Gess SPE LLC, 09-32846           )
20    ☐ CFP Gramercy SPE, LLC, 09-32849      )
      ☐ Fiesta Stoneridge, LLC, 09-32851     )
21    ☐ Fox Hills SPE, LLC, 09-32853         )
      ☐ HFAH Monaco SPE, LLC, 09-32868       )
22    ☐ Huntsville SPE, LLC, 09-32873        ) Ctrm:  RCJ - Courtroom 6
23    ☐ Lake Helen Partners SPE, LLC, 09-32875)        Bruce R. Thompson Federal Building
      ☐ Ocean Atlantic SPE, LLC, 09-32878    )         400 S. Virginia Street
24    ☐ Shamrock SPE, LLC, 09-32880          )         Reno, NV 89501
25    ☐ 10-90 SPE, LLC, 09-32882             ) Judge: Hon. Robert C. Jones

26  / / /

27  / / /

28  / / /

348830-v1                              - 1 -

Sullivan, Hill, Lewin, Rez & Engel ("Sullivan Hill"), counsel for the Chapter 7 trustee herein, William A. Leonard, Jr. ("Trustee"), hereby applies to this Court for an order allowing the attorney's fees and costs described herein as an administrative expense of these jointly administered estates of the above captioned debtors (collectively, "Debtors") pursuant to sections 330 and 331 of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and authorizing the payment of such expense.

Pursuant to this Court's Order entered on December 20, 2012 (Dkt. No. 2002) and LR 7-2 of the Local Rules of Practice for the United States District Court for the District of Nevada, this fee application is being noticed without a hearing date. Any response to the application shall be filed and served by an opposing party fourteen (14) days after service of this fee application. Thereafter the Court may decide the matter on the pleadings or may, in its discretion, set it for hearing.

## I.

## SUMMARY

| | |
|---|---|
| Name of Applicant: | Sullivan, Hill, Lewin, Rez & Engel |
| Authorized to Provide Professional Services to: | William A. Leonard, Jr., Chapter 7 Trustee |
| Date of Retention: | February 12, 2010 |
| Period for Which Compensation and Reimbursement is Sought: | August 1, 2012 through November 30, 2012 |
| Amount of Compensation Previously Noticed: | $126,154.75 |
| Amount of Compensation Previously Noticed per Interim Cap ("Capped Fees"): | $104,105.00 |
| Amounts of Compensation Previously Paid under Interim Compensation Procedures: | $83,284.00[1] |
| **Amount of Compensation for Which Authorization for Payment is Requested:** | **$10,410.50** |
| Amount of Expense Reimbursement Previously Noticed: | $3,137.51[2] |
| **Amount of Expense Reimbursement Requested:** | **$0.00** |

[1] This amount is equal to 80 percent of the fees incurred during this four-month period which are authorized to be paid on an interim basis pursuant to the Court's Order Establishing Procedures for Interim Compensation of professionals ("Interim Compensation Order") made in open court on May 27, 2010 and entered on October 15, 2010 [Docket No. 1243], as modified by the Court in its oral ruling on February 24, 2011, placing an interim cap ("Interim Cap") on rates of $400 per hour for attorneys and $100 per hour for paralegals ("Capped Fees").

[2] This figure represents the expenses previously noticed under interim compensation procedures, which have been paid in full to date.

348830-v1                                                      - 2 -

1    This is the eighth general fee application filed by Sullivan Hill in these jointly administered

2    cases.  The total number of hours worked during this four-month period was 348.7 and the blended

3    rate is 361.79 including paraprofessional time and $420.83 excluding paraprofessional time.

4    With the instant eighth general fee application, Sullivan Hill requests the same treatment

5    afforded by the Court on the prior fee applications – allowance of 100 percent of the fees

6    ($126,154.75) and costs ($3,137.51) requested herein, with 90 percent of Capped Fees (90 percent of

7    $104,105.00, or $93,694.50) and 100 percent of the costs ($3,137.51) authorized for immediate

8    payment (*to the extent not already paid*), and the remaining 10 percent of the fees ($10,410.50) held

9    back until further order of the Court.

