THE MAJORIE FIRM LTD.
Francis B. Majorie
*Pro Hac Vice* (Per BK Dkt. 1915 ¶ 153)
1450 Cottonwood Valley Court
Irving, Texas 75038
Telephone: (214) 306-8107
Fax Number: (214) 522-7911

*Counsel for Claims Recovery Trust*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.: BK-S-09-32824-RCJ (Lead Case) |
| ASSET RESOLUTION, LLC, | Chapter 7 |
| Debtor. | |
| Jointly Administered with Case Nos.:<br>BK-S-09-32831-RCJ; BK-S-09-32839-RCJ;<br>BK-S-09-32843-RCJ; BK-S-09-32844-RCJ;<br>BK-S-09-32846-RCJ; BK-S-09-32849-RCJ;<br>BK-S-09-32851-RCJ; BK-S-09-32853-RCJ;<br>BK-S-09-32868-RCJ; BK-S-09-32873-RCJ;<br>BK-S-09-32875-RCJ; BK-S-09-32878-RCJ;<br>BK-S-09-32880-RCJ; BK-S-09-32882-RCJ | **MEMORANDUM IN OPPOSITION TO MOTION OF COMMERCIAL MORTGAGE MANAGERS FOR RELIEF FROM STAY PURSUANT TO 11 U.S.C. 362 TO PROCEED IN NON-BANKRUPTCY FORUM [Dkt Nos. 3306 & 3308]**<br><br>Courtroom 4B<br>Lloyd D. George Federal Courthouse<br>333 Las Vegas Blvd., South<br>Las Vegas, Nevada 89101<br>Judge Robert C. Jones<br><br>Hearing: Monday, May 14, 2018 at 10am |
| **Affects this Debtor Only** | |

Plaintiff The Claims Recovery Trust ("CRT") and direct lender Universal Management, Inc., by and through their counsel, Francis B. Majorie, oppose the Motion Of Commercial Mortgage Managers For Relief From Stay Pursuant To 11 USC 362 To Proceed In Jon-Bankruptcy Forum [Dkt. Nos. 3306, 3307, & 3308](the "Lift Stay Motion"), as follows:

///

///

///

///

Page **1** of **17**

# I.

# **PRELIMINARY STATEMENT**

Through its present Lift Stay Motion, loan servicer Commercial Mortgage Managers, Inc. ("CCM") asks this Court to lift the automatic stay so that CCM can proceed with an arbitration concerning its handling—and failure to fully and properly account for—over $23 million of dollars it has received and partially disbursed for what is generally known as the "Marlton Square" loan. CMM asserts that the stay should be lifted so that it can engage in an "arbitration in which CMM is asking the arbitrator to review all funds spent and oversee the final distribution." CMM Motion at 7. CMM asserts that arbitration is required because there are arbitration clauses in its servicing agreement and in an operating agreement of the limited liability company CMM formed to take title to the real estate securing the Marlton Square loan when CMM foreclosed. *Id.*

CMM's Lift Stay Motion must be denied. CMM correctly asserts that its distributions of the DLs' cash must be "without error"—in fact, as the Court ruled in the '892 case and *Barkett*, a loan servicer owes the DLs a fiduciary duty to safeguard and account for all of the cash it has handled for the DLs. But CMM incorrectly asserts that the proper forum for making such an accounting is an arbitration rather than this Court. Nine of the twelve factors for showing "cause" to lift the automatic stay under *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984) *favor maintaining the stay,* and the remaining three are inapplicable. On proper analysis, this Court—not arbitration—is the only forum with sufficient jurisdiction and available remedies to approve a complete and final accounting and direct payments from and to all interested parties in connection with such an accounting. The Lift Stay Motion must therefore be denied and CMM should be directed to commence an adversary proceeding in this Court to obtain the final accounting and discharge of liability CMM seeks.

