THE MAJORIE FIRM LTD.
Francis B. Majorie
*Pro Hac Vice* (Per BK Dkt. 1915 ¶ 153)
1450 Cottonwood Valley Court
Irving, Texas 75038
Telephone:  (214) 306-8107
Fax Number: (214) 522-7911

*Counsel for Claims Recovery Trust*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re | ) Case No.: BK-S-09-32824-RCJ (Lead Case) |
| | ) |
| ASSET RESOLUTION, LLC, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) **DECLARATION OF DONNA** |
| Jointly Administered with Case Nos.: | ) **CANGELOSI  IN OPPOSITION TO** |
| BK-S-09-32831-RCJ; BK-S-09-32839-RCJ; | ) **MOTION OF COMMERCAL** |
| BK-S-09-32843-RCJ; BK-S-09-32844-RCJ; | ) **MORTGAGE MANAGERS FOR** |
| BK-S-09-32846-RCJ; BK-S-09-32849-RCJ; | ) **RELIEF FROM STAY PURSUANT TO** |
| BK-S-09-32851-RCJ; BK-S-09-32853-RCJ; | ) **11 U.S.C. 362 TO PROCEED IN NON-** |
| BK-S-09-32868-RCJ; BK-S-09-32873-RCJ; | ) **BANKRUPTCY FORUM [Dkt Nos.** |
| BK-S-09-32875-RCJ; BK-S-09-32878-RCJ; | ) **3306 & 3308]** |
| BK-S-09-32880-RCJ; BK-S-09-32882-RCJ | ) |
| | ) Courtroom 4B |
| | ) Lloyd D. George Federal Courthouse |
| | ) 333 Las Vegas Blvd., South |
| | ) Las Vegas, Nevada 89101 |
| | ) Judge Robert C. Jones |
| | ) |
| **Affects this Debtor Only** | ) Hearing:  Monday, May 14, 2018 at 10am |

I, DONNA CANGELOSI, hereby declare under penalties of perjury as follows:

1.    My name is Donna Cangelosi. I am over the age of 18 and able to testify if called upon.   The statements in this declaration are true and are based on my personal knowledge or my review of records, as indicated below.

2.    I am not a direct lender in Marlton Square, but hold governing positions on both the B&B DL Qualified Settlement Trust ("QST") and the Claims Recovery Trust ("CRT"). The QST is the equity interest holder in the Asset Resolution Estate per the Global Settlement in 2012 [Dkt No. 1915]. The Estate holds a direct lender interest of 39% of the subject property, Marlton Square. The CRT was created, among other reasons, to assist direct lenders in pursuit of claims.

3.    I have overseen and/or performed all the calculations for every distribution to DLs from various USACM loans since 2012 and have been responsible for distribution for all the funds to the B&B DLs and for most of the funds to the non B&B DLs from the liquidation of loans and settlement funds. During that period, we have issued over 10,000 checks with no errors, save for one (whereby 2 checks to different parties stuck together and were mailed together).

4.    No DL has ever raised a concern over not receiving a check, miscalculations, or any improper issues. Payments and calculations are fully documented and transparent. I and my team carefully work to find every DL or their legacy heirs, work through divorce, trust, probate and other issues and assure everyone is properly paid every penny they are owed. We have worked successfully with the Estate to find DLs for whom the Estate was holding "stale" funds from the 2010/2012 distributions and have gotten that money to those DLs or heirs. Currently, we hold money only for those whose funds are tied up in probate ownership issues, and those funds are held in a segregated account. We also secure all Tax ID numbers to assure for proper reporting. We maintain a secure sophisticated data base tracking all DLs, contact information, holdings, their voting records and distributions and TINs.

5.    In 2016, Kevin Olsen contacted me expressing his concern that CMM and David Rentz as manager of Marlton Recovery Partners had sold the remaining parcels of Marlton Square without so much as informing its members and DLs of the sale. He also expressed frustration regarding his repeated ignored requests to CMM for an accounting following the January 2012 distribution. He expressed that during that period, he had many DLs express concern over the lack of transparency and or missing distributions. Kevin requested The Claims Recovery Trust get involved to apply pressure for CMM to produce the required accounting transparency.

6.    On June 1, 2016, I wrote to David Rentz requesting a complete and transparent accounting. Exhibit 1 of this declaration is a duplicate of the email chain whereby I request that accounting. In this exchange, I cordially state to Mr. Rentz that he promised the Court he would make this available within a specified period, and we were prepared to file a motion to compel if it was not produced. This email chain also contains conversation concerning the facts as they were known at that time (I subsequently learned that the facts were different).

7.    Sometime between late June and August of 2016, it is my understanding a form of accounting was finally sent to the Marlton members/DLs. I did not receive a copy of that accounting. I have the mailing envelope of the package sent to Kevin Olsen and the postage stamp states CMM mailed it on August 1, 2016, even though the letter was dated June 24, 2016. The package contains various Quick Books-generated financial reports through February 28, 2016.

8.    In September 2016, Kevin sent me the accounting package he received from CMM for my review. Up until that point, I had no information regarding the accounting or practices related to CMM or Marlton Recovery Partners.

9.    Meanwhile, on July 18, 2016, Mike Milo of CMM sent an email to Rob Millimet of Brewer Attorneys (formerly Bickle & Brewer) requesting verification of the B&B DLs, attaching a spread sheet. My June 1 email had directed CMM to send any payments intended for the

Page **3** of **7**
Page **3** of **7**

Marlton B&B DLs to the QST for subsequent distribution, as has been customary of all distributions since 2012 in all assets. Mr. Millimet sent me the email and attachment for my review. Carol Kesler and I embarked upon an exercise to compare CMM's records to ours and provided numerous discrepancy reports to Mr. Millimet. Many emails were exchanged between Mr. Millimet and CMM until Sept 12, 2016, after which my records show communications between CMM and Mr. Millimet ceased.

10.     Between the period of September 12, 2016 to September 15, 2016, I commenced communicating directly via email with Rentz regarding the first distribution discrepancies, which were numerous. Exhibit 2 to this declaration is a duplicate of the email chain between us. In this email, I stated that we needed to sit down and compare records and that the appropriate time to do so was when we were to conduct a financial review the following week on September 20 and 21. I also expressed concern over why this review needed to be done at his attorney's office, stating it was an added expense that the DLs did not need to incur. Rentz did not respond.

11.     On September 20 and 21, Kevin Olsen and I conducted a financial review at CMM's law offices of Ervin Cohen & Jessup. The financial information we were presented was only made available through Feb 28, 2016. Some of the information discovered during and after that financial review is reported below. The financial review was conducted under close scrutiny of one of the firm's paralegals. We were not permitted to be alone in the room, the paralegal took notes of the discussions between Kevin and me, and the paralegal noted all the documents for which we requested copies. We repeatedly asked when David Rentz or any other CMM representative would be coming and were told they did not know. Mr. Rentz finally did appear for about five minutes and avoided answering any questions we had for him, stating he didn't know or remember. He quickly exited and we did not see him again.

12.      For approximately two months, Kevin and I diligently worked on verifying various items reflected in the CMM accounting, including verifying that there were missing 2012 distributions to various DLs and determining the rightful sums that should have been distributed to each and every Marlton DL in the 2012 distribution. We discovered that all payments CMM made to all DLs were incorrect and DLs were treated unevenly. We created discrepancy reports and set about rectifying these uneven payments through the final distribution. However, in order to do so we needed the accounting from Feb 28, 2016 to October 30, 2016 (which we were not provided).

13.      During this period, we also identified discrepancies between the bank statements, profit & loss statements and balance sheets presented by CMM. We requested the additional accounting information for the periods from March 1 through October 2016 (through lawyer Jann Chubb) and received bank statements with some but not all check images. However, we did not receive an accounting or supporting documentation for any checks.

14.      Meanwhile, CMM's attorneys were making allegations that we were holding up the final distribution. We were – we wanted CMM to get it right.

15.      **RESULTS OF CERTAIN FINDINGS REGARDING CMM PRODUCED RECORDS:**

- In 2012, CMM announced that Marlton Recover Partners would be distributing $6 Million to the member/DLs from the $15+ Million sale to Kaiser. Aside from the Member/DL distribution being incorrect, 13.25% of the distribution or $795,000 was not paid to MRP members/DLs and as of this date still has not been paid.

- At the time that CMM announced they would make that distribution, their bank account reflected they had insufficient funds to cover that $6 Million. The maximum bank balance they had was $4.954 Million on December 10, 2012.

- CMM and related parties had paid themselves more than $1.8 Million from the bank account, not including payments made to them directly from the closing escrow and other payments to CMM owned affiliates. These were not payments associated with CMM's DL owned interests up to this point.

- In CMM's January 13, 2013 report to the court, it states the distribution was made according to the 2012 Global Settlement – it was not; and an accounting would be forthcoming – which was never produced until June 2016.

- CMM never set aside the $795,000 associated with unpaid or uncashed checks Member/DL checks. This money remained comingled in their operating account. CMM never sought my help to find those DLs. Instead, it continued to compensate itself another $910,000 in questionable fees driving the bank balance to -796.74 on December 17, 2015 (which is, of course, woefully insufficient to cover the $795,000 owed to certain Member/DLs).

- CMM had taken as compensation money that belonged to Members/DL from the first distribution.

16.    On November 29 and 30, 2016, I responded to a letter Ms. Chubb had received from Robert Waxman of Ervin, Cohen & Jessup. A duplicate of the email exchange on this topic is attached as Exhibit 3 to this declaration. That email details the events showing the DLs' repeated, unfulfilled requests for documents and information. These stand in sharp contrast to the assertions about disclosures and accountings made in the Declaration of Mr. Rentz [Dkt 3308]. My email ended with the following:

> *" The document request is incomplete.  When will CMM provide the accounting from Feb 2016 to October 2016?  Are you suggesting there is no accounting and only source documents for which we must create accounting?*
>
> *I might add that there are many questions to the significant sums CMM and others have taken that do not tie into any agreements or disclosures contrary to his statement.  It is unreasonable that the DLs have realized less than $8 Million on a sale of $23 Million and CMM and affiliates have taken significant undisclosed sums.  How do they want to proceed with satisfying these questions?  Until then, this matter is not ready to be closed."*

///

///

///

17.    During the next 60 days, I was made aware that CMM filed demands for arbitration and sent a communication to various   MRP Members/DLs (Marlton DLs), whereby they were bullied to either go to arbitration/litigation or sign waivers that provided CMM/Marlton Recovery Partners with releases.

18.    Attached as Exhibits 4, 5, and 6 to this declaration are duplicates of orders entered in either the Asset Resolution case or the *Barkett* case.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Executed this 30th day of April, 2018.

DONNA CANGELOSI

CERTIFICATE OF SERVICE

This certifies that the undersigned has served the foregoing opposition on counsel for CCM, the Debtor, and others through the ECF system on April 30, 2018.

