LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 7491
**LAW OFFICE OF LISA RASMUSSEN, P.C.**
601 South 10th Street, Suite #100
Las Vegas, NV 89101
Tel.  (702) 471-1436
Fax.  (702) 489-6619
Email: Lisa@LRasmussenLaw.com

*Attorneys for the B&B Settlement Trust*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:   ASSET RESOLUTION, LLC<br><br>Debtor,<br>_____<br> And related cases | Case No. BK-S-09-32824 RCJ<br>(Lead Case)<br><br>**RESPONSE TO DANIEL NEWMAN'S MOTION TO REMOVE CANGELOSI, AND OLSEN FROM THE TRUST ADVISORY COMMITTEE AND MICHAEL COULSON AS TRUSTEE OF THE B&B SETTLEMENT TRUST [ECF 3454]** |

COMES NOW the respondent, B&B Settlement Trust, by and through its counsel, Lisa A. Rasmussen, and hereby responds to the Motion to Remove Donna Cangelosi and Kevin Olsen form the Trust Advisory Committee and to Remove Michael Coulson as Trustee from the B&B DL Settlement Trust. [ECF 3454.]

Counsel for Mr. Newman agreed to a one-week extension to file this Response, an unopposed motion was filed, and this response is timely filed pursuant to that agreement as yesterday was a federal holiday.  [See ECF 3458.]

**I.    Introduction**

Mr. Newman seeks (1) an Order removing Donna Cangelosi and Kevin Olsen from the

1

Trust Advisory Committee; and (2) an Order removing Michael Coulson as Trustee of the B&B DL Settlement Trust. [ECF 3454, page 1.] This Motion was filed on the heels of his Motion asking that he be reinstated to the Trust Advisory Committee, alleging that he was wrongfully removed because he asked for information documenting payments to the undersigned and to Ms. Cangelosi. [*See* ECF 3447.] As the B&B noted in the Response to that motion, the payments to the undersigned, for legal fees, were authorized by this court and the direct lenders as part of the settlement agreement as was the payment to Ms. Cangelosi and any other direct lender who had advanced money for legal fees on behalf of the direct lenders, including Mr. Newman. [*See* ECF 3457.] As such, that Response and the attached Declarations are incorporated herein by this reference.

## II.    There are No Improper Payments by Anyone / To Anyone

Mr. Newman's instant Motion, just like his prior application, are all based on the assumption that there was an improper payment to Donna Cangelosi and that there was an improper payment to the undersigned. Neither are true, as demonstrated in the B&B Settlement Trust's prior Response at ECF 3457. Mr. Newman's motion fails for this reason and must be denied.

As explained ad nauseum, the voting direct lenders authorized repayment to Ms. Cangelosi (and other direct lenders) for any fees advanced to Fulbright and Jaworski, or the undersigned's law firm. The fees paid to the undersigned were a court ordered award of fees against ARC/Silar, which were authorized by the QST to be paid out of monies received from the 2012 settlement. *See* Declaration of Lisa Rasmussen, attached hereto. Mr. Newman should be grateful that neither the undersigned nor Ms. Cangelosi requested interest on the amounts that were due and owing. Instead, he alleges they were improper payments, which they were not.

Furthermore, Mr. Newman asked for, and received, documentation of these payment in December 2015. In late 2019, he has renewed his complaints, which are just as unfounded

today as they were in 2015.

### III. There is No Basis to Remove Cangelosi, Olson or Coulson

Mr. Newman's entire premise for removal is based on payment that were not authorized. Since the payment were authorized, specifically by vote of the settling direct lenders, there is no basis for removal of any of the three persons Newman seeks to have removed – Cangelosi, Olsen, or Coulson.

A December 5, 2012 email was sent to all direct lenders explaining to them that as part of the settlement, they were also expressly authorizing the repayment of legal fees advanced by any direct lender. The persons who voted authorized the repayment. [See Exhibit 1, attached hereto.]  Mr. Newman's argument, that there was no vote, is not a valid argument.

### IV. Removing Cangelosi, Olsen or Coulson would Severely Damage the QST Beneficiaries

Mr. Newman's self-interest in seeing Ms. Cangelosi, Mr. Olsen and Mr. Coulson should not be overlooked. He wants to be reinstated as a member of the Trust Advisory Committee, as this court can glean from his prior Motion [ECF 3447]. Reinstating him is not in the best interest of the QST, nor is it desirable given the amount of work that has been done to correct errors that he previously made and efforts that he has made to interfere with legal counsel. [See ECF 3457, Response to Motion to Reinstate.]