10    Pursuant to:

11    (1)    the Court's Order Establishing Procedures for Interim Compensation of Professionals

12    ("Interim Compensation Procedures") made in open court on May 27, 2010, and as

13    modified by the Court in its oral ruling on February 24, 2011, placing an interim cap

14    on rates of $400 per hour for attorneys and $100 per hour for paralegals; and

15    (2)    the various interim fee notices filed by Sullivan Hill in accordance with the Interim

16    Compensation Procedures (Docket Nos. 1965, 2003, 2004, 2005),

17    Sullivan Hill has previously noticed a total of $126,154.75 in fees and $3,137.51 in costs for the four-

18    month time period covered by this application.    To date, the Trustee has paid Sullivan Hill

19    $83,284.00 of these fees and $3,137.51 of these costs on an interim basis.  Accordingly, after a

20    holdback of 10 percent of the Capped Fees requested herein ($10,410.50), Sullivan  Hill is asking in

21    this application for authorization for the Trustee to pay the firm the remaining $10,410.50 in fees and

22    $0.00 in costs incurred during this fee application period and yet to be paid.

23    **II.**

24    **SUMMARY OF PRIOR APPLICATIONS**

25    On October 8, 2010 Sullivan Hill filed its first general fee application (Docket No. 1235).

26    The Court's order thereon (Docket No. 1319 ) allowed and authorized – in addition to the 80 percent

27    of fees previously paid under the Interim Compensation Procedures (defined below) -- another 10

28

348830-v1                                              - 3 -

1    percent of the fees requested, bringing to 90 percent the level of fees allowed and authorized for

2    payment, and holding back the final 10 percent ($75,465.80).

3          On January 11, 2011 Sullivan Hill filed its second general fee application (Docket No. 1361).

4    The Court's order thereon (Docket No. 1446) placed an interim cap on the firm's fees and allowed

5    and authorized – in addition to the 80 percent of fees previously paid under the Interim

6    Compensation Procedures (defined below) -- another 10 percent of the fees requested, as calculated

7    using the court's Interim Cap, bringing to 90 percent the level of fees allowed and authorized for

8    payment, and holding back the final 10 percent ($28,864.28).

9          On January 11, 2011 Sullivan Hill filed its discrete and separate Application for

10    Compensation (Gramercy) (Docket No. 1364).   The Court's order thereon (Docket No. 1447)

11    allowed and authorized for payment 90 percent of the fees requested relating to the Gramercy

12    property, calculated using the Court's interim cap, holding back the final 10 percent ($11,413.80).

13          On June 17, 2011 Sullivan Hill filed its third general fee application (Docket No. 1555).  The

14    Court's order thereon (Docket No. 1588) placed an interim cap on the firm's fees and allowed and

15    authorized – in addition to the 80 percent of fees previously paid under the Interim Compensation

16    Procedures (defined below) -- another 10 percent of the fees requested, as calculated using the

17    court's interim cap, bringing to 90 percent the level of fees allowed and authorized for payment, and

18    holding back the final 10 percent ($30,179.80).

19          On September 27, 2011, Sullivan Hill filed its fourth general fee application (Docket No.

20    1617).  The Court's order thereon (Docket No. 1712) placed an interim cap on the firm's fees and

21    allowed and authorized – in addition to the 80 percent of fees previously paid under the Interim

22    Compensation Procedures (defined below) -- another 10 percent of the fees requested, as calculated

23    using the court's interim cap, bringing to 90 percent the level of fees allowed and authorized for

24    payment, and holding back the final 10 percent ($16,665.40).

25          On January 31, 2012, Sullivan Hill filed its fifth general fee application (Docket No. 1683).

26    The Court's order thereon (Docket No. 1711) placed an interim cap on the firm's fees and allowed

27    and authorized – in addition to the 80 percent of fees previously paid under the Interim

28    Compensation Procedures (defined below) -- another 10 percent of the fees requested, as calculated

1  using the court's interim cap, bringing to 90 percent the level of fees allowed and authorized for

2  payment, and holding back the final 10 percent ($10,380.65).

3        On June 22, 2012, Sullivan Hill filed its sixth general fee application (Docket No. 1798).

4  The Court's order thereon (Docket No. 1987) placed an interim cap on the firm's fees and allowed

5  and authorized – in addition to the 80 percent of fees previously paid under the Interim

6  Compensation Procedures (defined below) -- another 10 percent of the fees requested, as calculated

7  using the court's interim cap, bringing to 90 percent the level of fees allowed and authorized for

8  payment, and holding back the final 10 percent ($10,578.88).

9        On October 19, 2012, Sullivan Hill filed its seventh general fee application (Docket No.

10  1954). The Court's order thereon (Docket No. 1992), placed an interim cap on the firm's fees and

11  allowed and authorized – in addition to the 80 percent of fees previously paid under the Interim

12  Compensation Procedures (defined below) -- another 10 percent of the fees requested, as calculated

13  using the court's interim cap, bringing to 90 percent the level of fees allowed and authorized for

14  payment, and holding back the final 10 percent ($16,036.23).