## II.

## **FACTS APPLICABLE TO THE MOTION**

The facts relevant to the Lift Stay Motion and this opposition are set forth in the Declaration of David Rentz and its exhibits (submitted with the Lift Stay Motion) and the Declarations of Donna Cangelosi and Kevin Olsen and the exhibits attached thereto (submitted concurrently herewith). In general, the evidence shows that the Marlton Square loan was a real-estate secured loan originated by USACM. There were 272 direct lenders ("DLs") who contributed $30 million of principal for the loan. In or about July 2010, CMM received the approval of the holders of 52.87 percent of the loan to serve as the loan servicer. Approximately half of the 52.87 percent of DL interests (or about 25% of the overall loan) were held directly or indirectly by David Rentz, who is the principal of CMM. *See* Olsen Declaration. Rentz refused to allow any other entity to be the servicer. *Id.*

By CMM own admission, it has received $23,065,320 in cash for the DLs, which has "netted" only $7,954,369.34 for DL distributions (or only about 34% of the cash actually received for the collateral). *See* Lift Stay Motion at 6-7; Olsen Declaration. The gross receipts resulted from two sales of the real estate collateral: one in May 2012 for $15,065,320; and another in February 2016 for $8 million. Serious questions exist with respect to where the **$15,110,951** difference between the gross cash received and "net" cash available for distributions was spent and why. For example, based on information supplied by CMM to certain DLs, $800,000 of the initial distribution was earmarked to be paid to specific direct lenders but was not disbursed; the money should be in an escrow account for them but no proof of the existence of such an account or of the $800,000 has been forthcoming. *See* Olsen Declaration. It also appears from the information received to date that CMM has taken $5.4 million of fees and unsubstantiated "expenses" for

affiliates. *Id.*; *see also* Olsen Declaration Exhibit 5 (spreadsheet). There are numerous other discrepancies which have yet to be answered and are detailed in the Cangelosi and Olsen declarations.

CMM filed numerous reports with the Court concerning its general activities with respect to the Marlton Square loan. However, such reports did not provide detailed financial accountings to the DLs. Meanwhile, like many of the other USACM loans in this bankruptcy case, a "point person" or "loan captain" has been informally monitoring the loan (in this case, Kevin Olsen), with the assistance of Donna Cangelosi and others. *See* Olsen Declaration. Both Olsen and Cangelosi have repeatedly requested formal accountings from CMM throughout CMM's period as servicer, with increased efforts taking place after the second sale of collateral (*i.e.,* from about June through December 2016). *See, e.g.,* Cangelosi Declaration Exhibit 1 (email chain in June 2016); Olsen Declaration Exhibit 1 (February 2013 email); Olsen Declaration Exhibit 2 (January 2016 to July 2017 emails). Those demands were also accompanied by detailed descriptions of problems and questions about how CMM was handling the DLs' money.

CMM's "response" to the demand for more information and correction was to threaten Cangelosi and Olsen and file an arbitration demand in December 2016. *See* Cangelosi Declaration Exhibit 2 (December 2016 email chain); Olsen Declaration Exhibit 6. CMM then followed that demand with a letter to the DLs emphasizing that arbitration "would be a long, expensive, and drawn out" process and proposing that they simply stipulate to whatever CMM proves at the arbitration, that CMM receive a total discharge of its fiduciary duties, and that any fees and costs for the arbitration be allocated solely to any objecting DL. *See* Olsen Declaration Exhibit 3 (February 2, 2017 letter from CCM to DLs, with attachment). CMM followed that letter with yet another, In July 2017, stating:

> Some LLC members voiced their extreme frustration that they were named in the arbitration. **Especially given the fact that we asked that the cost of the arbitration be paid by the losing party, putting the LLC members and us in a financial risk position.** Some LLC Members wanted nothing to do with the arbitration. Therefore, our attorneys prepared a form that would allow each LLC member to opt out of the arbitration, but be bound by the results. Signing the form did two things:
>
> 1. It eliminated the possibility of any arbitration cost being assessed against those that opted out;
>
> 2. It lowers the overall cost of the arbitration.

*See* Olsen Declaration Exhibit 4 (July 31 2017 letter from CCM to DLs)(bold added). Then, when many more months had passed and it was met with the assertion that the automatic stay barred the arbitration, it filed the present Lift Stay Motion.