*/s/ Francis B. Majorie*
Francis B. Majorie

# EXHIBIT 1

From: **Donna Cangelosi** <dcangelosi@gmail.com>
Date: Thu, Jun 9, 2016 at 9:23 AM
Subject: Re: FW: MARLTON
To: David Rentz <sfg.rentz@sbcglobal.net>
Cc: "Cc: Frank Majorie" <fbmajorie@themajoriefirm.com>, Janet Chubb
<JChubb@kcnvlaw.com>, Jonathan Dabbieri <dabbieri@sullivanhill.com>, Michael Coulson
<michael@coulsoncpa.com>, Kevin Olsen <kevinolsen50@gmail.com>, Rob Millimet
<rrm@bickelbrewer.com>


Hello David

Thanks for the reply.

I agree with many of the statements you made.

1.  Yes, distribution of money must be made very carefully to assure it gets in the correct
hands.   I and my team have distributed over 30 million dollar and am proud to say without an
error.   We are very cautious and spend an extraordinary amount of time maintaining accurate
records for all the dls, tracking divorces, gifting and legacy, moves, etc to assure there are no
errors.    I would advise you to compare your records with ours as we have found the status
of  every single DL so far to assure accurate distributions.

2.  David, I most whole*heartedly* agree that you have advanced the funds necessary to resolve the
assets and have zealously pursued a recovery.   I wish Duncan had done the job he promised to
do - which is what you have done.   I do know these assets are difficult to resolve with  what
should be  criminal underwriting  issues and state/county/city difficulties.

What I cannot agree to is that  accounting has been presented to either the court or the direct
lenders.   I looked through your reports to the court and found discussion of the problems, but no
accounting.   In your April 15, 2016 report, you do report that a final accounting would be made
available in 90 days.   If my counting is correct, that is next week.   However, I am aware that
Kevin has asked over and over for this information throughout this process and it has not been
forthcoming but has had many missed promises.

The Direct Lenders should not have to go to the court to review  information concerning their
asset.   They are frustrated that they have had no say at all.   The information should be
forthcoming from you.   In fact, no DL was included in your certificate of service so you can see
they have been in the dark.    They are frustrated by the lack of accounting information which is
turning a good event into a frustration and seeking help from the Claims Recovery Trust to
acquire the accounting which they claim they have been asking for years.

It is in all's best interest if a complete accounting  is made available for anyone who wishes to
conduct a review.   I assume your agreement grants the DLs  the right to have access to this
information, without having to go through your attorney or accountant - which incurs extra
expense.   It should be made available by you in your office.

My email is a call to help avoid any extra expense and ask your cooperation for something that has been requested since the first distribution in 2012.

Thank you.

On Thu, Jun 2, 2016 at 1:00 PM, David Rentz <sfg.rentz@sbcglobal.net> wrote:

Donna:

It was nice to hear from you. As we explained to Kevin, we are going through the same process as we did last time in January of 2013, before we make a final distribution.  This includes us confirming that no interests in the LLC have been sold or transferred.  Because this is the final accounting, it is essential that we take every precaution to ensure that there are no mistakes. It is much more difficult  to have money returned if a mistake is made.

In regard to your statement that there has not been "one bit of accounting," that simply is incorrect.  Please check the routine reports that we filed with the Court each quarter, as required.

We look forward to making the final distribution and closing the LLC within the next 30 days.  However, as I told Kevin, the independent CPA will have her work completed next week.  We explained to Kevin that the CPA could not get to Marlton until after tax season (April 18th).  Since then she has been working with us to prepare a final accounting. We directed the CPA to include all LLC members with financial statements which would include all items in 2016 and not just 12/31/2015 ending statements. We are not her only client and must work with her schedule and she has been very good to accommodate us.

We would enjoy you coming to our office. However, you should have the final accounting in hand so you will have a base-line to work from. As soon as you get the accounting let's make arrangements for a time and we will accommodate your visit.

When we did the last distribution we paid B&B and the trustee directly. You mentioned the "many hats" you wear in the USACM matters. In that regard, please provide us a letter from B&B that they want their upcoming check sent to a third party. We will do whatever they want, however, it is a change from what was required last time.

Lastly, we do not take your threat of litigation lightly, and would prefer to expedite the distribution process.  We are a California LLC and are governed by California law and our LLC agreement. We have done much more than would have ever been expected of us to maximize the return to the investors. The largest expense to the LLC has been property taxes that were not challenged before we became the loan servicer. Working with our consultants on this matter and title issues has, in fact, pulled this loan out of a complete failure. Furthermore, as you, Kevin and I have discussed, the past unpaid property taxes and failure of past servicers to timely dispute the taxes have cost millions. And it was our consultants and our efforts that did, in fact, result in the return of a small portion of property taxes. I feel badly for the LLC members that more money may be spent on additional attorneys with nothing to be gained. Our accounting at all levels will prove to be clean and now there is yet another delay in bringing this loan to an end.

We look forward to seeing you in the near future.

David Rentz

For: Marlton Recovery Partners, LLC

2601 Airport Dr. #290

Torrance, CA  90505

O – 310-325-1409

From: Donna Cangelosi [mailto:dcangelosi@gmail.com]
Sent: Wednesday, June 1, 2016 08:02 PM
To: David Rentz <sfg.rentz@sbcglobal.net>
Cc: Frank Majorie <fbmajorie@themajoriefirm.com>; Janet Chubb <JChubb@kcnvlaw.com>; Jonathan Dabbieri <dabbieri@sullivanhill.com>; Michael Coulson <michael@coulsoncpa.com>; Kevin Olsen

<kevinolsen50@gmail.com>; Rob Millimet <rrm@bickelbrewer.com>
**Subject:** Re: MARLTON

Hello David

I hope this communication finds you well.

I have been appraised of the emails going back and forth between you and Kevin.  .   As you may know, I do wear many hats in the USACM  matters which include representative  of the equity interest holders (the BB DL Settlement Trust) of the ARC estate,  the primary contact with the Trustee and Counsel of the ARC estate concerning the assets and financial matters of the estate (and I might say it is a very functional relationship),  a director of the Claims Recovery Trust which is tasked with bringing claims forward of those who have are  deemed to have harmed the DLs,    and  the primary Bickel & Brewer liaison. I have also either directly resolved numerous of the USACM assets or been closely involved in their resolution.  In addition to those various roles, I have been directing distributions to all BB DLs  since 2012 as well as all DLs involved in certain assets.  Complete transparency is essential in these matters.

Since 2012 Kevin Olsen has patiently and repeatedly asked you for a complete and transparent accounting.  Many millions of dollars have been withheld from sales proceeds and there has not been one bit of accounting.   Most recently, Kevin has been asking you for this accounting since prior to April 15th, and there has always been  excuses, unkept promises and missed dates.  So David, what should one assume?

Kevin and I would like to come to your office for a complete review of  the  expenses charged against Marlton within the next two weeks.  Please tell us which dates work for you.   We would like to review all invoices, agreements, bank statements, expense registers and any other pertinent documents.

If you cannot accommodate us, we plan to seek a court order compelling this review.

Also, please send the Marlton funds you plan to distribute to the BB DLs to the Qualified Settlement Trust for distribution.  My team will do that distribution and assure that all funds are received by each of the BB DLs.

Thank you and I look forward to hearing from you with some dates.

On Wed, Jun 1, 2016 at 2:55 PM, Kevin M. Olsen <kevinolsen50@gmail.com> wrote:

Hello David,

This is nice to know, however direct lenders and the ARC Estate need an advanced accounting BEFORE the distribution of checks.  All parties need to see expenses before distribution should there be issues regarding accounting.  By doing this CMM can avoid making an error in the anticipated distribution.   Could you please send me the final expense report for the project along with the anticipated distribution amount to the DL's as soon as you can?

Also, if you need help contacting DL's who haven't responded please let me know and I will use our resources to attempt to locate them.

Thanks,

Kevin

702-822-0964

**From:** David Rentz [mailto:sfg.rentz@sbcglobal.net]
**Sent:** Wednesday, June 01, 2016 2:09 PM
**To:** 'Kevin M. Olsen'
**Cc:** 'Mike Mollo'
**Subject:** MARLTON

Kevin:

Attached please find the updated equity accounts that will be used to make distributions and complete the accounting. If you see any errors, please let us know. We will start sending checks and the accounting next week. We have received most of the estoppable letters. For those few we are not received, we are going to reach out to them, but it will not hold up the distributions or accounting any longer.

Thanks.

David Rentz

2601 Airport Dr. #290

Torrance, CA  90505

O – 310-325-1409

--

Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.

--

Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.

--

Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.

# EXHIBIT 2

From: **Donna Cangelosi** <dcangelosi@gmail.com>
Date: Thu, Sep 15, 2016 at 1:48 PM
Subject: Fwd: FW: Marlton CMM File review #2
To: David Rentz <sfg.rentz@sbcglobal.net>, Carol Kesler <DIRECTLENDER20@gmail.com>,
Rob Millimet <RRM@brewerattorneys.com>, Janet Chubb <JChubb@kcnvlaw.com>, Kevin
Olsen <kevinolsen50@gmail.com>

The PDF to which I am referring is the one you sent Rob Millimet on August 25.  It us attached
below with all the other documents sent.

When I referred to each DL receiving the same percentage, what that meant was the following:

A 50K position received  - ,according to your schedule  -  $10,617.81
Therefore, a 100K position should have received double that or  21,235.62.   But you are
indicating you only sent  $20,610.81 for a $100K position.
You say that for a 300K position you sent 62,457.01, but assuming you sent the right amount for
a $50 K position, it should have been $63,706.86.
When I referred to the same percentage of distribution for each DL, of course that considered
their position size and it meant each DL received their equal pro-rata share of the distributed
funds.

Now we have all the non BB DLS for whom you claim you sent us money, despite the fact that
they were never on our list we sent you in 2012 naming the BB DLs.  We didn't send them
money - did you?   We didn't sent you back those funds  you say you sent us for them as we
didn't even know you sent us money for them.   We assumed the money you sent was for those
on our list - not some other list.  So if they did get paid - then who paid them?

And then we have those who were always BB DLs - were always on the  list we sent you  - and
we never received money for them. These were not new clients to BB.  BB hasn't signed a new
client since 2009.  That list has been very static.   We sent every BB DL on our list a  check yet
you say you didn't send us money for them as you didn't know they were BB DLs.   And if your
position is they were not BB DLs - then you should have sent them money.  So the should have
gotten  money from us and you.

The only way we can solve this is by sitting down with your check register and ours  and
comparing  who got what funds and what the  math was behind the money you sent us and the
non BB  dls.  So we will be there in your attorney's office on Tuesday as we have been
instructed and will be prepared with our documents.   But  Frankly David - I don't know why we
have to meet in an attorney's office - it's an unnecessary expense to involve attorneys in a
financial matter. I am sure you are not concerned this is a legal matter - it's all math and all
properly documented.

David - I and my team are really good at accurately distributing funds.   We have cut over 10,000
checks thus far with only 1 error which was quickly resolved - and it was a mailing error of 2

checks sticking together.    Biff counts on our calculations for his distributions.    I am certain we can resolve this, but we need all the distribution data to resolve this - not just the BB half.