Nonetheless, assuming *arguendo* that Mr. Newman were not reinstated and that entirely new people were appointed, that appointment would have to be done by vote of the direct lenders, not by request to the court by Mr. Newman. Then, the issue is who would take over and how much time and effort would it take for someone to get up to speed on the remaining affairs of the QST. The entire replacement of the TAC members and Mr. Coulson as Trustee of the QST would cost the beneficiaries to the QST not less than $500,000. This is not in the

best interest of a single beneficiary to the QST, including Mr. Newman.

Ms. Cangelosi has not only worked to maximize the benefits to the QST beneficiaries, she works to maximize the benefits to the ARC Estate.  *See* Declarations of Lisa Rasmussen and William Leonard.   Removing her would work to the detriment of everyone.  The parties are trying to wind down the assets of this case, not delay resolution.  No person or beneficiary, other than Mr. Newman, wants this outcome.

### V.     The QST will Request Legal Fees from Mr. Newman if he Continues to File Frivolous Motions

Mr. Newman has a history of filing actions that cost time and resources and legal fees to litigate.  For example, his previous efforts related to Castaic Investors, his attempts to remove the undersigned and myriad other issues, cost those direct lenders well over $25,000.  See Declaration of Lisa Rasmussen.   This does not include the time of the various volunteer direct lenders who have, over the years, responded to Mr. Newman's demands that have come and gone, only to resurface years later.

Mr. Newman has, at times, contributed to the efforts of the direct lenders in a positive manner.   In contrast, his unyielding attacks on the undersigned, Ms. Cangelosi, Mr. Coulson and Ms. St. John, including the instant round of attacks filed in August and September of 2019 are borderline frivolous.  This is because Mr. Newman requested the information about the payments in 2015 and he received the information he requested in 2015.  Four years later, literally out of the blue, he wants to be reinstated to the Trust Advisory Committee and he complains of payments that were explained to him in 2015.

While the QST is not asking for legal fees at this time, it will not hesitate to do so in the future.

4

## CONCLUSION

For each of the reasons set forth herein, it is respectfully requested that Mr. Newman's Motion to Remove Ms. Cangelosi, Mr. Olsen and Mr. Coulson be denied.

Respectfully submitted this 15th day of October 2019,

**LAW OFFICE OF LISA RASMUSSEN, P.C.**

*/s/ Lisa A. Rasmussen*
**LISA A. RASMUSSEN, ESQ.** (NV Bar No. 7491)
601 South 10th Street, Suite #100
Las Vegas, NV 89101

*Attorneys for the B&B Settlement Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October 2019, I served a copy of the foregoing, RESPONSE TO MOTION TO REMOVE (ECF 3454) upon all persons registered to receive filings in this case via CM/ECF, including, but not limited to:

David Clark, Esq.
Counsel for Daniel Newman

*/s/ Lisa A. Rasmussen*
An Employee of Law Office of Lisa Rasmussen, PC

5

# Exhibit 1

Exhibit 1

---------- Forwarded message ---------
From: **Direct Lender22** <directlender22@gmail.com>
Date: Wed, Dec 5, 2012 at 11:20 PM
Subject: WE NEED YOUR VOTE TO DISTRIBUTE THE SETTLEMENT $$
To: <dcangelosi@gmail.com>

Having trouble viewing this email? Click here

# SILAR/ARC SETTLEMENT  $$

## PROPOSED DISTRIBUTION METHODOLOGY
and

## HOW TO VOTE

**WE NEED YOUR VOTE.  THE FASTER YOU VOTE, THE FASTER  THE SETTLEMENT MONEY CAN BE DISTRIBUTED, IF APPROVED BY THE B&B DLS.**

1

**VOTING IS SIMPLE BECAUSE YOU CAN VOTE BY EMAIL.  TO VOTE, PLEASE FOLLOW THE SIMPLE INSTRUCTIONS BELOW.  WE ARE PROVIDING YOUR ACCOUNT NUMBER TO INCLUDE IN YOU EMAIL VOTE IMMEDIATELY BELOW.**