15        Cumulatively, pursuant to previously entered fee application orders of this Court, the Trustee

16  is holding back fees otherwise requested by Sullivan Hill, at its non-capped rates, in the amount of

17  $215,602.78, consisting of $75,465.80 on its first general fee application, $31,868.03 on its second

18  general fee application, $12,843.00 on the discrete Gramercy-related fee application, $33,967.90 on

19  its third general fee application, $18,682.75 on its fourth general fee application, $11,852.05 on its

20  fifth general fee application, $11,932.57 on its sixth general fee application, and 18,990.68 on its

21  seventh general fee application.

22                              **III.**

23                    **STATEMENT OF THE CASE**

24  A.  **Background**

25        These Debtors have presented the Court and the Trustee many challenges during the

26  administration of these cases.  Because the Court is intimately familiar with these cases and their

27  history, the description of their facts and circumstances will be abbreviated herein.

28

1    The cases arise out of the separate bankruptcy proceedings of USA Commercial Mortgage

2    Company ("USACM") and its related entities.  USACM solicited investments from individuals

3    (each a "Direct Lender, and collectively, the "Direct Lenders") which were packaged into secured

4    loans, with each Direct Lender holding a fractionalized interest therein.  USACM retained

5    fractionalized interests in many of the loans it placed.  USACM executed with most, but not all,

6    Direct Lenders a loan servicing agreement authorizing it to collect a monthly base servicing fee and

7    other expenses and charges.

8    On or about April 13, 2006, USACM filed a Chapter 11 bankruptcy petition in the United

9    States Bankruptcy Court for the District of Nevada.  The USACM bankruptcy court authorized a sale

10    of USCAM's rights under the loan servicing agreements, including the right to collect fees, as well

11    as the sale of USACM's fractionalized interests in the loans and/or properties.  Those assets were

12    purchased by Compass Financial Partners, LLC ("Compass").  Compass' acquisition of the assets

13    was funded by Silar Advisors, LP ("Silar"), through a Master Repurchase Agreement.  Silar

14    contends the funding was a loan with the purchased assets serving as security for the financing.  The

15    Court, however, has determined that under the Master Repurchase Agreement Silar actually

16    purchased the assets from Compass, with Compass using Silar's payment to obtain the assets from

17    USACM.  In either case, Compass ultimately defaulted on its obligations to Silar, and on or about

18    September 26, 2008, Silar "foreclosed" on the assets, (i.e., all of the assets Compass purchased out

19    of the USACM bankruptcy), forming Asset Resolution, LLC ("Asset Resolution" or "ARC"), the

20    lead Debtor herein, to acquire these assets through foreclosure and to serve as loan servicer

21    thereafter.

22    On October 14, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of the

23    Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  On

24    November 24, 2009 on motion of various creditors, venue of the Debtors' Chapter 11 cases was

25    transferred to the United States Bankruptcy Court for the District of Nevada.  On January 25, 2010,

26    the United States District Court for the District of Nevada entered an order withdrawing the

27    reference of the Chapter 11 cases and assigning the Chapter 11 cases to the Honorable Judge Robert

28    C. Jones.

1    On January 29, 2010, this Court entered an order converting the Chapter 11 cases to cases

2 under Chapter 7 of the Bankruptcy Code nunc pro tunc to January 19, 2010.  See Docket No. 356.

3 On or about January 29, 2010, the Trustee was appointed as the trustee for each of the Debtors in all

4 of their Chapter 7 cases.

5 **B.  Property Sales and Other Recoveries**

6    Since the Trustee's appointment, he and his professionals have worked (i) to maintain the

7 status quo of the various estates and their property interests as servicing rights are transferred to new

8 servicers, and (ii) to liquidate the assets of the estates in a fashion intended to realize maximum

9 value in an orderly fashion as expeditiously as possible under the current circumstances.  The

10 Trustee has sold some of the estates' assets pursuant to orders of this Court.  He has objected to and

11 opposed objectionable and involuntary sales and other dispositions of other assets and property

12 interests which appeared to be set for sale on unfavorable terms.  He has fought to avoid losses of the

13 estates' interests through foreclosure sales, tax sales, and the like.  The Trustee has recovered estate

14 funds held by the Debtors' pre-petition professionals.  He has preserved ARC's rights to recover

15 fees, advances and purchased accounts receivable from ARC's various single purpose entities (each

16 an "SPE," and collectively the "SPE's") the loans and their collateral – which rights will likely

17 produce cash at some point.  He participated in pending litigation matters – which are crucial to

18 resolving claims against the various estates and determining the claims of the estates against third

19 parties.  The Trustee estimates that since his appointment on January 29, 2010, he devoted more than

20 1600 hours in the first 336 days of his service toward administering these debtor estates.  The

21 Trustee has been an active participant in adversary proceedings and contested matters, formal and

22 informal discovery processes and examinations, sale proceedings, property and loan management

23 matters, as well as generally interfacing with creditors and interest holders in these bankruptcy cases.