The CRT is a trust formed by this Court's "Global Settlement Order" [Dkt. 1915] to provide direct lenders a vehicle to protect their DL interests by aggregating their claims and utilizing the CRT to litigate their interests as a group. Kevin Olsen's company, Universal Management, Inc. ("UMI"), is a holder of Marlton Square DL interests in the amount of $60,000 and is now a putative member of the limited liability company formed by CMM to take title to and then sell the DLs' real estate. Olsen has asked the CRT and counsel to represent UMI for the purpose of opposing the Lift Stay Motion. If the Lift Stay Motion is denied, the CRT will pursue the "Claims Assignment" procedure under this Court's order to allow DLs to Opt-In to having the CRT protect their interests with respect to the final accounting and discharge requested by CMM.

### III.

### ARGUMENT

**A.    This Court Has Jurisdiction To Adjudicate The Issues In The Arbitration**

CMM asserts that, although this Court has subject matter jurisdiction to decide whether or not the stay should be lifted, the issues which are subject to the arbitration are "not likely subject

to this Court's jurisdiction as set forth in *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011)." Lift Stay Motion at 8. Because CMM does not provide any additional details to support this assertion, it is difficult to know why it contends that there are "likely" jurisdictional issues under *Stern*. Regardless, CMM's jurisdiction "argument" is wrong for at least three reasons.

First, to the extent CMM refers to *Stern's* holding concerning the difference between the powers of an Article III and Article I court to decide "non-core" matters, CMM's argument fails. Although Congress has divided bankruptcy disputes into "core" and non-core" in 28 U.S.C. §157, there is no question that Congress vested the *District Courts* of the United States with "original and exclusive jurisdiction of *all cases* under title 11." 28 U.S.C. §1334(a)(italics added). There is also no question that this Court has continuously exercised Article III jurisdiction over the Asset Resolution bankruptcy case ever since it withdrew the automatic reference on January 25, 2010. *See* Cangelosi Declaration Exhibit 6 (January 25, 2010 Order, Dkt. No. 346-1). Thus, this Court does not face a *Stern* jurisdiction issue concerning the matters which will be subject to arbitration.

Second, to the extent CMM's reference to "jurisdiction" concerns a possible lack of complete diversity between CMM and the DLs, its argument also fails.[1] In *McKnight v. Barkett*, Case No. 2:10-cv-01617 ("McKnight"), this Court was faced with a motion to dismiss for lack of subject matter jurisdiction on virtually identical jurisdictional facts. In that case, as in this one, DLs holding more than 51% of the DL interests in the "Castaic" loan—but not all of the DLs in

---

[1] The servicing agreement submitted by CMM states that CMM is a **California** corporation. (Dkt. 3308, Ex. A at page 1) CMM does not attach a copy of the operating agreement of Marlton Recovery Partners, LLC ("MRP"), the entity CMM formed to take title to the real estate collateral upon foreclosure. However, the servicing agreement states at page 3 that MRP would be a California limited liability company.  (*Id.*) The initial letter from the AAA to the "parties" when CMM commenced the arbitration in December 2016 reflects addressees in the following states: Arizona (2); **California** (16); Florida (1); Idaho (2); Illinois (3); Indiana (1); Massachusetts (2); Nevada (34); New York (2); Texas (2); Utah (1); Washington (1). Olsen Declaration Exhibit 6. Two of those "parties" were law firms: lawyers for CMM and the law firm of Bickel & Brewer. *Id.*

that loan—appointed DACA to act as the servicer. DACA foreclosed on the property which served as collateral for the loan and put title to that property in a limited liability company. The non-consenting DLs included the Estate, but the Estate was not a party to the proceeding itself. There was also a lack of complete diversity between the servicer, the DLs, and the borrower and guarantor. *See* Cangelosi Declaration Exhibit 4 (August 3, 2012 Order). The Court held that it had subject matter jurisdiction to adjudicate all of the issues between the parties under 28 U.S.C. §1334, stating:

> In order to be "related to" a bankruptcy case such that federal jurisdiction is independently supported under § 1334(b), the present case must have some conceivable effect on a bankruptcy estate. That is, it must seek an award against the estate, it must consist of a claim owned by the estate, or it must otherwise conceivably effect the administration of the estate. . . . **Asset Resolution . . . still owns its fractional interests in the Castaic loans**, because the 51% rule does not permit the majority interest to transfer a minority interest's ownership itself, but only governs administration of the loans. **Because the present action will determine whether the Castaic entities breached a contract to which Asset Resolution is also a party, whether Barkett breached a guaranty to which Asset Resolution is a party, and will result in declarations concerning the validity of these documents, the Court finds that the outcome of the present case could have a conceivable effect on the bankruptcy estate and will not dismiss for failure to satisfy §1334(b).**

*Id.* at 8-9 (emphasis added). This *Barkett* ruling is equally applicable here.

According to CMM's motion papers, it received $23,065,320 in cash for the DLs, which "netted" only $7,954,369.34 for distributions. *See* Lift Stay Motion at 6-7. CMM claims that it "had no alternative" but to file the arbitration because it has been "unable to make absolutely certain that a final distribution was without error." Lift Stay Motion at 7. The arbitration will therefore necessarily involve a detailed, granular review of all of the cash CMM received for the collateral, where the **$15,110,951** difference between the gross cash received and "net" cash available for distributions was spent and why, and which DLs received some distributions while others have not received any, and why. The proceeding will also involve a determination of

whether CMM properly received over $ 5.4 million of "fees" and "expenses" under the servicing agreement and/or the limited liability company operating agreement.[2] *See* Olsen Declaration; *see also* Lift Stay Motion at 10-11. All of these determinations will directly impact the payments to be made to the Estate. Thus, this Court has subject matter jurisdiction to adjudicate all of the issues which would be subject to CMM's arbitration.

Third, this Court has explicitly retained jurisdiction over issues relating to CMM's servicing of the loan and its impact on Asset Resolution's DL interest. Paragraph 8 of the Court's order confirming the 52.87 percent DL vote appointing CMM as servicer (Dkt. 3308, Exhibit B) states: "This Court retains jurisdiction to enforce and interpret this Order and further retains jurisdiction over the above-listed Debtors and all property of such Debtor's bankruptcy estates as defined by 11 U.S.C. §541, including but not limited to a Debtor's Direct Lender interest." Again, as in *McKnight*, the issues to be adjudicated in CMM's proposed arbitration will have an effect on the Estate's DL interest. For the foregoing reasons, the Court can and should reject CMM's assertion that the court is "not likely" to have jurisdiction over the allegedly "arbitrable" disputes.

B.  **The Automatic Stay Applies To The Arbitration**

CMM asserts at page 9 and elsewhere in the Lift Stay Motion that it "is entirely possible this Court may find the automatic stay does not apply to CMM's current dispute with the owners of MRP." But this assertion is wrong.

11 U.S.C. §362(a)(3) stays "any act to obtain possession of property of the estate or to exercise control over property of the estate." 11 U.S.C. § 541(a)(1) defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the

---

[2] CMM asserts that the operating agreement governs all of the DLs' interests, but this cannot be the case in light of the Court's other ruling in *Barkett* (discussed below) that non-consenting DLs cannot be forced into membership of an entity under the 51% rule.

case." Sections 54(a)(6) and (7) in turn include "proceeds, product, offspring, rents, or profits of or from property of the estate" and "[a]ny interest in property that the estate acquires after the commencement of the case."

CMM asserts at page 9 of its motion that the Estate holds a 1.5% interest in MRP and acknowledges that the Estate is owed fees and expense reimbursements out of cash collections which arose after the bankruptcy was commenced. Moreover, as noted above, the "no error" distributions relief CMM claims to be seeking in the arbitration itself represents an act to exercise control the amount of the cash to be paid over to the Estate and all of the other parties in interest. Thus, the stay applies by CMM's own version of the facts (the arbitration involves membership interests of the Estate) or by virtue of the relief it seeks about distributions (proceeds from the Estate's DL interest or its interest in cash distributions for reimbursement of fees and expenses which arose after commencement of bankruptcy).