See you Tuesday.  We'll be in the office by about 10 but please reconsider having this meeting in a lower cost environment.   The DLs have already had far too many expenses with this asset.

Thank you.

---------- Forwarded message ----------
From: **Rob Millimet** <RRM@brewerattorneys.com>
Date: Thu, Aug 25, 2016 at 4:10 PM
Subject: FW: Marlton CMM File review #2
To: Donna Cangelosi <dcangelosi@gmail.com>, "Carol Kesler (directlender20@gmail.com)" <directlender20@gmail.com>

**From:** David Rentz [mailto:sfg.rentz@sbcglobal.net]
**Sent:** Thursday, August 25, 2016 6:10 PM
**To:** Rob Millimet
**Cc:** 'Mike Mollo'
**Subject:** RE: Marlton CMM File review #2

Mr. Millimet:

Please see the attached information.

During the last distribution we worked with everyone on your team trying to get it correct. However, I believe there was an inaccuracy, which we are trying to correct.

As you can see from the attached email, we sent the trustee a check for $133,650 for his fees. However, when the email read "less B&B share" we then sent a check to B&B for the $91,350.00. No one

corrected us at the time. We now realize that was incorrect. We should have subtracted the $133,650 from the Non-B&B clients resulting in leaving more funds in the total pool for distribution.


We sent the attached checks to B&B:


     1.  $2,436,402.00

     2.  $   91,350.00

     3.  $   64,620.97

     4.  $   10,617.69

     5.  $   10,617.69

     6.  $   36,134.00

The total amount of the last distribution was $6,000,000. Based upon the amounts listed above and the list of B&B clients provided to us for the last distribution, there was an overpayment to B&B. Please see the attached list that was provided to us for calculation of the last distribution. We are going to distribute the current funds in distribution in two amounts to make sure that there are no mistakes that cannot be adjusted in the final distribution.


One more side issue. Your new B&B clients, such as Kevin Olsen received a check directly last time ($12,000), which had no B&B fees subtracted.  We have no reason to reconcile those type issues as we view them as a B&B internal issue.


I hope all this helps.


Thanks.


David

David Rentz

2601 Airport Dr. #290

Torrance, CA  90505

O – 310-325-1409

**From:** Rob Millimet [mailto:RRM@brewerattorneys.com]
**Sent:** Tuesday, August 23, 2016 09:00 AM
**To:** 'David Rentz' <sfg.rentz@sbcglobal.net>
**Cc:** Mike Mollo (mp.mollo@verizon.net) <mp.mollo@verizon.net>; Donna Cangelosi
<dcangelosi@gmail.com>; Carol Kesler (directlender20@gmail.com) <directlender20@gmail.com>
**Subject:** RE: Marlton CMM File review #2

David,

We are still working on tying up the numbers from the last Marlton distribution.  To do that, we need to know the exact gross dollar amount you previously distributed to all Marlton DLs (not just Marlton B&B DLs) or the percentage of the total Marlton UPB that the distribution was based on.  Can you please send me those numbers?

Also, can you please tell me if there were any Asset Resolution servicing fees credited or deducted as part of the lump sum amount that you sent us for disbursement to the Marlton B&B DLs in connection with the prior distribution?  If so, how much in total?

Once we get that information, we should be able to resolve any outstanding issues concerning the new distribution.

I have added Donna and Carol to this email string because they are the ones working on this matter with us.  Please copy them on your communication back to me.

Thanks,

Rob

**From:** David Rentz [mailto:sfg.rentz@sbcglobal.net]
**Sent:** Thursday, August 18, 2016 2:46 PM
**To:** Rob Millimet
**Subject:** RE: Marlton CMM File review #2

Thank you

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------

From: Rob Millimet <RRM@brewerattorneys.com>

Date: 8/18/16 11:38 AM (GMT-08:00)

To: 'David Rentz' <sfg.rentz@sbcglobal.net>

Cc: 'Mike Mollo' <mp.mollo@verizon.net>

Subject: RE: Marlton CMM File review #2

Perhaps another week.  We are still trying to track down a couple of issues that we have determined require information to be pulled from storage.  We are working on it, though.  We will get back to you as soon as we can.

**From:** David Rentz [mailto:sfg.rentz@sbcglobal.net]
**Sent:** Thursday, August 18, 2016 10:30 AM
**To:** Rob Millimet
**Cc:** 'Mike Mollo'
**Subject:** RE: Marlton CMM File review #2

Mr. Millmet:

On Aug, 8, 2016 I sent the email below. Do you have a time frame that we may expect an answer?

Thank you.

David Rentz

2601 Airport Dr. #290

Torrance, CA  90505

O – 310-325-1409

**From:** David Rentz [mailto:sfg.rentz@sbcglobal.net]
**Sent:** Monday, August 8, 2016 03:03 PM
**To:** 'Rob Millimet' <RRM@brewerattorneys.com>

**Cc:** 'Mike Mollo (mp.mollo@verizon.net)' <mp.mollo@verizon.net>
**Subject:** RE: Marlton CMM File review #2

Robert:

Ok. We have completed step one. We now have the new list of B & B clients.

Step 2. The last distribution to all LLC Members was 20% of the gross LLC Membership ($30,000,000) or $6,000,000. We may have been incorrect on the money we sent to B&B.

What happen was, we may have sent a credit on the trustee servicing fees, which B&B Members were not to pay, and then not charged the Non-B&B LLC Members. Therefore, we are going to need to balance the ledger on this distribution.

On the last distribution we sent the following checks to B&B.

|   |   |   |
|---|---|---|
| 1. | $2,436,402.00 | (12/26/2012) |
| 2. | $    91,350.00 | (12/26/2012) |
| 3. | $    64,620.97 | (12/28/2012) |
| 4. | $    36,134.00 | (12/31/2012) |
| 5. | $    10,619.69 | (2/27/2013) |
| 6. | $    10,617.69 | (2/27/2013) |

Total    $2,649,742.35

The last distribution was made based on equity of $11,689,500. Now that you have added new B & B clients. Can your office please tell us who was newly added since the last distribution?  For example, we know Kevin Olsen was newly added. After we get that information we can then look at what was sent last time and make sure no one was over or under paid.

Thanks.

David

David Rentz

2601 Airport Dr. #290

Torrance, CA  90505

O – 310-325-1409

**From:** Rob Millimet [mailto:RRM@brewerattorneys.com]
**Sent:** Monday, August 8, 2016 01:01 PM
**To:** 'David Rentz' <sfg.rentz@sbcglobal.net>
**Cc:** 'Mike Mollo' <mp.mollo@verizon.net>
**Subject:** RE: Marlton CMM File review #2

Please wire the total to be disbursed to the B&B DLs to the following account:

**Wells Fargo Bank**

**Eden, UT 84310**

**801-745-0295**

The information contained in this e-mail message, including any attachments, is privileged and/or confidential information intended only for the use of the individual or entity named as addressee. The review, dissemination, distribution, or copying of this communication by or to anyone other than the intended addressee is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message. Unless otherwise stated in the e-mail message, the presence of

the sender's name and contact information in the e-mail message does not and is not intended to constitute a signature.

The information contained in this e-mail message, including any attachments, is privileged and/or confidential information intended only for the use of the individual or entity named as addressee. The review, dissemination, distribution, or copying of this communication by or to anyone other than the intended addressee is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message. Unless otherwise stated in the e-mail message, the presence of the sender's name and contact information in the e-mail message does not and is not intended to constitute a signature.

--
Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.

--
Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.

# EXHIBIT 3

From: "Janet Chubb" <JChubb@kcnvlaw.com>
Date: Dec 16, 2016 12:14 PM
Subject: Re: Additional Documents re Marlton
To: "John Shenk" <jshenk@ecjlaw.com>
Cc: "Cheryl Byrne" <CByrne@kcnvlaw.com>, "Robert Waxman" <rwaxman@ecjlaw.com>,
"Donna Cangelosi" <dcangelosi@gmail.com>

Thank you. I have forwarded your message to Ms. Cangelosi and will respond to you next week.
Jann Chubb

Sent from my iPhone

On Dec 16, 2016, at 8:21 AM, John Shenk <jshenk@ECJLAW.COM> wrote:

Dear Ms. Chubb,

I work with Robert Waxman. As you know, our client has carefully considered Ms. Cangelosi's email and does not think it is appropriate to debate its contents by correspondence. Suffice it to say that our client disagrees with the assertions that Ms. Cangelosi has made. That said, our client certainly does not take Ms. Cangelosi's unfounded accusations lightly, nor does it believe that final distributions to the Members of Marlton Recovery Partners LLC ("MRP") should be indefinitely held up at her insistence or that of the persons whom she claims to represent. To do so would be patently unfair to the other Members of MRP that seek to have their final distributions made forthwith and in accordance with the terms of the governing Operating Agreement.

But in light of the serious nature of those allegations along with the failure of Ms. Cangelosi and Mr. Olsen to cooperate with Commercial Mortgage Managers ("CMM") in its effort to clarify the proper amounts for final distribution, CMM has been left with no choice other than to commence arbitration under the terms of the Operating Agreement. The Arbitration Demand, attached here, seeks declaratory relief (1) for an order setting the amounts to be distributed to each of the Members; (2) that payments by MRP for services were made in accordance with the Operating Agreement; (3) finding that CMM has complied with its obligations and duties as Manager of MRP; (4) that the Members of MRP are required to hold CMM harmless as set forth in the Operating Agreement and to reimburse MRP for attorney fees advanced by it or to be paid by CMM relating to the declaratory relief action; and (5) for an order shifting the burden for reimbursement of those attorney fees from all Members of MRP to those Members who have improperly delayed or impeded final distribution, while at the same time objecting to CMM's efforts to wind up MRP.

Please communicate once again to Ms. Cangelosi and Mr. Olsen that CMM is committed to making sure that the final distributions are correct and that it desires to make those final distributions as soon as possible in order to wind up MRP. Because of CMM's commitment to doing so, it has commenced this

arbitration – naming all Members of MRP – in order to finalize these issues and adjudicate both the overt and veiled allegations made by Ms. Cangelosi on behalf the persons or entities she claims to represent.  However with or without arbitration, CMM remains ready and willing to work with any party that can aid in clarifying the proper amounts of distributions so that this matter can be finally resolved and all interested parties can move forward.

Regards,

**John W. Shenk, Esq.**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor | Beverly Hills, CA 90212-2974
(310) 281-6334 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | jshenk@ecjlaw.com

**From:** Janet Chubb [mailto:JChubb@kcnvlaw.com]
**Sent:** Thursday, December 08, 2016 11:28 AM
**To:** Robert Waxman
**Cc:** John Shenk; dcangelosi@gmail.com; Cheryl Byrne
**Subject:** RE: FW: Additional Documents re Marlton

Dear Mr. Waxman,

We look forward to hearing from you.

Thank you.

Jann

Cbc t 14

Please be advised that information sent to this email address may be read by my assistant.