**YOUR ACCOUNT NUMBER IS: P-1230**

**TO VOTE BY  REPLY EMAIL, PLEASE STATE:**

**"I \_\_\_\_\_NAME\_\_\_\_, ACCOUNT #   APPROVE OR DISAPPROVE THE PROPOSED SETTLEMENT DISTRIBUTION METHODOLOGY"**

**BELOW, PLEASE FIND THE PROPOSED VOTING METHODOLOGY WITH EXHIBITS.
PLEASE VOTE TODAY.**

**THANK YOU**

*Dear Bickel and Brewer Direct Lenders ("B&B DLs"):*

*Please take some time to read this communication in its' entirety.*

## *SETTLEMENT FUNDS DISTRIBUTION METHODOLOGY*

*The purpose of this communication is to discuss a proposed methodology for the distribution of the Settlement Funds received from the closing of the Settlement Agreement with Silar, the Asset Resolution Trustee, and Boris Piskun. B&B cannot take sides between its clients on the issue of how to distribute the Settlement Funds between all its direct lender clients. Thus, not only does B&B have no involvement in the determination of the settlement distribution methodology, but only the B&B DLs can determine how to distribute the Settlement Funds amongst themselves. Upon agreement by more than 51% of the B&B DLs (as calculated by beneficial loan interest), B&B will be authorized to immediately distribute the lump sum*

2

*Settlement Funds received from the approximately $6.2 million in cash received from Silar and Piskun under the Settlement Agreement. Once a settlement distribution methodology is agreed upon by more than 51% of the beneficial interest of B&B DLs, then B&B should be able to get your checks out to you within 5 days thereafter. An agreed-upon settlement distribution methodology will also apply to any future distributions to be realized from the Asset Resolution estate's liquid and illiquid assets (for example, from the liquidation of its DL interests in outstanding USACM loans) which the estate could distribute once it's outstanding proof of claims are resolved.*

*This communication is broken down into three parts. Please review it carefully to get the background and understanding you will need to vote. Note that there will be no conference calls with B&B to discuss this, for the reason previously discussed.*

*The first part is the tortured historical journey down memory lane so you can understand the foundation behind this proposed settlement distribution methodology.*

*The second part is the actual proposed settlement distribution methodology, along with an example. This example is approximate and representative of the distribution, if approved. The actual numbers may change. The proposed settlement distribution methodology is the work of several of your fellow B&B DLs, who have tried to reach as just a distribution methodology as possible.*

## *Pertinent Litigation History*

*In 2007 several Direct Lenders recognized that Compass, the successful purchaser of the USACM loan servicing rights, intended to take for itself large fees for the servicing of the loans from loan proceeds, even though the payment of those fees were obligations of the borrowers. The Compass position was that those fees, if not paid by the borrowers, were to be paid from the DLs' principal investment. Alan R. Smith, an attorney in Reno, was hired to protect the DLs' interests and ==the Lender Protection Group was formed. To fund the Smith law firm, numerous Direct Lenders contributed money. For those contributing DLs, this created a further hardship to their loss of income. Some contributed $10/month for many months, others sent in lump sum payments.== These people recognized the importance of protecting the DLs against the Compass fees position and were willing to assist in the effort to stand up to Compass. As predicted, Compass began its campaign to take borrower payments for themselves and*

3

*hide loan payoff amounts to cover its claimed fees. In June 2007, the Lenders Protection Group brought the first legal actions against Compass, requesting that the court rule on the compensation Compass was due under the loan servicing agreements, seeking the court's permission to terminate Compass as loan servicer, and commenced a lawsuit (the 892 Case) against Compass.*

*Immediately, Compass dragged the DLs back in front of Judge Reigle, who had approved and was protective of the Compass' purchase and their rights to service USACM's loans. The Lenders Protection Group succeeded in having the case removed from Judge Reigle to the Federal District Court (Judge Jones). ==In the summer of 2007, it was apparent that Compass was going to fight hard and dirty. The DLs needed more firepower. Fulbright & Jaworski, a well-respected and premier firm in the loan servicing world, was hired.== The Fulbright compensation was based upon the DLs' assignments of their loan interests into LLCs, and then Fulbright was to receive a fixed amount from each loan. In November 2007, Judge Jones entered a Preliminary Injunction that stopped the DLs from terminating Compass, but required that Compass to escrow all "disputed" fees on loans that it liquidated.*

*From the period that Compass took over servicing to the time they were foreclosed into Asset Resolution by Silar, Compass monetized 8 loans and that money was partially or fully distributed to the DLs in those loans. Any disputed waterfall fees, however, were escrowed until further order of the court. Each of these loans paid off more than the original principal investment. In the Standard Property loan, for example, the borrower paid principal and interest. Compass, however, misrepresented the payoff and took the interest payment for itself while the DLs got all their principal back. In 2 other loans (Wasco and Clear Creek), the DLs got all their money back - principal plus interest. In the 5 other loans (La Hacienda, San Fernando, Bar USA, Shamrock, and Bay Pompano), disputed fees were held while the DLs got a significant portion of their original investment back. The disputed fees were for claimed servicing fees, default interest, and late fees and became known as the "waterfall".*