24    The Trustee and his professionals assert that the efforts and activities described in this

25 application have and will continue to yield liquid proceeds which can and will be distributed to

26 creditors and interest holders.

27 **C.  The 892 Litigation**

28    One of the more time consuming matters for the Trustee has been litigation in the United

348830-v1                                          - 7 -

States District Court for the District of Nevada as Case No. 07-00892 ("892 Action"). This action addresses claims by a number of individual Direct Lenders that Asset Resolution, Compass, and Silar committed erroneous and/or wrongful acts in the pre-bankruptcy servicing of some of the loans placed by USACM, after Compass purchased the servicing rights from USACM in its separate bankruptcy proceedings. Trial of this matter commenced on November 16, 2010 and was completed on December 14, 2010. It resulted in an award of compensatory damages against ARC in the sum of approximately $54,000, and punitive damages of $1,250,000. Post-verdict, the parties to this action engaged in extensive settlement negotiations to resolve this suit, the 11-01100 action, and other disputes. After protracted negotiations a settlement was reached and a motion seeking Court approval of the proposed settlement was heard on April 12, 2012. The motion was granted and the settlement was approved. The parties then worked on preparation of the formal order, the liquidating/litigation trust agreement, and related documents. Preparation of the settlement documents has been very time consuming because of the complex nature of the issues involved, including the need to analyze the tax ramifications of the trust's funding and operation. Ultimately the parties agreed upon and submitted a proposed order and liquidating trust to the court, which the court has approved. Although the order approving the settlement has been appealed, the settling parties have agreed to go forward and are implementing the settlement's terms. Among other benefits, this has permitted the trustee to disburse funds he held for the benefit of direct lenders associated with eight of the loans.

### IV.

### SUMMARY AND DESCRIPTION OF SERVICES

The services rendered by Sullivan Hill during the four-month period covered by this fee application are broken down into the categories described below. This section includes a brief summary of the services Sullivan Hill provided to the Trustee and these estates in each of the categories during the period covered by this application (i.e., August 1, 2012 through November 30, 2012). A narrative summary of the services performed by Sullivan Hill in connection with each of the categories listed below are set forth in the Declaration of James P. Hill filed concurrently herewith ("Hill Declaration"), at ¶¶ 4-28.

1    In accordance with Local Bankruptcy Rule 2016 and the United States Trustee's Guidelines

2  for Reviewing Applications for Compensation & Reimbursement of Expenses ("UST Guidelines"), a

3  fee application summary sheet is attached as Exhibit "A" to the Hill Declaration.    Detailed

4  descriptions of the services performed by the attorneys and paralegals of Sullivan Hill, the time spent

5  in connection with those services, and the charges associated with those services, are set forth in the

6  corresponding statements of account attached as Exhibit "B" to the Hill Declaration.  The time and

7  charges are broken into and billed separately under the categories described below.

| Billing Category | Hours | Usual & Customary Fees | Capped Fees Paid[3] |
|---|---|---|---|
| Asset Resolution, LLC General Administration | 36.9 | $11,811.75 | $4,407.50 |
| Bundy 2.5M SPE, LLC 09-32831 | 0.3 | $55.50 | $30.00 |
| Bundy 5M SPE, LLC 09-32839 | 0.3 | $55.50 | $30.00 |
| CFP Gramercy SPE 09-32849 | 5.8 | $1,592.00 | $1,150.00 |
| Fiesta Stoneridge 09-32851 | 0.6 | $1,400.00 | $1,260.00 |
| Fox Hills SPE 09-32853 | 8.8 | $2,417.00 | $2,260.00 |
| HFAH Monaco SPE 09-32868 | 0.8 | $148.00 | $80.00 |
| Lake Helen Partners SPE 09-32875 | 26.6 | $9,761.00 | $9,107.50 |
| 10-90 SPE 09-32882 | 0.5 | $140.50 | $ 110.00 |
| Leonard v. Silar, Adv. #11-01100 | 2.1 | $652.50 | $ 540.00 |
| USA Commercial Mortgage, USDC #07-00892 | 151.2 | $60,568.00 | $54,030.00 |
| Appeals Litigation | 3.0 | $1,227.00 | $1,140.00 |
| Fee Applications | 25.0 | $5,413.00 | $3,310.00 |
| BarUSA | 1.0 | $425.00 | $400.00 |
| Bay Pompano | 0.3 | $103.50 | $90.00 |
| Binford Medical | 16.2 | $5,301.00 | $4,500.00 |
| Castaic (including Barkett litigation) | 1.4 | $569.00 | $ 440.00 |
| Comvest | 0.2 | $85.00 | $80.00 |
| Harbor Georgetown | 0.4 | $170.00 | $ 160.00 |
| Margarita Annex | 36.0 | $14,926.00 | $13,740.00 |
| Marlton Square | 2.0 | $934.00 | $800.00 |
| Claims held by ARC v. Loans | 1.8 | $779.00 | $690.00 |
| Claims Analysis/Objections | 0.9 | $166.50 | $90.00 |
| Preference Actions | 14.6 | $3,357.00 | $2,210.00 |
| Malpractice Actions | 12.0 | $4,097.00 | $3,450.00 |
| **Total** | **348.7** | **$126,154.75** | **$104,105.00** |