CMM argues at page 9 of the Lift Stay Motion that the Court "may wish to consider this motion moot" or the that the stay no longer applies because CMM made a distribution based on an agreement between Bickel & Brewer, Sullivan Hill, and unidentified "others." CMM does not cite any authority for such a "mootness" argument. It is, however, well-established in the Ninth Circuit that, in order to determine that a waiver of a right under the bankruptcy code has occurred, the court would need to find: "(1) the existence at the time of the waiver of a right, privilege, advantage or benefit; (2) the actual or constructive notice thereof; and (3) the intention to relinquish such right, privilege, advantage or benefit." *George v. Morro Bay (In re George)*, 177 F.3d 885 (9th Cir. 1999)(alleged waiver of rejection right by accepting lease payment). Here, there is no evidence in the record to establish any intention by the Debtor or anyone else to waive the automatic stay by agreeing to an interim distribution. Moreover, there is a substantial difference

between accepting an interim distribution and participating in a legal proceeding intended to account for all of the cash receipts and disbursements and ultimately discharge CMM from its fiduciary duties over handling $25 million belonging to the Estate and the other DLs. Thus, the Court can and should find that the filing and continued prosecution of the arbitration violates the automatic stay.

**C.     CMM Has Not Established Cause To Lift The Stay**

CMM's last arguments (at pages 9-13) involve its efforts to show that the automatic stay should be lifted. CMM correctly notes that the stay may be lifted for "cause" under 11 U.S.C. §362(a)(1) and that "cause" is determined on a case-by-case basis under what are generally referred to as the twelve *Curtis* factors. As shown below, these factors warrant a refusal to lift the stay.

**1.     Arbitration Cannot Completely Resolve The Issues, But This Court Can**

CMM asserts that the arbitration will completely resolve the issues. That is not true. It is axiomatic that a party cannot be forced to arbitrate unless that party has agreed to do so under the terms of relevant state law. *See* Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009). Here, by CMM's own admission, slightly less than half of the DLs (47.13%) did NOT vote for retaining CMM, did not sign the arbitration agreement, and did not become a member of the limited liability company which took title to the real estate and (apparently) received the DLs' cash. The Estate is one of those DLs. Moreover, of the 52.87 of the DL interests which approved the servicing agreement, almost half were held by the principal of CMM, David Rentz. *See* Olsen Declaration. There is also no evidence in the record that CMM followed the procedures for creating a foreclosure LLC under NRS 645B.356 (providing that "[a]ny term of a contract or other agreement that attempts to alter or waive the requirements of this

section is void"). There is thus a very real question as to whether CMM can require all of the DLs—including the Estate—to participate in a binding arbitration. Without all of the participation of the DLs, complete relief cannot be granted.

In fact, CMM's efforts to suggest that all of the DLs are bound to arbitrate under the 51% rule, the servicing agreement, or other MRP operating agreement is contradicted by the rationale of another ruling of this Court in *Barkett*. On January 5, 2015, the Court addressed the argument that allowing an entity controlling a 51% interest to obtain a judgment against the guarantor of a loan "would strip minority direct lenders of their interests in the Castaic loans because it would state that the 51% rule permits the assignment of 100% of the interest in fractionalized notes and security instruments upon the consent of 51%." *See* Cangelosi Declaration Exhibit 5 (January 5, 2015 Order) at 10. The Court was very clear that such an assertion was:

> **Not so. The 51% rule is not a rule whereby 51% of the owners of the beneficial interest in a loan may assign to themselves the beneficial interests of the minority. This Court has never so ruled, and no party before the Court, including DACA, has ever so argued.** The language of the Proposed Judgment is consistent with the law and makes clear that DACA will be the "sole beneficiary of record" under the deeds of trust, but not that it will be the sole beneficiary of the loans. **In fact, it makes clear that DACA will be a fiduciary for the minority interest-holders in the Castaic loans, who remain entitled to their pro rata shares of the proceeds of any recovery on those loans.** That is consistent with the 51% rule, which prevents minority interest-holders from frustrating action on a loan while protecting their equitable interest in the loan upon a decision by the majority interest-holders to pursue an action.