Janet L. Chubb

Kaempfer Crowell

50 West Liberty Street, Suite 700
Reno, Nevada 89501
Tel:  (775) 398-4740
Cell:  (775) 772-9252
Fax:  (775) 327-2011
Email:  jchubb@kcnvlaw.com

|  BIO  |  WEBSITE  |  VCARD  |

🌲 **Please consider the environment before printing this email**

This e-mail communication is a confidential attorney-client communication intended only for the person named above.  If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone (702) 792-7000.  Also, please e-mail the sender that you have received the communication in error.  We will gladly reimburse your telephone expenses.  Thank you.

IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Robert Waxman [mailto:rwaxman@ECJLAW.COM]
**Sent:** Thursday, December 8, 2016 10:52 AM
**To:** Janet Chubb
**Cc:** John Shenk
**Subject:** RE: FW: Additional Documents re Marlton

Dear Ms. Chubb,

Thank you for your correspondence.  We are discussing the Cangelosi email that you forwarded with our client and will fashion an appropriate response shortly.

Regards,

RMW

**From:** Janet Chubb [mailto:JChubb@kcnvlaw.com]
**Sent:** Wednesday, November 30, 2016 3:53 PM
**To:** Robert Waxman
**Cc:** Cheryl Byrne; dcangelosi@gmail.com
**Subject:** FW: FW: Additional Documents re Marlton

Dear Mr. Waxman,

Here is Donna's input.  Please let us know when the additional information/documents can be provided.

Thank you.

Jann

Please be advised that information sent to this email address may be read by my assistant.

<image001.gif>

Janet L. Chubb

Kaempfer Crowell

50 West Liberty Street, Suite 700
Reno, Nevada 89501
Tel:  (775) 398-4740
Cell:  (775) 772-9252
Fax:  (775) 327-2011
Email:  jchubb@kcnvlaw.com

| BIO  | WEBSITE  | VCARD |

 **Please consider the environment before printing this email**

This e-mail communication is a confidential attorney-client communication intended only for the person named above.  If you are not the person named above, or the employee or agent responsible for delivery of the following information, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone (702) 792-7000.  Also, please e-mail the sender that you have received the communication in error.  We will gladly reimburse your telephone expenses.  Thank you.

IRS Circular 230 Notice:  To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Donna Cangelosi [mailto:dcangelosi@gmail.com]
**Sent:** Tuesday, November 29, 2016 2:35 PM
**To:** Janet Chubb
**Cc:** Cheryl Byrne
**Subject:** Re: FW: Additional Documents re Marlton

Response to Robert Waxman letter to set the record straight and to request additional documents:

1.  For years, Mr. Olsen has been asking for the records from Mr. Rentz,  only to be met with excuses by Mr. Rentz.  No financial information has ever been presented to the DLs  or  the Federal District court prior to the documentation provided in late June 2016.  Discovery shall bear that out.

The request to have an in depth review of the records was finally agreed to in  August. An compreensive  list of documents was requested for that review.  Only partial information was presented  with significant gaps.  The documentation only dated to Feb 2016,  prior to the sale of the final parcels.  This represented a significant void for piecing this puzzle together.

2.  Mr. Rentz made himself available for 5 minutes.   He had no answers to any questions that were asked of him.  He played dumb when he was told the Feb – August 2016 data was missing, along with other questions he was asked.

3.  The  2012 DL  distribution is completely wrong for both the BB DLs and the non BB DLs.    Some DLs never received checks, other DLs received two checks.  In all cases the  2012 amounts remitted to all DLs was wrong.  Mr. Rentz completely ignored the 2012 spreadsheet  provided  by Bickel & Brewer further exacerbating his errors.   The task is now to determine how to rectify those errors and why that  undistributed money is missing from the  bank account.  This takes significant time and requires the information recently requested.  Both distributions have to be examined together to determine shortfalls and overpayments to Direct Lenders  on this asset.

4.  The  document request is incomplete .  When will CMM provide the accounting from Feb 2016 to October 2016?   Are you suggesting there is no accounting and only source documents for which we must create accounting?

I might add that there are  many questions to the significant sums CMM and others have  taken that do not tie into any agreements or disclosures contrary to his statement.   It is unreasonable that the DLs have realized less than $8 Million on a sale of $23Million and CMM and affiliates have taken significant  undisclosed sums.   How do they want to proceed with satisfying these questions.  Until then, this matter is not ready to be closed.

--
Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

THE RICHARD AND SHEILA J. MCKNIGHT 2000 FAMILY TRUST et al.,

        Plaintiffs,

vs.

WILLIAM J. BARKETT et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

2:10-cv-01617-RCJ-GWF

**ORDER**

    This case arises out of the same facts as the USA Commercial case. Pending before the Court are motions to dismiss two separate Complaints in Intervention and a Counterclaim for lack of subject matter jurisdiction. For the reasons given herein, the Court denies the motions.

**I.    FACTS AND PROCEDURAL HISTORY**

    Plaintiff Richard McKnight,[1] as trustee for The Richard & Sheila J. McKnight 2000 Family Trust ("the McKnight Trust") provided $100,000 out of the total of $4.5 million that various direct lenders loaned to Defendant Castaic III Partners, LLC ("Castaic III") through USA Commercial Mortgage Co. ("USA Commercial"). (Compl. ¶ 5, Sept. 21, 2010, ECF No. 1). The McKnight Trust has received no interest payments on the loan since August 2006. (*Id.* ¶ 9).

    Plaintiff sued Defendants Castaic III and William J. Barkett in this Court on two claims: (1) Breach of Guaranty (Barkett only); and (2) Declaratory Judgment. The Court denied a

---

[1] Richard McKnight is a apparently both a beneficiary and the trustee of the McKnight Trust and one of the McKnight Trust's attorneys in this action.

motion to reconsider transfer of the case from the Hon. Gloria M. Navarro to this Court,

dismissed the second cause of action for declaratory judgment, granted offensive summary

judgment on the first cause of action for breach of guaranty, and permitted 260 other direct

lenders to intervene as Plaintiffs and to add claims against Castaic Partners, LLC ("Castaic" or

"Tapia Ranch") and Castaic II Partners, LLC ("Castaic II").  Defendants appealed the judgment

against them as to breach of guaranty, but the Court of Appeals dismissed the appeal for lack of

finality.

      Each group of intervenors has filed its own complaint in intervention.  Intervenor

Plaintiffs Thomas J. Kapp and Cynthia S. Roher, as trustees of the T&C Kapp Family Trust (the

"Kapp Intervenors" or "Kapp") filed a Complaint in Intervention (the "Kapp CI") against

Barkett and Castaic II for breach of contract, breach of guaranty, and declaratory judgment. (*See*

Kapp CI, May 12, 2011, ECF No. 34).  A second group of intervenors (the "Rasmussen

Intervenors") have filed a complaint in intervention (the "Rasmussen CI") against Barkett,

Castaic, Castaic II, and Castaic III for breach of contract, breach of guaranty, and declaratory

judgment. (*See* Rasmussen CI, Aug. 8, 2011, ECF No. 61).  The Rasmussen CI alleges the

amount each Rasmussen Intervenor loaned the Castaic entities. (*See id.* ¶¶ 5, 67–69).  A third

group of intervenors, DACA-Castaic, LLC and Debt Acquisition Co. of America V, LLC

("DACA V," collectively, the "DACA Intervenors" or "DACA"), withdrew its motion to

intervene.

      The Court granted a motion to dismiss the Kapp CI in part, dismissing the declaratory

judgment claim but refusing to dismiss the breach of contract and breach of guaranty claims for

lack of standing.  Defendants argued that Kapp Intervenors had transferred their interests in the

relevant loans to DACA-Castaic, LLC and thus no longer had standing to sue for breach of

contract or breach of guaranty.  The Kapp Intervenors responded that they had only transferred

the deeds of trust, not the beneficial interest.  The Court invited summary judgment motions on

1    the issue but refused to dismiss because the Kapp CI was sufficiently pled.  The Court

2    completely denied a motion to dismiss the Rasmussen CI, noting that the claim for declaratory

3    relief thereunder was different from the declaratory relief claims in the Complaint and the Kapp

4    CI that the Court had dismissed.  The Court struck Defendants' "crossclaim," which was in

5    reality a third-party complaint and/or a counterclaim, directing Defendants to refile the pleading

6    properly, which they did. (*See* Countercl. and Third-Party Compl., ECF Nos. 156, 157).

7    Defendants countersued several Compass entities, the two DACA entities, and direct lenders for:

8    (1) breach of contract; (2) declaratory judgment; (3) interference with prospective economic

9    advantage; (4) usury; (5) breach of fiduciary duty (two Compass entities only); (6) unjust

10   enrichment; and (7) slander of title.

11         The Court refused to stay the judgment against Defendants in favor of Plaintiff but noted

12   that it would await summary judgment motions as to whether certain Intervenor Plaintiffs still

13   owned the beneficial interest in the loans or had transferred them to DACA-Castaic, LLC or

14   other parties.  DACA asked the Court to grant it summary judgment on thirteen issues under its

15   Counterclaim (as to Defendants' Third-party Complaint) for declaratory relief.  The Court

16   granted the motion in part, ruling that any direct lender who had transferred his or her beneficial

17   interest in a Castaic loan to DACA had also transferred his or her interest in the respective deed

18   of trust or guaranty and could no longer sue on the note or Barkett's guaranty thereof, because

19   the interest in the guaranty followed the interest in the note automatically under California law.

20   The Court noted that it remained a question of fact which direct lenders had effected such

21   transfers.  The evidence adduced at the time showed only a transfer of Castaic Partners, LLC's

22   beneficial interest in the Castaic loans to DACA-Castaic, LLC, but did not indicate any previous

23   transfer from any direct lenders to Castaic Partners, LLC.  The Court also noted that no party

24   disputed that the Castaic loans were in default but that it would not attempt to calculate the total

25   amount due on each loan at the pre-trial stage.  The Court also ruled that the notes were neither

usurious nor subject to offset. The Court ruled that the Castaic deeds of trust were enforceable under their terms and that the pending foreclosures in California under the 2007 notices of default were proper. The Court also noted that an action against Barkett for breach of guaranty would not violate the one-action rule even after foreclosure, because Barkett was not the target of any foreclosure, though Plaintiffs could only collect on a guaranty to the extent of any deficiency remaining after a foreclosure sale. The Court also ruled that the Purchase Agreement, under which DACA-Castaic, LLC purported to obtain the beneficial interests in the loans from Castaic Partners, LLC, was in compliance with the 51% rule under Chapter 645B, and that DACA-Castaic, LLC's decision to foreclose was valid. The Court declined to rule on the priority of a lien against the properties held by DACA V, because DACA V and DACA-Castaic were not adversaries in the present case.

Kapp Intervenors also moved for summary judgment on four points. The Court refused to rule that Barkett was liable to Kapp Intervenors on the guaranty because it was not clear that the Kapp Intervenors retained the beneficial interest in the loans. The Court again noted that no party denied the Castaic loans were in default. The Court then ruled that Barkett was liable to the Kapp Intervenors on the Castaic II Guaranty, but the Court added that Barkett could obtain relief under Rule 60(b) if he could later show that the Kapp Intervenors had transferred their interest in the Castaic II note. The Court ruled that it would not attempt to calculate the total amount due on the Castaic II loan at the pre-trial stage. Next, the Court ruled that the Castaic notes were to be interpreted by their terms under Nevada law, that Nevada had no usury law, and that the borrower under the notes had waived any right of offset. Finally, the Court declined to rule whether any direct lenders were liable for the wrongdoing of loan servicers.