*From 2008 to 2009, the Direct Lenders were under either a litigation standstill agreement or Tom Grimmett, the court-appointed receiver. The standstill came about because Compass had sued many Direct Lenders. Fulbright, failing to protect the LLC structure that had been formed was the means to its compensation, became concerned they would not be paid and expressed an intent to withdraw and not*

4

*defend the sued Direct Lenders (your loan captains). Therefore, the standstill was the only solution to protect the DLs and determine if settlement was possible.*

*Compass proposed an outrageous settlement agreement and certain Direct Lenders again sought alternate servicing and litigation solutions. In April 2008, Judge Jones stopped the DLs again from terminating Compass and imposed receiver Grimmett on the DLs. Judge Jones also placed several chilling injunctions on the DLs, which caused the organizers of the Lenders Protection Group to go underground to continue to protect the DLs. Fulbright applied to be special counsel to Grimmett, believing this was a way to get payment and virtually abandoned their DL clients, who now had no counsel and had been sued by Compass.*

*At the end of September 2008, Silar created Asset Resolution, foreclosed Compass, and assigned all of Compass's assets purchased from USACM into Asset Resolution. Silar entered into settlement discussions with Grimmett, which ultimately failed when not only the DLs rejected it, but the judge also did.*

*In the meantime, certain Direct Lenders determined that several issues needed to be appealed to the 9th Circuit Court of Appeals if the DLs were ever to prevail: (1) the stomping of the DLs' first amendment rights to organize; (2) the legality of the November 2007 Preliminary Injunction Order ; and (3) motions expressing concern over the judge being fair and impartial. ==Another round of DL funding was sought to hire Lisa Rasmussen to advance these issues and make the 9th Circuit aware of the DLs' plight. Again, Direct Lenders dug deep into their pockets to find some money to fund this effort. In reality, these very aggressive filings by Lisa Rasmussen were the start of a turning point in the Nevada District courtroom.== The DLs were not going to quit. Knowing that Rasmussen as a sole lawyer would not be able to carry this complex litigation alone and that the DLs had no ability to pay her going forward, certain DLs looked for contingency representation as a way for the DLs to pursue expensive and very complicated litigation despite their inability to pay. In the spring of 2009, Bickel & Brewer agreed to take the DLs' case under a full contingency agreement, which contained two compensation components since the DLs had two ways to win: (1) for a win on the waterfall, B&B would be paid 35% of savings against a schedule of loan waterfall fees computed from the rejected settlement agreement; and (2) for a win on damages, B&B was to be paid 50% of any damages which resulted from the litigation.*

*In the summer of 2009, in addition to pursuing successful litigation maneuvers undertaken regarding the waterfall, B&B won the rights of the Gess DLs to stop a forced sale of the Gess property, an action brought by Silar and Asset Resolution and formed a joint venture with the prospective buyer. For the first time, the court clearly saw the issues of the DLs relating to the Compass/Silar/Asset Resolution claimed "waterfall" fees. The DLs won the first positive rulings in the case regarding compensation under the USACM loan servicing agreements.*

*In the fall of 2009, Asset Resolution and 14 loan SPEs (the foreclosed loans) filed for bankruptcy protection in New York. After B&B won the right to transfer those bankruptcy cases to Nevada, Judge Jones agreed with B&B that he should take control of the bankruptcy cases. He then sanctioned the attorneys and Silar for attempting to "waltz around" his waterfall and Gess rulings by filing the bankruptcy cases in New York. The Asset Resolution bankruptcy cases did have some benefit in that the automatic stay stopped some tax sales. Today, the bankruptcy cases continue to provide that value to some properties.*

*In January 2010, B&B won the right to terminate Compass/Silar/Asset Resolution as the loan servicer under the USACM loan servicing agreement and to have certain injunctions removed. Cross FLS picked up the servicing for 22 loans. Others remained with the Asset Resolution trustee; Marlton was picked up by David Rentz; Palm Harbor was picked up by Pathfinder; and Brookmere had already been assigned to Tom Grimmett, the receiver.*