[3] This amount is equal to 80 percent of the fees incurred during this four-month period which are authorized to be paid on an interim basis pursuant to the Court's Order Establishing Procedures for Interim Compensation of professionals ("Interim Compensation Order") made in open court on May 27, 2010 and entered on October 15, 2010 [Docket No. 1243], as modified by the Court in its oral ruling on February 24, 2011, placing an interim cap ("Interim Cap")on rates of $400 per hour for attorneys and $100 per hour for paralegals.

1      While these 15 estates are jointly administered pursuant to Court order, they are not

2  substantively consolidated.  Certain of the fees and costs described below relate to a particular

3  identified estate.  The Trustee intends to pay such fees and costs from available funds of that

4  applicable identified estate or estates, and the fee application so indicates below.  ARC's is the

5  primary estate in these cases, as that company was the original "operative" or managing entity, with

6  the SPE's having been formed by ARC under this Court's supervision as vehicles to take title to real

7  property foreclosed upon, pursuant to orders of this Court issued during the preliminary injunction

8  phase of the 892 Action.  As interim loan servicer, ARC bore various responsibilities towards the

9  other Debtors, and held rights to be compensated for such services.  Accordingly, when services

10  within a billing category relate to many of (or all of) the Debtors, or simply to ARC, the Trustee

11  intends to allocate the charges for such services to ARC and the fee application so indicates below.

12  The result is that each SPE will pay the fees and costs shown its respective billing category, and

13  ARC will pay the fees and costs in all of the remaining billing categories.  One variation on this

14  approach relates to the few instances in which a particular SPE or loan lacks the available cash

15  needed to pays its allocated fees and costs in full.  In those instances, the Trustee intends to pay any

16  deficiency from available funds of ARC at least on an interim basis, subject to a later "true-up" or

17  adjustment before the cases are closed.  Pursuant to prior Court orders, in the event that the real

18  property held by an SPE is sold, the Trustee and his professionals will file fee applications relating

19  solely to that SPE (as was done following the closing of the sale of real estate owned by the CFP

20  Gramercy SPE estate).

21      The instant fee application is interim in nature, in the sense that the allocation of fees and

22  costs among the estates as presented here may be "trued up" at a later time, to ensure that each estate

23  bears its fair share of administrative expenses.  In the event that an estate is ultimately unable to pay

24  all of the fees and costs attributable to it, the Trustee intends to and requests that the Court authorize

25  the allocation of such fees and costs to the "master estate," namely ARC, which is the responsible

26  managing entity of all other estates.

27

28

348830-v1                                    - 10 -

## V.

## EVALUATING STANDARDS

Section 330 of the Bankruptcy Code authorizes compensation for professionals rendering services in connection with a bankruptcy case. See, e.g., United States Trustee v. Knudsen Corp. (In re Knudsen Corp.), 84 B.R. 668 (B.A.P. 9th Cir. 1988). The responsibility for determining reasonable compensation under section 330 of the Bankruptcy Code for services rendered to the estate rests with the bankruptcy court and the court's decision is final unless there is an abuse of discretion. In re Nucorp Energy, Inc., 764 F.2d 655, 657 (9th Cir. 1985). Section 330(1)(a)(1)(A) provides that "reasonable compensation" be awarded "for actual, necessary services." In determining the amount of reasonable compensation to be awarded, the court is to consider "the nature, the extent, and the value of the services rendered." In connection therewith, the court is to take into account "all relevant factors," including:

(a.)    the time spent on such services;

(b.)    the rates charged for such services;

(c.)    whether the services were necessary to the administration of or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(d.)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(e.)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(f.)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Section 330 otherwise provides that compensation is not allowed for unnecessary duplication of services or services that were not reasonably likely to benefit the debtor's estate or necessary to the administration of the case.