*Id.* at 10-11 (bold added). The non-consenting DLs—including the Estate—cannot be forced to arbitrate claims by the fifty-one percent rule. Only this Court, with its *in rem* jurisdiction over the loans, has the power to bind all of the relevant parties to a final accounting in one proceeding. Thus, the first prong of *Curtis* counsels against lifting the stay.

///

///

Page **11** of **17**

### 2. Requiring Loan Servicers To Render Complete And Final Accountings Has A Strong Connection To This Bankruptcy

CMM's next assertion is that the arbitration "will have very little, if any, impact or interference with the bankruptcy case . . . ." Lift Stay Motion at 11. This argument is wrong for two reasons.

First, as shown above, the rendition of a final accounting will require decisions about distributions and the operative agreements which will lead directly to a higher or lower payment to the Estate for both its DL interest and its fees and reimbursable expenses.

Second, in a very real sense, the entire Asset Resolution bankruptcy case has centered around protection of the DLs with respect to the handling of cash received from the USACM loans. CMM's description of the Estates interest as "minimal" echoes the statement by Compass representatives that Compass' claimed fees represented only a small amount to each DL. In fact, CMM's real motivation to avoid explaining how it handled the DLs' funds can be seen in what CMM did right after demanding arbitration: it sent a letter to the DLs emphasizing that arbitration "would be a long, expensive, and drawn out" process and proposing that they simply stipulate to whatever CMM proves at the arbitration, that CMM receive a total discharge of its fiduciary duties, and that any fees and costs for the arbitration be allocated solely to any objecting DL. *See* Exhibit 4 (February 2, 2017 letter from CCM to DLs, with attachment). This Court should decline to lift the stay so that all of the DLs can be protected from such strong-arm tactics and all of the issues concerning CMM's handling of the DLs' $25 million can be accounted for in the full light of litigation here.

///

///

///

### 3. The Proceedings Do Involve The Debtor As Fiduciary

CMM asserts that the arbitration proceeding involves its own handling of the cash and its own conduct and therefore does not involve conduct by the Debtor as a fiduciary. Although that is true in the most narrowest of senses, it once again misunderstands the history of these proceedings. The Chapter 7 trustee has always attempted to act to protect the DLs, whenever his efforts to do so did not violate his overall duties as trustee. Litigation of the issues by the Estate will substantially aid the court in the examination of the issues for similarly-situated DLs (*i.e.,* the non-consenters). The third *Curtis* factor therefore favors maintaining the stay.

### 4. This Court Is Essentially A "Specialized Tribunal" When It Comes To The USACM Loans

CMM's next assertion is that there is no "specialized tribunal" established to hear the issues raised by the arbitration, so this *Curtis* factor is not applicable. This assertion, again, is true only in the most limited of senses. This Court has almost eight years of experience addressing almost every conceivable issue with respect the USACM loans, servicing of those loans, the 51% rule, and oversight of the collection of proceeds, applications of fees and expenses, and distributions to DLs. The arbitrator, on the other hand, has no such experience and would have to be educated about many of this Court's rulings. This factor warrants maintaining the stay.

### 5. Insurance Carrier.

It is agreed that this factor is inapplicable.

### 6. The Debtor Is More Than A Bailee

CMM asserts at page 12 that the MRP Arbitration is "without question a dispute involving third parties" because all of the DLs are "current equity holders" in MRP. As noted in connection with the first *Curtis* factor, there are very real "questions" under this Court's rulings in *Barkett* and

Nevada law about whether the Estate and other non-consenting DLs can be forced into exchanging their DL interests for equity positions simply because a slight majority of interests have decided to join an LLC. The Estate is also asserting its on DL interest and its right to collect fees and expenses and is therefore serving as more than a "conduit." This factor therefore warrants maintaining the stay.

### 7. Litigation Through Arbitration Will Prejudice The Interests Of Others

CMM rehashes its argument that the Estate's DL interest is "minimal" and it can seek payment of its fees and expenses without fully participating in the arbitration. But the seventh element of *Curtis* focuses on whether arbitration would prejudice the interests of other creditors or parties in interest. The answer is that it will. This Court has adjudicated numerous issues which will need to be decided in the arbitration. The DLs in Marlton Square deserve to receive the same consistency as the other DLs in the many loans which have been brought to this court for resolutions. The seventh *Curtis* factor therefore warrants maintaining the stay.