Defendants have filed three similar motions. They ask the Court to dismiss the Kapp CI, the Rasmussen CI, and DACA's Counterclaim for lack of subject matter jurisdiction.

///

Page 4 of  10

## II.     LEGAL STANDARDS

Federal courts are courts of limited jurisdiction, possessing only those powers granted by the Constitution and statute. *See United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  The party asserting federal jurisdiction bears the burden of overcoming the presumption against it. *Kokkonen*, 511 U.S. at 377.  Federal Rule of Civil Procedure 12(b)(1) provides an affirmative defense for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1).  Additionally, a court may raise the question of subject matter jurisdiction *sua sponte* at any time during an action. *United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003).  Regardless of who raises the issue, "when a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing 16 J. Moore et al., Moore's Federal Practice § 106.66[1], pp. 106-88 to 106-89 (3d ed. 2005)).

### A.     Diversity Jurisdiction

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a), (a)(1).  Under the diversity statute, all Plaintiffs must be diverse from all Defendants. *See Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806).

### B.     Bankruptcy Jurisdiction

"[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

> Proceedings "related to" the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate . . . . The first type of "related to" proceeding involves a claim like the state-law breach of contract action at issue in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S.

Page 5 of  10

50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

*Vacation Vill., Inc. v. Clark Cnty., Nev.*, 497 F.3d 902, 911 (9th Cir. 2007) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)). Section 541 makes part of the estate, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "[P]ending causes of action qualify as 'property of the estate' in bankruptcy under 11 U.S.C. § 541(a)(1)—including causes of action sounding in tort, such as personal injury, for which the ultimate amount of recovery is uncertain." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1148 n.1 (9th Cir. 2009). Furthermore, "'[T]he district court in which the bankruptcy case is commenced obtains exclusive in rem jurisdiction over all of the property in the estate.' A chose in action is property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1). For this reason, only bankruptcy trustees, debtors-in-possession, or bankruptcy court authorized entities have standing to sue on behalf of the estate." *McGuire v. United States*, 550 F.3d 903, 914 (9th Cir. 2008) (citations omitted).

## III.     ANALYSIS

### A.     Motion No. 177

Defendants ask the Court to dismiss the Kapp CI for lack of diversity. Barkett is a California citizen. There is therefore not complete diversity if any Plaintiff is a California citizen. Defendants argue that at least some direct lenders are California citizens. The question as to the Kapp CI is whether any of the Kapp Intervenors are California citizens. The Kapp CI lists only Thomas J. Kapp and Cynthia S. Roher, as trustees for the T&C Kapp Family Trust, as Intervenor Plaintiffs. The Kapp CI avers that both Plaintiffs are Nevada citizens. Defendants point to no evidence to the contrary. The Court will therefore deny the motion.

### B.     Motion No. 178

Defendants ask the Court to dismiss the Rasmussen CI for lack of diversity. Defendants note that the asserted basis for jurisdiction over the Rasmussen CI is related-to jurisdiction under

28 U.S.C. § 1334(b) and supplemental jurisdiction under § 1367, likely because there were

several non-diverse intervenors.  Defendants note that no Defendant is in bankruptcy, and that

the Rasmussen Intervenors attempt to support jurisdiction under the Asset Resolution, LLC

bankruptcy, but that no claims in the Rasmussen CI arise out of or are related to the Asset

Resolution bankruptcy as those terms are used in the Bankruptcy Code.  Defendants also argue

for mandatory abstention under § 1334(c)(2) and equitable abstention.

Rasmussen Intervenors have the burden of showing federal jurisdiction once the issue is

raised.  They argue that the Court already denied a similar motion to dismiss for lack of

jurisdiction in a July 26, 2011 order (the "Order").  In the Order, the Court addressed

Defendants' motion to dismiss.  Defendants argued that the Court should dismiss for lack of

personal jurisdiction, improper venue, and failure to state a claim, and that the Court should

abstain under *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). *See*

Order 9:17–20, July 26, 2011, ECF No. 48).  The Court rejected these arguments, (*see id.* 9–12),

but never addressed any alleged lack of subject matter jurisdiction.  The Court did not even

imply bankruptcy jurisdiction, except to note as part of its abstention analysis that the present

case was "'related-to' Article III cases that have been pending in this Court for several years."

(*See id.* 11:21–22).  The issue of subject matter jurisdiction was not before the Court, and the

Court's statement that the case was related to other Article III cases was not meant to imply that

the case was "related to" any bankruptcy case under the meaning of § 1334(b), but only that it

arose out of some of the same facts as the USA Commercial case and others, which are Article

III cases, not bankruptcy cases.  Defendants may raise the issue of subject matter jurisdiction at

any time, and it is the Rasmussen Intervenors, who assert federal jurisdiction, who have the

burden of showing it.

In order to be "related to" a bankruptcy case such that federal jurisdiction is

independently supported under § 1334(b), the present case must have some conceivable effect on

a bankruptcy estate. That is, it must seek an award against the estate, it must consist of a claim owned by the estate, or it must otherwise conceivably effect the administration of the estate. The Rasmussen Intervenors make no argument concerning how they believe the present case does any of these things. First, Asset Resolution is not a party to this proceeding and does not appear to be a necessary party. Second, the Rasmussen Intervenors do not allege that their claims are owned by and brought on behalf of Asset Resolution. Only the Trustee may bring such claims, because the Asset Resolution bankruptcy has been converted to Chapter 7. The Rasmussen Intervenors argue that the present case is "related to" the Asset Resolution bankruptcy because Asset Resolution was for a time the servicer of the Castaic Loans. More importantly, the Rasmussen Intervenors note that Asset Resolution's bankruptcy owns the fractional interests in each of the three Castaic loans that it obtained from Compass USA SPE, LLC. They note that the Court approved the appointment of a new loan servicer (Cross) and approved Cross' sale of certain direct lenders' Castaic loans to DACA-Castaic, LLC pursuant to a majority vote of the direct lenders. Asset Resolution, however, still owns its fractional interests in the Castaic loans, because the 51% rule does not permit the majority interest to transfer a minority interest's ownership itself, but only governs administration of the loans. Because the present action will determine whether the Castaic entities breached a contract to which Asset Resolution is also a party, whether Barkett breached a guaranty to which Asset Resolution is a party, and will result in declarations concerning the validity of these documents, the Court finds that the outcome of the present case could have a conceivable effect on the bankruptcy estate and will not dismiss for failure to satisfy § 1334(b).

Because there is bankruptcy jurisdiction, Intervenors need not rely on supplemental jurisdiction under § 1367 based upon the existence of diversity jurisdiction as between Plaintiffs and Defendants when the Complaint was filed. They could not rely on such an argument, in any case. Such a maneuver, i.e., the later joinder of non-diverse parties in a case based purely upon

diversity, is specifically prevented by the supplemental jurisdiction statute, lest the joinder and intervention rules obviate the complete diversity requirement. *See* 28 U.S.C. § 1367(b).

Defendants also argue that the Court must abstain under § 1334(c)(2). In related-to cases based upon state-law claims, a Court must abstain upon motion where the only basis for federal jurisdiction is § 1334(b) and where an action has been commenced in state court. 28 U.S.C. § 1334(c)(2). As noted, *supra*, the Rasmussen CI is based purely upon § 1334(b) and § 1367, but § 1367 is not an appropriate basis for supplemental jurisdiction over the Rasmussen CI because the Complaint is based purely upon § 1332, and the Rasmussen CI would not independently qualify for § 1332 jurisdiction. *See* § 1367(b). There is jurisdiction over the Rasmussen CI under § 1334(b), but because that is the sole basis for jurisdiction over the purely state-law claims in the Rasmussen CI, the Court must abstain under § 1334(c)(2) if there is a pending state court action. Defendants note that they initiated a state court action in the Los Angeles County Superior Court against many direct lenders and others concerning the Castaic loans, but that the California court has stayed the case out of deference to this Court. Defendants appear to be correct. The Court will not abstain. The California case is stayed pending the present case and its existence does not require mandatory abstention. Nor will the Court abstain equitably. The Court will not, if it can prevent it, permit these interrelated cases to be determined piecemeal in various courts.

### C. Motion No. 179

Defendants ask the Court to dismiss DACA's Counterclaim for the same reasons it asks the Court to dismiss the Rassmussen CI. The motions are substantively identical in relevant part. The Counterclaim requests many declarations concerning the Castaic loans. These declarations could have a conceivable effect on Asset Resolution's bankruptcy estate. There is therefore § 1334(b) jurisdiction, and the Court will not abstain.

1

2

**CONCLUSION**

3       IT IS HEREBY ORDERED that the Motion to Dismiss Kapp CI (ECF No. 177), the

4   Motion to Dismiss Rasmussen CI (ECF No. 178), and the Motion to Dismiss Counterclaim (ECF

5   No. 179) are DENIED.

6       IT IS SO ORDERED.

7   Dated this 23rd day of July, 2012.

8

9   _____
                    ROBERT C. JONES
10                  United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

1

2

3

4                    **UNITED STATES DISTRICT COURT**

5                        **DISTRICT OF NEVADA**

6

7   THE RICHARD AND SHEILA J. MCKNIGHT        )
    2000 FAMILY TRUST et al.,                 )
                                              )
8              Plaintiffs,                    )
                                              )            2:10-cv-01617-RCJ-GWF
9        vs.                                  )
                                              )                    **ORDER**
10  WILLIAM J. BARKETT et al.,                )
                                              )
11             Defendants.                    )
    ────────────────────────────────         )

12

13         This is a complex breach of guaranty case related to the USA Commercial bankruptcy.

14  Pending before the Court is a Motion for Summary Judgment (ECF No. 331).  For the reasons

15  given herein, the Court grants the motion.

16  **I.      FACTS AND PROCEDURAL HISTORY**

17         Plaintiff Richard McKnight,[1] as trustee for The Richard & Sheila J. McKnight 2000

18  Family Trust ("the McKnight Trust") provided $100,000 out of the total of $4.5 million that

19  various direct lenders loaned to Defendant Castaic III Partners, LLC ("Castaic III") through USA

20  Commercial Mortgage Co. ("USA Commercial"). (Compl. ¶ 5, Sept. 21, 2010, ECF No. 1).  The

21  McKnight Trust has received no interest payments on the loan since August 2006. (*Id.* ¶ 9).

22         Plaintiff sued Defendants Castaic III and William J. Barkett in this Court on two claims:

23  (1) Breach of Guaranty (Barkett only); and (2) Declaratory Judgment.  The Court denied a

24  ────────────────────────

25         [1]Richard McKnight is a apparently both a beneficiary and the trustee of the McKnight
    Trust and one of the McKnight Trust's attorneys in this action.

motion to reconsider transfer of the case from the Hon. Gloria M. Navarro to this Court, dismissed the second cause of action for declaratory judgment, granted offensive summary judgment on the first cause of action for breach of guaranty, and permitted 260 other direct lenders to intervene as Plaintiffs and to add claims against Castaic Partners, LLC ("Castaic" or "Tapia Ranch") and Castaic II Partners, LLC ("Castaic II"). Defendants appealed the judgment against them as to breach of guaranty, but the Court of Appeals dismissed the appeal for lack of jurisdiction.