*In the summer of 2010, B&B obtained a ruling from Judge Jones to have the escrowed disputed waterfall money released for six loans: Bay Pompano, La Hacienda, Bar USA, Shamrock, San Fernando, and Anchor B. The DLs in those loans realized the win on the waterfall which enabled them to get just about all their principal back and more (other than Anchor B). Anchor B received very little money as it was sold as a "fire sale".The Anchor B DLs were significantly harmed. At the end of 2010, B&B obtained a jury verdict for damages against Silar/Asset Resolution/Compass/Piskun/Blatt in excess of $5 million for 52 DLs.*

*In 2010, Rasmussen filed a very aggressive "order to show cause" for improper accountings for money Asset Resolution/Silar/Compass received on certain liquidated loans, alleging the money was missing. Rather than litigate (and face the ire of Judge Jones), Silar remitted*

6

*the money to B&B. That over $1.3 million was later paid to the B&B DLs as part of their Settlement Agreement with Silar.*

*As we all know, in the fall of 2012, the Settlement Agreement was finalized and approved by Judge Jones, giving a lump sum cash payment of approximately $6.2 million to the B&B DLs, Silar's equity interest in the Asset Resolution bankruptcy estate, low interest loans to save some of the outstanding assets, and forgiveness of paid servicer advances by Compass/Silar/Asset Resolution. The B&B DLs were also offered the opportunity to join the Claims Recovery Trust, which was formed by the Settlement Agreement and provides for the opportunity to pursue litigation claims against certain professionals and others who have also harmed the DLs, as well as provides for foreclosure/litigation services for outstanding loans.*

*Today, many loans remain unresolved or, worse, have been wiped out or sold for very little money.Gramercy was sold under a forced sale, causing the DLs to lose significant value they otherwise could have realized had they just been able to hang on another year.Loan where no servicer advances were funded to pay taxes or other property protective issues clearly will realize little or no return.Those loans that Cross FLS liquidated on average are retuning $.10 on the invested dollar as no protective advances were made. DLs in these loans, along with the ones that have been lost to foreclosure, have been harmed the most. Marlton and Palm Harbor however have received the proper funding and those DLs appear to face better prospects in those loans, however the outcome still remains unknown.Therefore, the proposed settlement distribution methodology favors those with the most damage - loans with significantly diminished returns, loans with unknown prospects, or loans that have been wiped out due to the DLs' inability to terminate Compass in 2007. Loans where the DLs came out whole, or close to whole based on the waterfall win by B&B, are not considered in the proposed settlement distribution methodology.While the Standard Property DLs did get 100% of their principal, their interest was stolen by Compass, so the amount of that interest ($893K) is being included as the qualifying amount for the Standard DLs.*

## *THE PROPOSED SETTLEMENT DISTRIBUTION METHODOLOGY*

*THE GOAL OF THE PROPOSED SETTLEMENT DISTRIBUTION METHODOLOGY*
*IS FAIRNESS AND SIMPLICITY.*

*All 52 loans that Compass originally assumed the servicing rights for have been examined. That loan list has been reduced by loans which fall under the following categories: (a) loans where principal was paid in full or more, or close to full principal or loans that Compass either never serviced or where the servicing was assumed by DACA or Platinum properties (Exhibit A);. The remaining loan list (Exhibit B) contains the loans that are included in this proposed settlement distribution methodology.*

*CLICK ON THE RED LINK TO OBTAIN EXHIBIT A & B.*
*Both pages are exhibits are contained in the link.*

# **EXHIBITS A & B**

*Under the proposed settlement distribution methodology, all B&B DLs holding an interest in the loans on Exhibit B have been aggregated by their total original principal balance for any and all such loans. Each B&B DL's aggregated total is then combined with all other B&B DLs' aggregated totals to arrive at a total portfolio calculation (in other words, the sum total of all such B&B DLs' loan interests on Exhibit C, as calculated by original principal balance (except Standard Property). Each B&B DL's pro rata or fractional share of the total portfolio calculation is then determined by dividing each B&B DL's aggregate total by the total portfolio calculation. That pro rata or fractional share is then multiplied by the gross settlement dollars to come up with each B&B DL's gross proposed settlement proceeds.*

*Legal Fee allocation:*

*Each B&B DL's gross proposed settlement proceeds then becomes the basis for the B&B contingency fee allocation. 50% of the gross proposed settlement proceeds is subtracted and paid to B&B for its legal services according to the engagement agreement.Next , the expenses which B&B incurred are then allocated out pro-rata. B&B has agreed to waive a significant portion of the expenses they are entitled to under their engagement agreement. While their expenses equal almost $600,000, they have agreed to concede all but approximately $75,000.*