In the Ninth Circuit, the primary method used to determine a reasonable fee in bankruptcy cases is to calculate the lodestar. See Law Offices of David A. Boone v. Derham-Burk (In re

348830-v1                                    - 11 -

1    Eliapo), 468 F.3d 592, 598 (9th Cir. 2006); Yermakov v. Fitzsimmons (In re Yermakov), 718 F.2d

2    1465, 1471 (9th Cir. 1983).  A court computes the lodestar by multiplying the number of hours

3    reasonably expended by a reasonable hourly rate. Yermakov, 718 F.2d at 1471; see Hensley v.

4    Eckerhart, 461 U.S. 424, 433 (1983) (reasoning that the lodestar "calculation provides an objective

5    basis on which to make an initial estimate of the value of a lawyer's services").

6    　　　　Once the lodestar is established, there is a strong presumption that the lodestar figure

7    represents a reasonable fee which should be adjusted only in rare or exceptional cases.  Cunningham

8    v. County of L.A., 879 F.2d 481, 488 (9th Cir. 1988).  The Supreme Court explained the basis for

9    this presumption:

10    　　　　　　[W]hen an attorney first accepts a case and agrees to represent the client,
　　　　　　he obligates himself to perform to the best of his ability and to produce the
11    　　　　　　best possible results commensurate with his skill and his client's interests.
　　　　　　Calculating the fee award in a manner that accounts for these factors,
12    　　　　　　either in determining the reasonable number of hours expended on the
　　　　　　litigation or in setting the reasonable hourly rate, thus adequately
13    　　　　　　compensates the attorney, and leaves very little room for enhancing the
　　　　　　award based on his post-engagement performance. In short, the lodestar
14    　　　　　　figure includes most, if not all, of the relevant factors constituting a
　　　　　　"reasonable" attorney's fee, and it is unnecessary to enhance the fee for
15    　　　　　　superior performance in order to serve the statutory purpose of enabling
　　　　　　plaintiffs to secure legal assistance.

16

17    Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565-66 (1986).

18    　　　　In this application, Sullivan Hill is not seeking any upward adjustment in the "lodestar"

19    approach to its fee request. The requested fees in this application are the product of the number of

20    the hours expended by attorneys in representing the interests of the Trustee multiplied by their

21    respective hourly rates.

22    **VI.**

23    **DETERMINATION OF APPROPRIATE AWARD OF FEES**

24    **A.  Time Spent**

25    　　　　As noted above, the first element to be considered in determining the reasonableness of

26    compensation under section 330(a)(3)(A) is the amount of time consumed in rendering the services

27    for which compensation is sought.  Section 330(a)(3)(D) requires that a court determine whether the

28    services were performed within a reasonable amount of time based upon the complexity, importance,

348830-v1                                    - 12 -

1    and nature of the issue. In this respect, courts have required professionals seeking payment to

2    provide accurate records of the amount of time spent and the manner in which it was spent, based

3    upon detailed, contemporaneous time records that reveal enough information to enable the court to

4    make an informed judgment about specific tasks and the time allotted.

5        The custom and practice of Sullivan Hill is to keep detailed time records for all services

6    performed by shareholders and employees of the firm.  As explained in the Hill Declaration,

7    Sullivan Hill keeps detailed daily time records reflecting all services rendered in the case.  These

8    daily time records are reduced on a monthly basis to statements of account that set forth the date the

9    various services were rendered, a detailed description of the services performed, the person

10   performing the services, and the amount of time spent performing the services.  See the Hill

11   Declaration, ¶ 3.  The statements of account are attached as Exhibit "B" to the Hill Declaration and

12   are categorized according to the various billing categories, and include attorney/paralegal time spent

13   in connection with each category of services and the costs and expenses incurred during the time

14   period covered by the fee application.  The costs and expenses incurred during the time period

15   covered by this fee application are summarized and included on Exhibit "C" to the Hill Declaration.

16       Sullivan Hill's time records demonstrate that during this four-month application period

17   Sullivan Hill spent a total of 348.7 hours in representing the Trustee.  Sullivan Hill submits that a

18   review of its time records will disclose that all of the time spent was reasonable and necessary for the

19   adequate representation of the Trustee in connection with the matters for which Sullivan Hill was

20   employed. The blended hourly rate for Sullivan Hill's service is $420.83 per hour, excluding

21   paralegals and paraprofessionals, and $361.79 per hour, including paralegals and paraprofessionals,

22   which the firm strives to include in the performance of its professional services as appropriate.