### 8. Equitable Subrogation.

It is agreed that this factor is inapplicable.

### 9. Avoidable Judicial Lien.

It is agreed that this factor is inapplicable.

### 10. Judicial Economy And Expeditious And Economical Determination Will Be Fostered Here, Not In Arbitration

CMM's sole argument about this factor is that it would be "inequitable and a waste of resources to require the parties to start over by bringing litigation before this Court." CMM acknowledges that it has not even completed service on all the DLs, let alone engaged in any activity other than some mailings, some letter writing, and a preliminary conference. Requiring

CMM to serve all DLs by mail in an adversary action in this Court is not unduly burdensome. The litigants will also save themselves from what CMM told the DLs would be a "long, expensive, and drawn-out arbitration process" by litigating here. There are no arbitration fees to be paid here. The CRT will be available to be utilized by the DLs if they so choose, in this Court. Moreover, there is no question that the litigants will receive the benefits of this Court's learning curve on the substantive issues. Finally, this Court has numerous powers not held by the arbitrator, such as for example appointing an expert accountant under FRE 706 or a special master under FRCP 53. Thus, the tenth *Curtis* factor favors maintenance of the stay.

**11.  The Arbitration Has Just Started And Is Nowhere Near Trial**

CMM asserts that the factor of nearness to trial is "inapplicable."  It is only "inapplicable" because the arbitration is at the very beginning stage and no trial has been set (let alone is anywhere near in sight). This factor favors maintaining the stay because there would be no advantages of a prompt trial in arbitration over litigation here.

**12.  The Impact On The Parties And "Balance Of Hurt"**

CMM's last argument is that the "balance of hurt" is in its favor because a majority of the DLs voted to substitute CMM as servicer and that appointment required the DLs to arbitrate. If the Rentz, CMM-insider DL interests are removed from the equation, there is no majority "choice" for arbitration. CMM does not provide ANY  reason why arbitration is a better forum than this Court, and its conduct in arbitration to date—especially with respect to its "waiver" letter to the DLs—suggests that CMM wants to use the more informal arbitration process as a means to avoid any real scrutiny of how it has handled the DLs' $25 million.

CCM also asserts that the Court should find the "balance of hurt" in CCM's favor  because the Estate has not made any "specific claim" for fees even though the Trustee "has been aware of

Page **15** of **17**

the MRP Arbitration for more than a year." The more salient question is why CCM has allowed the arbitration to languish. Could it be that it was trying to collect DL waivers before getting to the merits? And why hasn't CMM simply provided a detailed accounting from a certified public accountant—something it promised to do several years ago? *See* Exhibit 5 (report to DLs). Could it be that CMM preferred the "long, expensive, and drawn out accounting process" to a straightforward accounting from a CPA detailing what money went where and why?

These are not mere technical arguments. As the Declarations of Donna Cangelosi and Kevin Olsen and their exhibits submitted herewith show, there are very real questions about the $23 million of DLs' cash have been handled. CMM agreed to render reports to this Court (and has done so) for many years. There is no reason why it should not make the full and complete disclosures necessary to obtain a final discharge of its obligations to the Estate and the other DLs. The motion to lift stay should be denied.

### IV.

### CONCLUSION

For these reasons, the CRT requests that the Court DENY the Motion To Lift Stay and grant the CRT and DLs such other relief to which they prove entitled.

Dated: April 30, 2018

                                                      THE MAJORIE FIRM LTD.

                                                      By:   */s/ Francis B. Majorie*
                                                               Francis B. Majorie

                                                      *Counsel for Claims Recovery Trust*

CERTIFICATE OF SERVICE

This certifies that the undersigned has served the foregoing opposition on counsel for CCM, the Debtor, and others through the ECF system on April 30, 2018.

*/s/ Francis B. Majorie*
Francis B. Majorie