Each group of intervenors has filed its own complaint in intervention. Intervenor Plaintiffs Thomas J. Kapp and Cynthia S. Roher, as trustees of the T&C Kapp Family Trust (the "Kapp Intervenors" or "Kapp") filed a Complaint in Intervention (the "Kapp CI") against Barkett and Castaic II for breach of contract, breach of guaranty, and declaratory judgment. (*See* Kapp CI, May 12, 2011, ECF No. 34). A second group of intervenors (the "Rasmussen Intervenors") have filed a complaint in intervention (the "Rasmussen CI") against Barkett, Castaic, Castaic II, and Castaic III for breach of contract, breach of guaranty, and declaratory judgment. (*See* Rasmussen CI, Aug. 8, 2011, ECF No. 61). The Rasmussen CI alleges the amount each Rasmussen Intervenor loaned the Castaic entities. (*See id.* ¶¶ 5, 67–69). A third group of intervenors, DACA-Castaic, LLC and Debt Acquisition Co. of America V, LLC ("DACA V," collectively, the "DACA Intervenors" or "DACA"), withdrew its motion to intervene.

The Court granted a motion to dismiss the Kapp CI in part, dismissing the declaratory judgment claim but refusing to dismiss the breach of contract and breach of guaranty claims for lack of standing. Defendants argued that Kapp Intervenors had transferred their interests in the relevant loans to DACA-Castaic, LLC and thus no longer had standing to sue for breach of contract or breach of guaranty. The Kapp Intervenors responded that they had only transferred the deeds of trust, not the beneficial interest. The Court invited summary judgment motions on the issue but refused to dismiss because the Kapp CI was sufficiently pled. The Court

completely denied a motion to dismiss the Rasmussen CI, noting that the claim for declaratory relief thereunder was different from the declaratory relief claims in the Complaint and the Kapp CI that the Court had dismissed. The Court struck Defendants' "crossclaim," which was in reality a third-party complaint and/or a counterclaim, directing Defendants to refile the pleading properly, which they did. (*See* Countercl. and Third-Party Compl., ECF Nos. 156, 157). In that pleading, Defendants countersued several Compass entities, the two DACA entities, and direct lenders for: (1) breach of contract; (2) declaratory judgment; (3) interference with prospective economic advantage; (4) usury; (5) breach of fiduciary duty (two Compass entities only); (6) unjust enrichment; and (7) slander of title.

The Court refused to stay the judgment against Defendants in favor of Plaintiff but noted that it would await summary judgment motions as to whether certain Intervenor Plaintiffs still owned the beneficial interest in the loans or had transferred them to DACA-Castaic, LLC or other parties. DACA asked the Court to grant it summary judgment on thirteen issues under its Counterclaim (as to Defendants' Third-Party Complaint) for declaratory relief. The Court granted the motion in part, ruling that any direct lender who had transferred his or her beneficial interest in a Castaic loan to DACA had also transferred his or her interest in the respective deed of trust or guaranty and could no longer sue on the note or Barkett's guaranty thereof, because the interest in the guaranty followed the interest in the note automatically under California law. The Court noted that it remained a question of fact which direct lenders had effected such transfers. The evidence adduced at the time showed only a transfer of Castaic Partners, LLC's beneficial interest in the Castaic loans to DACA-Castaic, LLC, but did not indicate any previous transfer from any direct lenders to Castaic Partners, LLC. The Court also noted that no party disputed that the Castaic loans were in default but that it would not attempt to calculate the total amount due on each loan at the pre-trial stage. The Court also ruled that the notes were neither usurious nor subject to offset. The Court ruled that the Castaic deeds of trust were enforceable under their

1  terms and that the pending foreclosures in California under the 2007 notices of default were

2  proper.  The Court also noted that an action against Barkett for breach of guaranty would not

3  violate the one-action rule even after foreclosure, because Barkett was not the target of any

4  foreclosure, though Plaintiffs could only collect on a guaranty to the extent of any deficiency

5  remaining after a foreclosure sale.  The Court also ruled that the Purchase Agreement, under

6  which DACA-Castaic, LLC purported to obtain the beneficial interests in the loans from Castaic

7  Partners, LLC, was in compliance with the 51% rule under Chapter 645B, and that DACA-

8  Castaic, LLC's decision to foreclose was valid.  The Court declined to rule on the priority of a

9  lien against the properties held by DACA V, because DACA V and DACA-Castaic were not

10  adversaries in the present case.

11         Kapp Intervenors also moved for summary judgment on four points.  The Court refused

12  to rule that Barkett was liable to Kapp Intervenors on the guaranty because it was not clear that

13  the Kapp Intervenors retained the beneficial interest in the loans.  The Court again noted that no

14  party denied the Castaic loans were in default.  The Court then ruled that Barkett was liable to the

15  Kapp Intervenors on the Castaic II Guaranty, but the Court added that Barkett could obtain relief

16  under Rule 60(b) if he could later show that the Kapp Intervenors had transferred their interest in

17  the Castaic II note.  The Court ruled that it would not attempt to calculate the total amount due on

18  the Castaic II loan at the pre-trial stage.  Next, the Court ruled that the Castaic notes were to be

19  interpreted by their terms under Nevada law, that Nevada had no usury law, and that the

20  borrower under the notes had waived any right of offset.  Finally, the Court declined to rule

21  whether any direct lenders were liable for the wrongdoing of loan servicers.

22         Defendants then filed three similar motions, asking the Court to dismiss the Kapp CI, the

23  Rasmussen CI, and DACA's Counterclaim for lack of subject matter jurisdiction.  The Court

24  ruled that it had diversity jurisdiction to adjudicate the Kapp CI and bankruptcy jurisdiction (but

25  not diversity jurisdiction) to adjudicate the Rasmussen CI and DACA's Third-Party

1  Counterclaim, and that neither mandatory nor equitable abstention under the Bankruptcy Code

2  were appropriate.

3  In March 2013, the Court granted in part DACA's motion for leave to file a Supplemental

4  Third-Party Counterclaim against Defendants and a Supplemental Fourth Party-Complaint

5  (against Pond Avenue Partners, LLC ("Pond"), Merjan Financial Corp. ("Merjan"), and Palisades

6  Capital (NV), LLC), based upon events occurring after DACA filed its Third-Party Counterclaim

7  in February 2012.  DACA soon thereafter filed that consolidated pleading, i.e., the Answer,

8  Counterclaim, Supplemental Counterclaim, and Fourth-Party Complaint (the "DACA Pleading").

9  (*See* DACA Pldg., Mar. 25, 2012, ECF No. 231).  The Court adopted the magistrate judge's

10  recommendation to strike the answers of Barkett and the Castaic Defendants and to instruct the

11  Clerk to enter default as a sanction for failing to comply with a court order to retain new counsel.

12  The Clerk entered default as to the February 2012 Counterclaim, accordingly.

13  DACA asked the Court to strike Barkett's and the Castaic Defendants' Answer and

14  Counterclaims (ECF No. 247) to the DACA Pleading and also requested a default judgment or

15  offensive summary judgment as to its third-party counterclaims in the DACA Pleading, offensive

16  summary judgment on its fourth-party claims, and defensive summary judgment against

17  Defendants' third-party claims.  The Court struck the answer as against the first counterclaim in

18  the DACA Pleading, but not as against the answers to the second counterclaim and the

19  supplemental counterclaim therein.  The Court granted default judgment in favor of DACA and

20  against Defendants as to DACA's first third-party counterclaim, but not as to its supplemental

21  counterclaim, and the Court solicited a proposed form of judgment from DACA.  The Court

22  dismissed DACA's second third-party counterclaim for appointment of a receiver.  The Court

23  granted offensive summary judgment to DACA's on its Fourth-Party Complaint as against

24  Palisades Capital (NV) LLC, but denied it as against Pond or Merjan.  The Court denied

25  offensive summary judgment to DACA on its supplemental third-party counterclaim against

1   Defendants.  The Court granted in part and denied in part defensive summary judgment to DACA

2   as against Defendants' second third-party claim for declaratory judgment.  The Court granted

3   defensive summary judgment to DACA as against Defendants' seventh third-party claim for

4   slander of title.

5           Plaintiffs asked the Court to dismiss Defendants' counterclaims as against Plaintiffs.  The

6   Court granted the motion.  DACA has now asked the Court for summary judgment in several

7   respects.

8   **II.   SUMMARY JUDGMENT STANDARDS**

9           A court must grant summary judgment when "the movant shows that there is no genuine

10  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

11  Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v.*

12  *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute as to

13  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict

14  for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and

15  dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.

16  Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining summary judgment, a court uses a burden-

17  shifting scheme:

18          When the party moving for summary judgment would bear the burden of proof at
            trial, it must come forward with evidence which would entitle it to a directed verdict
19          if the evidence went uncontroverted at trial. In such a case, the moving party has the
            initial burden of establishing the absence of a genuine issue of fact on each issue
20          material to its case.

21  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

22  and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of

23  proving the claim or defense, the moving party can meet its burden in two ways: (1) by

24  presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

25  demonstrating that the nonmoving party failed to make a showing sufficient to establish an

1    element essential to that party's case on which that party will bear the burden of proof at trial. *See*

2    *Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary

3    judgment must be denied and the court need not consider the nonmoving party's evidence. See

4    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).

5           If the moving party meets its initial burden, the burden then shifts to the opposing party to

6    establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

7    475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). To establish the existence of a

8    factual dispute, the opposing party need not establish a material issue of fact conclusively in its

9    favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to

10   resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec.*

11   *Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party

12   cannot avoid summary judgment by relying solely on conclusory allegations unsupported by

13   facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go

14   beyond the assertions and allegations of the pleadings and set forth specific facts by producing

15   competent evidence that shows a genuine issue for trial. See Fed. R. Civ. P. 56(e); *Celotex Corp.*,

16   477 U.S. at 324.

17          At the summary judgment stage, a court's function is not to weigh the evidence and

18   determine the truth, but to determine whether there is a genuine issue for trial. See *Anderson*, 477

19   U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are

20   to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely

21   colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

22   **III.    ANALYSIS**

23          DACA first asks the Court to grant it offensive summary judgment on its counterclaim

24   for declaratory relief against Defendants that: (1) the nonjudicial foreclosure under the deeds of

25   trust on the Castaic and Castaic II properties, including the respective trustee's sales on

November 13 and 16, 2012, were valid; (2) Defendants have no right to rescind or set aside the foreclosures; and (3) Defendants have no interests in the Castaic or Castaic II properties by virtue of their succession to any interest of any direct lenders.