==*Then, the total dollars paid to the Lenders Protection Group and Rasmussen (LPG Expenses) are allocated as an expense across the Total Portfolio Calculation pro-rata for each B&B DL. Those who contributed to LPG Expenses should end up with a credit for their contribution. Those who did not contribute are being asked to reimburse a small amount to those who funded the LPG Expenses, as these contributions were essential and valuable dollars to our success. Without these contributions, you may not be receiving any settlement dollars and would likely have had no return of money from your loans.*==

*<u>Example:</u>*
*John Smith had investments in Shamrock, Standard Property, Gramercy, Lake Helen Partners, Fiesta Stoneridge, and Lerin Hills - each for $50,000. John Smith also contributed $700 to the LPG Expenses.*

*Shamrock was paid in full. Therefore, it does not qualify for any Settlement Funds.*

*Standard Property was paid in full - however, Compass stole $893K in collected interest that was undisclosed to the DLs. Therefore, John is being credited with his pro rata portion of the $893K to his Total Portfolio calculation or $4,465 for Standard Property.*

*Gramercy (low recovery) and Lake Helen (no recovery and unresolved) and Lerin Hills (no recovery and wiped out) are on Exhibit B. Therefore, John gets $150,000 (3 loans with $50K investment each) added to his Total Portfolio calculation.*

*Fiesta Stoneridge servicing was assumed by DACA. Therefore, Compass is not responsible for losses, if any, nor did B&B ever collect any fees from the payment of these loans assumed by DACA/Platinum.*

*John Smith's additional Aggregated total investment is $154,465 which will now be added to the totals of all other B&B DLs' Aggregated Total investments for a Total Portfolio Calculation of $252,000,000 (this number is just an example, but very much in the ballpark.) John Smith's fractional interest of the Total Portfolio Calculation is: 0.0612956.*

9

*The available Settlement Funds are approximately $5.8 Million at this time (subject to some adjustment). There are certain holdbacks mandated until the Settlement Trust organization and the valuation of the Asset Resolution estate's illiquid assets has been completed.It is anticipated that sometime in the first half of next year, another distribution will be made to you after certain claims are settled with the Asset Resolution estate and the valuation has been completed.B&B has agreed to further compromise a portion of their fees on that distribution.*

*Based on John Smith's pro rata or fractional interest in the Total Portfolio Calculation, his gross proposed settlement proceeds would be approximately $3,555.14. B&B's contingency fee is 50% of that sum, or $1,777.57His portion of the $75K legal expenses equals approximately $46.65.*

*John Smith's expense allocation for the Lenders Protection Group's and Rasmussen's legal fees would be approximately $209.17 and he would be credited with his payment of $700.00. (At this point, the B&B DLs' total legal fees paid for Rasmussen and the Lenders Protection Group appear to be approximately $341,254.)*
*John Smith would receive the following:*

*Gross Distribution$3,555.14*
*B&B Fees($1,777.57)*
*Reimbursed Legal Fees($ 46.65)*
*LPG Expense($209.17)*
*Credit Expense $700.00*
*Admin (check & 1099 exp)($45.00)*
*Net John Smith Distribution$2,176.25*
(Sorry if the formatting for the numbers screwed up!)

*The above numbers are approximate but are a representative sample of the proposed settlement distribution methodology. Please take some time to review this.*

*Due to the length of this communication, an explanation of how to vote for or against this proposed settlement distribution methodology will be sent separately.*

*If 51% of the beneficial interest of the Total Portfolio Calculation or approximately $127 Million in B&B DL beneficial interest approves this proposal, then checks will be immediately prepared for distribution. The money is there and ready for distribution and could*

*be distributed within 5 days of an approved settlement distribution methodology.*

*We appreciate your patience during this process. The goal is to get you money before Christmas - if approved. Thank you.*

Sincerely,

The DL Communications Team
Direct Lender 22

Direct Lender 22
Direct Lender Group
Salt Lake City, Utah 84117

**Forward this email**

 

This email was sent to dcangelosi@gmail.com by directlender22@gmail.com |
Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.
Direct Lender 22 | Direct Lender Group | PIO Box 171131 | Salt Lake City | UT | 84117

--
Donna Cangelosi

The contents of this electronic mail message and any attachments are confidential, possible privileged and intended for the address(s) only. Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.