23   **B.  <u>The Attorneys of Sullivan Hill Have Exercised a High Degree of Skill in Performing the</u>**

24       **<u>Required Services</u>**

25       Part and parcel of the analysis of the quantity of time spent is also the quality of services

26   provided.  Indeed, many courts recognize that a strict adherence to time alone, without consideration

27   of other factors, would not be fair.  <u>See</u>, <u>e.g.</u>, <u>In re Westec Corp.</u>, 313 F.Supp. 1296 (S.D. Tex.

28   1970).

1    As stated in Collier on Bankruptcy:

2    [a]lthough the number of hours fairly and properly devoted to a case may
     aid the court in arriving at a reasonable compensation, it should not serve
3    as one of the predominant considerations. Undue emphasis on the factor of
     the "time spent" fails to acknowledge the fact that skill and experience
4    may accomplish much in a short period of time. … Focus on the hours
     expended by a professional also may ignore the fact that some services are
5    routine and ordinary while others involve complex and difficult issues.

6    3 A. Resnick & H. Sommer, eds., COLLIER ON BANKRUPTCY, ¶ 330.04[4][d] (15th ed. rev.

7    2002).

8    Sullivan Hill has continued to draw on its experience and competency in resolving complex

9    issues and deftly handling numerous developments during the span of its engagement.  Sullivan Hill

10   has used discretion, good judgment and worked efficiently to handle the issues that have arisen in

11   this case.  See the Hill Declaration, ¶ 29.

12   **C.  The Rates Charges**

13   Section 330(a)(3)(B) of the Bankruptcy Code requires that the bankruptcy court consider the

14   rates charged for services. Generally, the benchmark that is used is the market.  In In re Busy Beaver

15   Bldg. Ctrs., Inc., 19 F.3d 833 (3d Cir. 1994), the court approved the use of credible evidence of

16   market prices in determining the cost of comparable services rendered in non-bankruptcy cases.  The

17   Third Circuit also noted that not only the rates, but the compensation structures generally prevalent

18   in the market, are embraced by section 330:

19   [W]ith the rise of competitive pressures and the ceaseless evolution of the
     legal community, we may expect to witness law practitioners adapt to the
20   changed circumstances by developing alternative billing practices and
     methods. The strength of the market approach Congress embraced with §
21   330 is that these developments, including regional variations, will
     automatically percolate up through bankruptcy fee allotments. While §
22   330 is not an engine for implementing innovative billing strategies, it will
     readily accommodate alternative practices once comfortably established in
23   the realm of comparable nonbankruptcy legal services.

24   Id. at 856 (applying the market approach to the role of paralegals in bankruptcy proceedings).

25   Here, Sullivan Hill's rates and rate structure are comparable to other comparable firms in the

26   relevant Nevada and California marketplace where many of the case activities were centered.  See

27   the Hill Declaration, ¶ 30.  Attached as Exhibit "D" to the Hill Declaration are excerpts from recent

28

348830-v1                          - 14 -

1    fee applications filed in various Mega Cases[4] pending in District of Nevada, detailing the hourly

2    rates of each firm's respective professionals.  Sullivan Hill observes that its fees for its professionals

3    are no greater than, and in most cases are less than, rates charged by professionals regularly

4    practicing and performing services on larger cases in the District of Nevada, like these cases in

5    which the firm's services are charged here. See the Hill Declaration, ¶ 32.

6    **D.  Whether the Fee is Contingent**

7          The Court authorized the Trustee's retention of Sullivan Hill, and the firm's compensation as

8    an administrative expense on an hourly basis, plus reimbursement of actual, necessary expenses

9    actually incurred.  In one sense, however, representation of statutory parties in every bankruptcy

10    case is contingent. The contingent nature depends on the availability of estate assets to satisfy

11    administrative claims.  In light of the risk taken by the firm, Sullivan Hill asserts that the fees

12    requested herein are reasonable. See the Hill Declaration, ¶ 33.

13    **E.  The Services Were Necessary and Beneficial to the Estates**

14          This application describes the activities undertaken and the results obtained by the Trustee

15    and Sullivan Hill – who have been active protectors of the interests of the estates in a very

16    challenging economic environment.  By quickly and efficiently assimilating and analyzing the

17    complex issues in the case, the Trustee and his counsel attempted to maximize the value of the

18    estates' assets.  The services that were performed were essential to the estates and benefited creditors

19    and other parties-in-interest.  Sullivan Hill has made every effort to avoid excessive and

20    inappropriate administrative expenses in this case. See the Hill Declaration, ¶ 34.