DACA notes that the Court has already ruled in this case that the deeds of trust are enforceable, (*see* Order 9:19–20, ECF No. 170), and that the then-impending foreclosures were proper, (*see id.* 9:20–21). The Court agrees that these issues are settled, i.e., that the deeds of trust are valid and that foreclosures were therefore generally appropriate. The potential remaining issue is whether the foreclosures were in fact carried out pursuant to California law. DACA has adduced the two trustee's deeds as evidence of the completed trustees sales and notes that the trustee's sales give rise to a rebuttable presumption of the validity of the foreclosure sale under California law. *See* Cal. Civil Code § 2924(c); *Stevens v. Plumas Eureka Annex Mining Co.*, 41 P.2d 927, 928 (Cal. 1935) ("[T]he recital in the deed from trustee to purchaser at the sale, coupled with the other facts in the record, is sufficient to show prima facie that the trustee duly gave notice of sale as required by law and the provisions of the trust deed under the terms of which the sale was had."). Recitations of compliance with applicable foreclosure laws appear in the trustee's deeds in this case. (*See* Castaic Trustee's Deed, ECF No. 337-4, at 62; Castaic II Trustee's Deed, ECF No. 337-4, at 72). DACA notes that under California law, an equitable action by a mortgagor to set aside a foreclosure, even where illegality of the foreclosure can be shown, requires that the mortgagor tender the amount in default, which Defendants have never claimed here. *See Lona v. Citibank*, 134 Cal. Rptr. 3d 922, 633 (Ct. App. 2011). DACA also notes that Defendants have admitted having no direct lender interests in the Castaic loans. (*See* Supplemental Responses to Interrogatories Nos. 5 and 9, 3:21–22, 5:2–4, ECF No. 337-6, at 8, 10). The Court finds that DACA has satisfied its initial burden to show that there is no genuine issue of material fact as to its requested declarations.

In response, Defendants first argue that the motion for summary judgment should be

1    denied because DACA filed no separate statement of undisputed facts under "Local Rule 7056."

2    Defendants presumably mean to refer to Local Rule of Bankruptcy Practice 7056(a). That rule

3    applies only to adversary proceedings. Although jurisdiction in this case is based in part on

4    relation to a bankruptcy case under 28 U.S.C. § 1334(b), the present case is not in fact an

5    adversary proceeding under the Bankruptcy Code but a "regular" civil case. Local Rule of Civil

6    Practice 56-1 requires no separate statement of undisputed facts. Next, Defendants argue the

7    foreclosure sales are void, but they adduce no evidence in support. The only evidence adduced in

8    opposition are Barkett's and Carrie Rowell's brief declarations consisting of irrelevant claims

9    and legal conclusions. There is no evidence of any irregularity in the foreclosure sales. The

10   Court rejects Defendants' arguments that DACA was not permitted to foreclose because it did

11   not have a 100% beneficial interest in the loan. The Court has already ruled that DACA had the

12   right to foreclosure under Nevada's 51% rule. Any minority lenders retain their right to a pro

13   rata share of the proceeds of the foreclosure, but it only takes 51% to make the decision to

14   foreclose. Finally, Defendants point to, but do not produce, an alleged declaration in a

15   bankruptcy case in another district wherein Barkett has attested that either he or entities of which

16   he is the managing member have acquired some beneficial interest in the Castaic and Castaic II

17   deeds of trust. Because the claim of ownership is in the alternative (the alternative being that

18   some entity separate from Barkett has the alleged interest), it would not create a genuine issue of

19   material fact even if it were adduced. Nor is the declaration alleged to indicate that Barkett or

20   others apart from DACA in fact own more than 49% of the interest in any of the loans, which

21   would be the only way for that single piece of evidence to create an issue of material fact that

22   DACA did not have the right to foreclose without one or more other parties' consent.

23   Defendants have not satisfied their shifted burden on summary judgment.

24       Second, DACA asks the Court to grant it offensive summary judgment on its fourth-

25   party claims for declaratory relief against Pond, Merjan, and Palisades that: (1) the nonjudicial

1    foreclosure under the deeds of trust on the Castaic and Castaic II properties, including the

2    respective trustee's sales on November 13 and 16, 2012, were valid; (2) Forth-Party Defendants

3    have no right to rescind or set aside the foreclosures; and (3) Fourth-Party Defendants have no

4    interests in the Castaic or Castaic II properties by virtue of their succession to any interest of any

5    direct lenders.  The Court grants the motion in this respect.  DACA has carried its initial burden

6    on summary judgment on these issues as against any potential objector to the foreclosure, as

7    noted, *supra*, and no Fourth-Party Defendant has responded to attempt to satisfy its shifted

8    burden.

9           Third, DACA asks the Court to grant it defensive summary judgment against all of

10   Defendants' third-party claims.  DACA notes that the Court has already granted it defensive

11   summary judgment as against the second and seventh third-party claims, (*see* Order, ECF No.

12   317), and although it believes the other third-party claims do not apply against DACA, it brings

13   the present motion for defensive summary judgment against those claims "in an abundance of

14   caution."  The Court agrees with DACA's analysis that: (1) the first third-party claim for beach

15   of contract is against Compass as the successor service to USA Commercial; (2) the third third-

16   party claim for interference with prospective economic advantage relates to conduct by those two

17   entities; (3) that the fourth third-party claim for usury is necessarily without merit because, as the

18   Court has stated, Nevada has no usury law; (4) the fifth third-party claim for breach of fiduciary

19   duty expressly applies only against Compass; and (5) the sixth third-party claim for unjust

20   enrichment relates only to fees and charges by Compass.  Defendants present no substantive

21   arguments in response.  The Court therefore grants summary judgment.

22          Finally, DACA asks the Court to enter final judgment on all claims by and against

23   DACA.  The Court grants the request and shall separately enter the Proposed Judgment (ECF No.

24   331) attached to DACA's motion.  Defendants object that the Proposed Judgment would strip

25   minority direct lenders of their interests in the Castaic loans because it would state that the 51%

1  rule permits the assignment of 100% of the interest in fractionalized notes and security

2  instruments upon the consent of 51%. Not so. The 51% rule is not a rule whereby 51% of the

3  owners of the beneficial interest in a loan may assign to themselves the beneficial interests of the

4  minority. This Court has never so ruled, and no party before the Court, including DACA, has

5  ever so argued. The language of the Proposed Judgment is consistent with the law and makes

6  clear that DACA will be the "sole beneficiary of record" under the deeds of trust, but not that it

7  will be the sole beneficiary of the loans. In fact, it makes clear that DACA will be a fiduciary for

8  the minority interest-holders in the Castaic loans, who remain entitled to their pro rata shares of

9  the proceeds of any recovery on those loans. That is consistent with the 51% rule, which

10  prevents minority interest-holders from frustrating action on a loan while protecting their

11  equitable interest in the loan upon a decision by the majority interest-holders to pursue an action.[2]

**CONCLUSION**

13      IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 331) is

14  GRANTED.

15      IT IS SO ORDERED.

16  Dated: This 5th day of January, 2015.

                                    _____
18                                  ROBERT C. JONES
                                    United States District Judge

---

[2]The 51% rule technically requires a supermajority to act. A majority is anything greater than 50%, e.g., 50.1%. The distinction does not present itself in this case.

Page 11 of 11

# EXHIBIT 6

JANET L. CHUBB, ESQ.
Nevada State Bar No. 176
LOUIS M. BUBALA III, ESQ.
Nevada State Bar No. 8974
JONES VARGAS
100 W. Liberty St, 12th Floor
P.O. Box 281
Reno, NV 89504-0281
Telephone: 775-786-5000
Fax: 775-786-1177
Email: jlc@jonesvargas.com
    and    tbw@jonesvargas.com
    and    lbubala@jonesvargas.com

WILLIAM A. BREWER III, ESQ.
Texas State Bar No. 02967035
*Admitted Pro Hac Vice*
MICHAEL J. COLLINS, ESQ.
Texas State Bar No. 00785495
*Admitted Pro Hac Vice*
KENNETH N. HICKOX, JR., ESQ.
Texas State Bar No. 24045194
*Admitted Pro Hac Vice*
ROBERT M. MILLIMET, ESQ.
Texas State Bar No. 24025538
*Admitted Pro Hac Vice*
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas  75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015
Email:  wab@bickelbrewer.com
    mjc@bickelbrewer.com
    kzh@bickelbrewer.com
    rrm@bickelbrewer.com

**Entered on Docket
January 25, 2010**

Attorneys for:
Robert J. Kehl; Ruth Ann Kehl; Robert A. Kehl; Christina "Tina" M. Kehl; Krystina L. Kehl; Daniel J. Kehl; Kevin A. Kehl, individually and on behalf of Susan L. Kehl and Andrew R. Kehl; Patrick J. Anglin; Cynthia A. Winter; Kehl Development Corporation; Judy A. Bonnet; Kevin A. McKee; Pamela J. McKee; Warren Hoffman Family Investments, LP Charles B. Anderson, as trustee of the Charles B. Anderson Trust; Rita P. Anderson, as trustee of the Rita P. Anderson Trust; Baltes Company; Mojave Canyon, Inc., Donna Cangelosi, Tito Castillo, Tony Chaudhry, Jonathan Eller, Robin Graham, Don Hess, Christina Knoles, Arthur Kriss, Joe LaFayette, Janice Lucas, Charles Maraden, Carol Mortenson, Daniel Newman, Edward Schoonover, Carol Simon, Lawrence Tengan, Connie Westbrook, Ken Zawacki, Alfie Fujitani, Walt Musso, Cyril Tammadge, and Robert Fuller
(collectively, the "Direct Lenders")

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br>            Debtor. | Case No. 2:07-CV-892-RCJ-GWF-BASE |
| 3685 SAN FERNANDO LENDERS, LLC, *et al.*,<br>            Plaintiffs,<br>v.<br><br>COMPASS USA SPE LLC, *et al.*,<br>            Defendants**.** | |
| In re:<br><br>ASSET RESOLUTION LLC, et al.,<br>            Debtors.<br>- | Chapter 11<br>    (Jointly Administered under)<br>Case No. BK-S-09-32824-bam<br><br>**ORDER GRANTING MOTIONS TO WITHDRAW REFERENCE** |

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281    Fax: (775) 786-1177
Tel: (775) 786-5000

On January 5, 2010, a hearing was held in the United States District Court, District of Nevada before the Honorable Judge Robert C. Jones in connection with the motions by Certain Direct Lenders to withdraw the reference, in whole or in part, regarding the Asset Resolution LLC, et al., Chapter 11 cases jointly administered under Case No. BK-S-09-32824-bam. Pursuant to 28 U.S.C. § 157(d), FED. R. BANKR. P. 5011, and LR 5011, based on the pleadings and oral argument of counsel, and for all the reasons set forth on the record at the hearing,

IT IS HEREBY ORDERED that the motions to withdraw the reference for the entirety of the above-captioned chapter 11 cases are immediately GRANTED.