21    **F.  Customary Fee for Comparable Services**

22          Section 330(a)(3)(F) requires that compensation allowed in a bankruptcy case should not be

23    below the level allowed for comparable services in a nonbankruptcy case.  Under this factor, a court

24    assesses the reasonableness of fees of bankruptcy practitioners based market-establishes rates and

25    compensation structures for nonbankruptcy legal services.  This requirement is a departure from

26

27    [4]  Mega cases are single case or set of jointly administered or consolidated cases that involve $100,000,000 or more,
1000 or more creditors or a hold a high degree of public interest, as defined by the United States Bankruptcy Court, for

28    the District of Nevada's website.

348830-v1                                                    - 15 -

1  prior law governing the allowance of compensation.  The drafters of the Bankruptcy Code

2  abandoned the notions of conservation of the estate and economy of administration which were

3  pivotal concepts in assessing compensation under the prior Bankruptcy Act.  Rather, Congress

4  attempted to attract bankruptcy law specialists to make the adjudication of bankruptcy cases more

5  efficient.  As noted in Collier on Bankruptcy:

6  … the change was based on the fundamental economic principle that the
 payment of arbitrarily lower rates to lawyers in bankruptcy proceedings
7  compared to market-established rates for non-bankruptcy legal service
 would cause attorneys to leave bankruptcy practice or to refrain from
8  entering bankruptcy practice. An inherent risk in this system, as
 recognized by Congress, is that creditors would have to absorb the cost of
9  improper and inefficient administration.

10  3 COLLIER ON BANKRUPTCY, ¶ 330.03[12].

11  Sullivan Hill's billing statements depict the hourly rates charged by the firm's attorneys, as well as

12  the actual total time spent by each attorney and paralegal for services provided in this case.  The fees

13  prayed for in this application are based on the normal and customary hourly charges of Sullivan Hill.

14  Such fees are comparable to ones which would be charged for services provided by the firm in non-

15  bankruptcy types of cases.  Such fees are comparable to ones which would be charged for services

16  provided by <u>other</u> firms in the relevant Nevada and Southern California marketplace in non-

17  bankruptcy types of cases.  <u>See</u> the Hill Declaration, ¶ 35.

18  **G.  <u>The Experience, Reputation and Ability of the Attorneys Involved</u>**

19  The qualifications of the attorneys performing services on behalf of the Trustee in these cases

20  are set forth in Exhibit "E" attached to the Hill Declaration.  Sullivan Hill believes that each of the

21  persons listed on Exhibit "E" is highly qualified to perform the services rendered on the Trustee's

22  behalf and have billing rates commensurate with similarly qualified attorneys.  Sullivan Hill submits

23  that it has a well-earned reputation for providing high quality and efficient legal services.  <u>See</u> the

24  Hill Declaration, ¶ 37.

25  / / /

26  / / /

27  / / /

28  / / /

## VII.

## PREPARATION OF FEE APPLICATION

Sullivan Hill submits that it should receive compensation for time spent in preparing fee applications in an appropriate amount as determined by the Court.  See 11 U.S.C. § 330(a)(6); In re Nucorp Energy, Inc., 764 F.2d 655 (9th Cir. 1985).

## VIII.

## TRUSTEE'S REVIEW

Pursuant to Section (b)(1)(v) of the UST Guidelines, Sullivan Hill has provided the Trustee with a copy of this fee application and its billing statements.  The Trustee has reviewed the Sullivan Hill billing statements as adjusted, and has no objection to those statements.

## IX.

## CONCLUSION

Based on the foregoing, Sullivan Hill respectfully requests that the Court allow its Chapter 7 fees of $126,154.75 and Chapter 7 costs of $3,137.51. for the period of August 1, 2012 through and including November 30, 2012 (which fees and costs have been paid in part pursuant to this Court's Interim Compensation Procedures), and authorize the immediate payment of the unpaid portion of such fees and costs incurred during this period in the amount of $10,410.50, leaving a remaining 10 percent ($10,410.50) as a hold back pending further order of the Court, with all such fees and costs to be allocated on an interim basis between the estates as set forth herein, and granting such other relief as the Court may find just and proper.

Dated:        February 13, 2013            SULLIVAN, HILL, LEWIN, REZ & ENGEL
                                                          A Professional Law Corporation


                                              By:        /s/ James P. Hill
                                                          James P. Hill, CA SBN 90478 (Pro Hac Vice)
                                                          Jonathan S. Dabbieri, CA SBN 91963 (Pro Hac Vice)
                                                          Elizabeth E. Stephens, NV SBN 5788
                                                          Attorneys for Chapter 7 Trustee,
                                                          William A. Leonard, Jr.

348830-v1                                    - 17 -