IT IS FURTHER ORDERED THAT the case and docket entry numbers shall remain the same, with the exception that the initials following the case numbers shall be changed from "BAM" to "RCJ."

IT IS FURTHER ORDERED THAT all papers and pleadings shall continue to be filed with the clerk for the United States Bankruptcy Court for the District of Nevada.

IT IS FURTHER ORDERED THAT the Federal Rules of Bankruptcy Procedure as well as the Local Rules for the United States Bankruptcy Court for the District of Nevada shall continue to apply to the above-captioned chapter 11 cases.

IT IS FURTHER ORDERED THAT any appeals from orders entered in the above-captioned chapter 11 cases shall be taken directly to the Ninth Circuit Court of Appeals.

IT IS FURTHER ORDERED THAT the adversary complaint filed by Debtors on December 30, 2009 [Doc. #218], shall be assigned a new case number pursuant to further order of the Court.

Dated: _____January 25, 2010_____

_____
THE HONORABLE ROBERT C. JONES
UNITED STATES DISTRICT JUDGE

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

Jones Vargas
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

# CERTIFICATE OF SERVICE

1.   On January 12, 2010, I filed and served the following document(s):

   **[PROPOSED] ORDER GRANTING MOTIONS TO WITHDRAW REFERENCE**

2.   I served the above-named document(s) by the following means to the persons listed below:

■   a.   ECF System (attach the "Notice of Electronic Filing" or list all persons and addresses):

- Joshua S. Akbar
  jakbar@sonnenschein.com
- Mark Albright
  gma@allbrightstoddard.com
- Lindsy Nicole Alleman
  lalleman@fulbright.com
- Michael W. Anglin
  angling@fulbright.com
- Patrick Anglin
  tbw@jonesvargas.com
- Reid L. Ashinoff
  rashinoff@sonnenschein.com
- Anthony W. Austin
  aaustin@lrlaw.com
- Baltes Company
  tbw@jonesvargas.com
- Judy A. Bonnet
  tbw@jonesvargas.com
- Georganne Bradley
  Georganne.bradley@bullivant.com,mary.opatrny@bullivant.com
- Andrew M. Brumby
  abrumby@shutts-law.com
- Louis Martin Bubala, III
  lbubala@jonesvargas.com,bcopeland@jonesvargas.com
- Donna Cangelosi
  mail@asmithlaw.com
- Candace C. Carylon
  ccarlyon@sheacarlyon.com,ltreadway@sheacarlyon.com,
  manthony@sheacarlyon.com,rmsmith@sheacarlyon.com,pdriscoll@sheacarlyon.com
- Rob Charles
  rcharles@lrlaw.com,cjordan@lrlaw.com
- Janet L. Chubb
  tbw@jonesvargas.com
- Terry A. Coffing
  tcoffing@marquisaurbach.com,smong@marquisaurbach.com
- Jamie S. Cogburn
  jsc@cogburnlaw.com,ch@cogburnlaw.com
- Kristin H. Cogburn
  KHC@COGBURNLAW.COM
- Compass Financial Partners, LLC
  georganne.Bradley@bullivant.com
- Compass USA SPE LLC
  Georganne.bradley@bullivant.com
- Robert P. Cummins

1    rpc@cumminslawfirm.com
2    - Louis A. Curcio
     lcurcio@sonnenschein.com,jakbar@sonnenschein.com,JForstot@sonnenschein.com,
     calbanese@sonnenschein.com,rashinoff@sonnenschein.com,
3    kpettapiece@sonnenschein.com,fitzmaurice@sonnenschein.com
     - Kevin A. Darby
4    Kevin@darbylawpractice.com
     - Laurel E. Davis
5    ldavis@fclaw.com,mhurtado@fclaw.com
     - Allan B. Diamond
6    adiamond@diamondmccarthy.com
     - Direct Lenders
7    mail@asmithlaw.com
     - Craig S. Dunlap
8    cdunlap@fclaw.com
     - Brent C. Eckersley
9    beckersley@halelane.com
     - Thomas H. Fell
10   usdcnotices@gordonsilver.com
     - Elizabeth Fielder
11   efielder@jonesvargas.com
     - Arley D. Finley, III
12   tfinley@diamondmccarthy.com
     - Patrick Fitzmaurice
13   Fitzmaurice@sonnenschein.com,yzitelli@sonnenschein.com
     - Jonathan D. Forstot
14   jforstot@tpw.com
     - Louis E. Garfinkel
15   law@lgkattorneys.com,dstrawder@lgkattorneys.com
     - Gregory E. Garman
16   usdcnotices@gordonsilver.com
     - Wade B. Cochnour
17   WBG@h2law.com,bd@h2law.com
     - Gerald M. Gordon
18   gmg@gordonsilver.com
     - Talitha B. Gray
19   usdcnotices@gordonsilver.com
     - Peter W. Guyon
20   pguyon@yahoo.com
     - Joseph P. Hardy
21   jhardy@gordonrees.com,mtwitst@gordonrees.com,wdanhieux@gordonrees.com
     - Brigid M. Higgins
22   usdcnotices@gordonsilver.com
     - Randolph L. Howard
23   rhoward@klnevada.com,ckishi@klnevada.com,usdistrict@klnevada.com
     - C. Stanley Hunterton
24   shunterton@huntertonlaw.com,janallen@huntertonlaw.com
     - Annette W. Jarvis
25   ajarvis@rqn.com
     - Erin E. Jones
26   ejones@diamondmccarthy.com
     - Spencer M. Judd
27   sjudd@albrightstoddard.com
     - Lindsay S. Katz
28   lkatz@tpw.com
     - Kehl Development Corporation

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

tbw@jonesvargas.com

- Dean T. Kirby
  dkirby@kirbymac.com,gsparks@kirbymac.com
- Joanna S. Kishner
  Joanna.kishner@dlapiper.com,usdclv@dlapiper.com,darhyl.kerr@dlapiper.com
- Mitchell J. Langberg
  mlangberg@bhfs.com,orodriguez@bhfs.com
- Cynthia J. Larsen
  clarsen@orrick.com,wpeters@orrick.com
- Kent F. Larsen
  kfl@slwlaw.com,cld@slwlaw.com
- Anne M. Loraditch
  lvlitdock@gtlaw.com,loraditcha@gtlaw.com,koisp@gtlaw.com
- Eric D. Madden
  emadden@diamondmccarthy.com
- Kevin McKee
  tbw@jonesvargas.com
- Pamela McKee
  tbw@jonesvargas.com
- Richard McKnight
  rmcknight@lawlasvegas.com,gkopang@lawlasvegas.com,
  mmcalonis@lawlasvegas.com,dmincin@lawlasvegas.com,cburke@lawlasvegas.com
- McKnight 2000 Family Trust dated 4/20/00
  rmcknight@lawlasvegas.com
- Jeanette E. McPherson
  usdcfilings@s-mlaw.com
- Shawn W. Miller
  smiller@sheacarlyon.com,ltreadway@sheacarlyon.com,rmsmith@sheacarlyon.com,
  aboehmer@sheacarlyon.com
- Douglas M. Monson
  dmonson@rqn.com
- Peter D. Navarro
  pnavarro@klnevada.com,dhoule@klnevada.com
- Nikoll Nikei
  nik@schwartzlawyers.com,ecf@schwartzlawyers.com,sam@schwartzlawyers.com
- Henry H. Oh
  Henry.oh@dlapiper.com
- Bobby L. Olson
  olsonb@gtlaw.com,koisp@gtlaw.com,lvlitdock@gtlaw.com,jenkinsm@gtlaw.com
- Christine Pajak
  cpajak@stutman.com
- Andrew M. Parlen
  aparlen@stutman.com
- Stanley W. Parry
  parrys@ballardspahr.com,waltons@ballardspahr.com
- Jon T. Pearson
  jpearson@fclaw.com
- William Pletcher
  wpletcher@milbank.com
- Norlynn B. Price
  Nprice@fulbright.com,cchiasson@fulbright.com
- Lisa A. Rasmussen
  lisa@lrasmussenlaw.com,tamika@lrasmussenlaw.com,secretary@lrasmussen.com,
  sarah@lrasmussenlaw.com
- Samuel A. Schwartz
  sam@schwartzlawyers.com

- Lenard E. Schwartzer
  jsdcfilings@s-mlaw.com
- James Patrick Shea
  bankruptcyfilings@sheacarlyon.com
- Shlomo S. Sherman
  ssherman@sheacarlyon.com,ltreadway@sheacarlyon.com,
  swinder@sheacarlyon.com, manthony@sheacarlyon.com,rmsmith@sheacarlyon.com
- Betty M. Shumener
  Betty.sumener@dlapiper.com
- Alan R. Smith
  mail@asmithlaw.com,turk@asmithlaw.com,marsh@asmithlaw.com
- Stephanie O. Sparks
  sos@hogefenton.com
- John D. Spurling
  John.spurling@dlapiper.com
- Steven C. Strong
  sstrong@rqn.com
- Jeffrey R. Sylvester
  jeff@sylvesterpolednak.com,jsylvester@sylvestorpolednak.net
- The Lenders Protection Group
  mail@asmithlaw.com
- Warren Hoffman Family Investments, LP
  tbw@jonesvargas.com
- Gabriel M. Weaver
  gweaver@milbank.com
- Gregory L. Wilde
  feddc@wildelaw.com
- Cynthia Winter
  tbw@jonesvargas.com
- Michael Yoder
  myoder@diamondmccarthy.com
- Matthew C. Zirzow
  usdcnotices@gordonsilver.com

☐ b.    United States mail, postage fully prepaid(list persons and addresses):

☐ c.    Personal Service (list persons and addresses):

■ d.    By direct email (as opposed to through the ECF System) (list persons and email addresses):

- JOSEPH C. CORNEAU    jcorneau@klestadt.com
- NATALIE M. COX    ncox@klnevada.com,
  bankruptcy@klnevada.com;kgregos@klnevada.com
- MELANIE A. ELLS    mells@whiteandwetherall.com, ksmith@whiteandwetherall.com
- JAMES D. GREENE    jgreene@rsrslaw.com,
  mkemple@rsrslaw.com;cjorvig@rsrslaw.com;fritchie@rsrslaw.com
- RANDOLPH L. HOWARD    rhoward@klnevada.com,
  ckishi@klnevada.com;bankruptcy@klnevada.com
- TRACY L. KLESTADT    tklestadt@klestadt.com, tklestadt@gmail.com
- NILE LEATHAM    nleatham@klnevada.com,
  ckishi@klnevada.com;bankruptcy@klnevada.com
- CRAIG E. POWER    cpower@cbylaw.com, ahamilton@cbylaw.com

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

- SEAN C. SOUTHARD    ssouthard@klestadt.com
- U.S. TRUSTEE - LV - 11    USTPRegion17.lv.ecf@usdoj.gov
- KATHERINE M. WINDLER    katherine.windler@bryancave.com

☐ e.    By fax transmission (list persons and fax numbers):

☐ f.    By messenger

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 12th day of January 2010.

Tawney Waldo                              /s/Tawney Waldo
Name                                      Signature

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177